# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARTIN GALLEGOS,

     Plaintiff,

vs.                                 No. CIV 16-0127 JB/WPL

BERNALILLO COUNTY BOARD OF
COMMISSIONERS; BERNALILLO COUNTY
DETENTION CENTER; NEW MEXICO
DEPARTMENT OF CORRECTIONS, and
JOHN DOES 1 through 5,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant New Mexico Department of Corrections' Motion for Summary Judgment and Memorandum Brief in Support Thereof, filed April 7, 2017 (Doc. 67)("MSJ"); and (ii) the Plaintiff's Motion to File a Second Amended Complaint, filed February 17, 2017 (Doc. 58)("Motion to Amend"). The Court held a hearing on June 2, 2017. The primary issues are: (i) whether Defendant New Mexico Department of Corrections is entitled to summary judgment, because the New Mexico Corrections Department enjoys sovereign immunity from Plaintiff Martin Gallegos' suit, including Gallegos' state tort claim and his 42 U.S.C. § 1983 claim that the New Mexico Corrections Department inflicted cruel and unusual punishment on him in violation of the Eighth Amendment to the Constitution of the United States of America by receiving him into custody such that Gallegos was without methadone; (ii) whether the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to -30 ("NMTCA"), waives the New Mexico Corrections Department's Eleventh Amendment immunity from Gallegos' state tort claims for receiving him into custody such that Gallegos was without methadone; (iii) whether § 41-4-6(A)'s waiver provision does not apply, because the

New Mexico Corrections Department failed to implement a safety policy regarding the provision of methadone necessary to protect those who use the building that housed Gallegos; (iv) whether § 41-4-6(A)'s waiver provision does not apply, because Gallegos' state tort claim is predicated on a single, discrete administrative act affecting only himself; (v) whether Gallegos' proposed amendment to add Mr. James Brewster, the New Mexico Corrections Department's General Counsel, is futile, because Mr. Brewster is immune from Gallegos' claims to the extent that they are based on Brewster's enforcement of facially-valid court orders; and (vi) whether the Court should deny Gallegos' proposed amendment to add Mr. Brewster as a defendant as futile, because Mr. Brewster was neither negligent nor deliberately indifferent to Gallegos' withdrawal symptoms.

The Court concludes that: (i) the New Mexico Corrections Department is entitled to summary judgment on Gallegos' claims, because the New Mexico Corrections Department enjoys sovereign immunity from Gallegos' suit; (ii) the NMTCA does not waive the New Mexico Corrections Department's Eleventh Amendment immunity from Gallegos' state tort claim; (iii) even if the NMTCA waives the New Mexico Corrections Department's Eleventh Amendment immunity from Gallegos' state tort claim, § 41-4-6(A)'s waiver provision does not apply, because Gallegos has not sufficiently demonstrated that the New Mexico Corrections Department failed to implement a safety policy necessary to protect those who use the building that housed him; (iv) even if the NMTCA waives the New Mexico Corrections Department's Eleventh Amendment immunity to Gallegos' state tort claims, § 41-4-6(A)'s waiver provision does not apply, because § 41-4-6(A) does not waive the New Mexico Corrections Department's immunity from Gallegos' state tort claim to the extent that Gallegos' state tort claim is predicated on a single, discrete administrative act affecting only himself; (v) Gallegos' proposed

amendment to add Mr. Brewster as a defendant is futile, because Mr. Brewster is immune from Gallegos' claims to the extent that Gallegos' claims are based on Mr. Brewster's enforcement of facially valid court orders; and (vi) Gallegos' proposed amendment to add Mr. Brewster as a defendant is futile, because Mr. Brewster was neither negligent nor deliberately indifferent to Gallegos' withdrawal symptoms. Accordingly, the Court grants the MSJ and denies in part the Motion to Amend to the extent that Gallegos proposes to add Mr. Brewster as a defendant.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' assertions of undisputed material fact in their summary judgment motion papers. See MSJ ¶¶ 1-12, at 2-4; Plaintiff's Response to Defendant New Mexico Department of Corrections Motion for Summary Judgment ¶¶ 13-26, at 1-4, filed April 24, 2017 (Doc. 68)("Response); Reply to Plaintiff's Response to Defendant New Mexico Department of Corrections' Motion for Summary Judgment and Memorandum Brief in Support Thereof ¶¶ 13-26, at 1-4, filed May 8, 2017 (Doc. 69)("Reply").

**1.    Gallegos' Remand to the Metropolitan Detention Center and Subsequent Transfer to the New Mexico Corrections Department.**

On November 6, 2014, the Honorable Michael Martinez, District Court Judge Pro Tem for the Second Judicial District Court, County of Bernalillo, State of New Mexico, remanded Gallegos to the Metropolitan Detention Center ("MDC") in Albuquerque, New Mexico. See MSJ ¶ 1, at 2 (asserting this fact); Response at 1 (admitting this fact). See also Order Remanding Defendant to Metropolitan Detention Center (MDC) ¶ 3A, at 1 (filed in state court on November 6, 2014), filed in federal court on April 7, 2017 (Doc. 67-1)("Remand Order").[1] The Remand

_____

[1]In the Response, Gallegos asserts that he "was remanded to Metropolitan Detention Center ('MDC') according to a 'Titration Order,'" which Gallegos alleges was "scanned to MDC." Response ¶ 14, at 1-2 (internal quotation marks omitted). Gallegos asserts that the remand order stated: (i) that Gallegos "shall be remanded to the Metropolitan Detention Center";

- 3 -

Order states that Gallegos shall remain in the MDC's custody "until his level of methadone[2] treatment has reached a point where he will not incur life-endangering withdrawal symptoms upon transfer" to the New Mexico Corrections Department.  MSJ ¶ 1, at 2 (asserting this fact). See Response at 1 (admitting this fact); Remand Order ¶ 3.C, at 1-2.  Gallegos asserts that "[i]t is clear that the Titration[3] orders such as these were used frequently, by the District Court, for people who were on methadone."  Response ¶ 21, at 3 (citing Deposition of Douglas Wilber at 32:18-33:1; id. at 33:10-25 (taken February 9, 2017)(Lawless, Wilber), filed April 7, 2016 (Doc. 68-1)("Wilber Depo.").  See Reply ¶ 21, at 3 (not disputing the factual allegation).[4]  The court

<hr>

(ii) that Gallegos "shall be enrolled and participate in the Methadone Program at the Metropolitan Detention Center (MDC) in order to decrease his levels of dependency"; and (iii) that Gallegos "shall remain in custody of the Metropolitan Detention Center (MDC) until his level of methadone treatment has reached a point where [Gallegos] will not incur life-endangering withdrawal symptoms upon transfer to the Department of Corrections, where he is to serve the remainder of his sentence."  Response ¶ 14, at 2 (emphasis in original).  See Remand Order ¶ 3, at 1.  In reply to these allegations, the Department of Corrections "admits that there was an Order Remanding Defendant to Metropolitan Detention Center . . . ."  Reply ¶ 14, at 1. See Remand Order ¶ 3, at 1.  Thus, the parties do not dispute that there is a Remand Order remanding Gallegos to MDC.

> [2]Methadone, sold under the brand name Dolophine, among others, is an opioid used to treat pain and/or as maintenance therapy or to help with tapering in people with opioid dependence.  Detoxification using methadone can either be done relatively rapidly in less than a month or gradually over as long as six months.  While a single dose has a rapid effect, maximum effect can take five days of use.  The effects last about six hours after a single dose and a day and a half after long-term use in people with normal liver function.  Methadone is almost always taken by mouth and rarely by injection into a muscle or vein.

"Methadone," Wikipedia, https://en.wikipedia.org/wiki/Methadone (last viewed, June 21, 2017).

[3]A titration is the "continual adjustment of a dose based on patient response.  Dosages are adjusted until the desired effect is achieved."  titration dose, Medical Dictionary for the Health Professions and Nursing (2012), http://medical-dictionary.thefreedictionary.com/titration+dose (last viewed June 22, 2017).

[4]Although the New Mexico Corrections Department does not specifically dispute the factual allegation that the state court frequently enters titration orders, the New Mexico

filed the Remand Order on November 6, 2014. <u>See</u> Remand Order at 1.[5] The Remand Order

states that it was to remain in effect for six weeks at maximum. <u>See</u> MSJ ¶ 1, at 2 (asserting this

fact); Response at 1 (admitting this fact). <u>See also</u> Remand Order at ¶ 4, at 2.

---

Corrections Department "denies that Mr. Wilber's deposition testimony provides support for the
statement." Reply ¶ 21, at 3. Mr. Wilber's deposition testimony provides:

> Q. Titration orders, you mentioned that you've been involved in some.

> A. Yes.

> Q. What about -- but you also mentioned that probation violation sees a lot of these. Is that a fair statement?

> A. Yeah. In our -- in the probation violation courtroom, they are entered on what I would say is a pretty regular basis.

> Q. And do they all occur the same way? In other words, the judge enters an order sending somebody to the Department of Corrections and then enters an order saying don't sent them until this titration order is completed? . . . As far as you can recall.

> A. I would say that yes, in general, in my experience, that's how it works. That's kind of the only reason for a titration order generally, because of that specific situation, what we call a titration order, I don't know if it's really a common term. It's how we refer to them in our office. And so it's almost a probation-specific term, but yes.

> Q. So they go in the same day -- here's the sentence to DOC -- and then hold it for a while because there is a titration order to get them to reduce methadone dependency, is that fair?

> A. I would say that's normally how it works. I think sometimes the titration order might get entered later if the issue isn't discovered until maybe the day after the sentencing. But usually it's the intent to have them entered together.

Wilber Depo. 32:18-33:25 (Lawless, Wilber). Accordingly, the Court deems the fact that the
state court frequently enters titration orders as undisputed. <u>See</u> D.N.M.L.R.-Civ. 56.1(b)("All
material facts set forth in the Response will be deemed undisputed unless specifically
controverted.").

[5]<u>See</u> Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it
may consider other materials in the record.").

On November 7, 2014, Judge Martinez committed Gallegos to the New Mexico Corrections Department. See MSJ ¶ 2, at 2 (asserting this fact); Response at 1 (admitting this fact). The state court sentenced Gallegos to serve an 834-day term in the New Mexico Corrections Department, beginning on November 6, 2014. See MSJ ¶¶ 2-3, at 2 (asserting this fact); Response at 1 (admitting this fact); Response ¶ 16, at 2 (asserting this fact); Reply ¶ 16, at 2 (admitting this fact). See also First Order Revoking Probation at 2, filed in state court on November 6, 2014, filed in federal court on April 7, 2017 (Doc. 67-2)("First Order Revoking Probation"); Judgment, Sentence, and Order Suspending Sentence, filed in state court on November 7, 2017, filed in federal court on April 7, 2017 (Doc. 67-3)("State Court Judgment, Sentence, and Order Suspending Sentence"). "On page two of the [probation revocation] order, the space entitled 'MDC' is crossed out and there is a handwritten note that says 'No MDC.'" MSJ ¶ 2, at 2 (alteration added)(asserting this fact)(quoting First Order Revoking Probation at 2); Response at 1 (admitting this fact). "[T]he Titration Order [i.e., the Remand Order] was signed out [sic] the same day as" the First Order Revoking Probation and the State Court Judgment, Sentence, and Order Suspending Sentence -- November 6, 2014. Response ¶ 15, at 2 (asserting this fact). See Reply ¶ 15, at 2 (not disputing this fact).[6] The New Mexico Corrections Department received Gallegos from the Bernalillo County Sheriff's Department on November 12, 2014, at 9:00 a.m. See MSJ ¶ 4, at 2 (asserting this fact); Response at 1 (admitting this fact).

---

[6]The New Mexico Corrections Department admits that the Remand Order; the First Order Revoking Probation; and the State Court Judgment, Sentence, and Order Suspending Sentence "appear to all have been signed by Judge Martinez on the same day, November 6, 2014." Reply ¶ 15, at 2 (asserting this fact). The New Mexico Corrections Department maintains, however, that the state court filed only the Remand Order on November 6, 2014. See Reply ¶ 15, at 2 (asserting this fact). See also Remand Order at 1. The Court deems that fact undisputed. See Remand Order at 1; First Order Revoking Probation at 1; State Court Judgment, Sentence, and Order Suspending Sentence at 1. See also Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").

See also New Mexico Corrections Department Receipt of State Prisoner, filed April 7, 2017 (Doc. 67-4). Gallegos received a methadone dose on the day that he was transferred from MDC to the New Mexico Corrections Department. See Response ¶ 22, at 3 (alleging this fact); Reply ¶ 22, at 3 (alleging this fact).[7]

## 2. Discussions Between Gallegos' Counsel and the New Mexico Corrections Department Concerning Gallegos' Treatment.

Mr. Douglas Wilber, Gallegos' counsel in the state criminal matter, "was notified that [Gallegos] was no longer at MDC and had been transferred." Response ¶ 17, at 2 (citing Wilber Depo. at 9:1-25 (Wilber). See Reply ¶ 17, at 2 (not contesting this assertion). Mr. Wilber then contacted the New Mexico Corrections Department, because, according to Mr. Wilber, "we had [an] entered order that I thought would take care of it. So at this point, I thought I needed to figure out why it appeared that the order had been missed or whatever the situation was." Response ¶ 17, at 2 (citing Wilber Depo. at 14:14-17 (Wilber)). See Reply ¶ 17, at 2 (not disputing the factual allegation and "admit[ting] that Mr. Wilber made these statements in his deposition")(alteration added).[8] After Mr. Wilber discovered that Gallegos had been transferred

---

[7]The parties dispute how much methadone Gallegos received at MDC. See Response ¶ 22, at 3; Reply ¶ 22, at 3. According to Gallegos,

> At the point of transfer, [he] was stepped down to 180 milligrams of methadone when he was taken to the Department of Corrections. The step down was occurring at 5 milligrams per day to take approximately 40 to 45 days before Gallegos would be in a position to be transferred to avoid the life endangering symptoms.

Response ¶ 22, at 3 (citing Wilber Depo. at 28:22-25). The New Mexico Corrections Department counters that "[t]he medical records establish that on November 12, 2014, when [Gallegos] was transported from MDC, he was given a dose of 155 milligrams of methadone." Reply ¶ 22, at 3. See Medication History -- Gallegos, Martin, filed May 8, 2017 (Doc. 69-1)("Gallegos Medication History").

[8]The Court deems this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts

to the New Mexico Corrections Department, Mr. Wilber contacted Mr. Brewster, New Mexico Corrections Department General Counsel, on November 24, 2014. <u>See</u> MSJ ¶ 5, at 3 (asserting this fact); Response at 1 (admitting this fact). <u>See also</u> Affidavit of Douglas Wilber (dated November 23, 2015), filed April 7, 2017 (Doc. 67-5); Email from Douglas Wilber to James Brewster at 1 (dated November 24, 2014, 1:51 p.m.), filed April 7, 2017 (Doc. 67-6)("November 24, 2014, 1:51 p.m. Email from Wilber to Brewster")("I'm not sure if there was a mixup at MDC, but [Gallegos] was apparently transported with NO methadone step down . . . and he is in pretty bad shape.").[9]

Mr. Brewster replied to Mr. Wilber, requesting "all relevant orders in order to properly assess this matter and [Mr. Wilber's'] request." Email from James Brewster to Douglas Wilber at 1 (dated November 24, 2014, 1:57 p.m.), filed April 7, 2017 (Doc. 67-6)("November 24, 2014, 1:57 p.m. Email from Brewster to Wilber"). <u>See</u> MSJ ¶ 6, at 3 (asserting this fact); Response at 1 (admitting this fact). Mr. Wilber promptly sent Mr. Brewster the orders pertaining to Gallegos' custody. <u>See</u> MSJ ¶ 7, at 3 (asserting this fact); Response at 1 (admitting this fact). <u>See also</u> Email from Douglas Wilber to James Brewster at 1 (dated November 24, 2014, 2:07 p.m.), filed April 7, 2017 (Doc. 67-6)("November 24, 2014, 2:07 p.m. Email from Wilber to Brewster"). Mr. Brewster indicated to Mr. Wilber that Mr. Brewster would direct the New Mexico Corrections Department's medical vendor to assess and to treat Gallegos. <u>See</u> MSJ ¶ 7, at 3 (asserting this fact); Response at 1 (admitting this fact). <u>See also</u> Email from James Brewster to Douglas Wilber at 1 (dated November 24, 2014, 2:45 p.m.), filed April 7, 2017 (Doc. 67-6)("November 24, 2014, 2:45 p.m. Email from Brewster to Wilber"). Mr. Brewster explained

set forth in the Response will be deemed undisputed unless specifically controverted.").

[9]<u>See</u> Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").

that he could not guarantee that Gallegos would receive methadone. See MSJ ¶ 7, at 3 (asserting this fact); Response at 1 (admitting this fact). See also November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1. Mr. Brewster "was fully aware that medical detoxification was authorized but that titration did not occur at the DOC facilities since methadone was not used in any way at those facilities." Response ¶ 23, at 4 (asserting this fact)(citing New Mexico Department of Corrections Reg. CD-170100.U-V, filed April 24, 2017 (Doc. 68-2)("New Mexico Department of Corrections Reg. CD-170100.U-V"); Reply at ¶ 23, at 3 (not disputing this fact).[10] See November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1.

Mr. Brewster also indicated that, while the state court's first order had remanded Gallegos to MDC for six weeks before Gallegos was to be transferred to the New Mexico Corrections Department, the state court's second order "apparently sends him to NMCD the very next day[.]" November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1. See MSJ ¶ 7, at 3 (asserting this fact); Response at 1 (admitting this fact). Mr. Brewster asked Mr. Wilber whether Mr. Wilber had brought this inconsistency "to the attention of the sentencing judge[.]" November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1. See MSJ ¶ 7, at 3 (asserting this fact); Response at 1 (admitting this fact). Mr. Wilber responded to Mr. Brewster that Mr. Wilber would "try to see what will work best." Email from Douglas Wilber to James Brewster at 1 (dated November 24, 2014, 2:56 p.m.), filed April 7, 2017 (Doc. 67-6)("November 24, 2014, 2:56 p.m. Email from Wilber to Brewster"). See MSJ ¶ 8, at 3 (asserting this fact); Response at 1 (admitting this fact). Mr. Wilber also asked for Mr. Brewster's recommendation regarding the "best wording to say that the sentence would begin on [Gallegos'] release from MDC." Email

---

[10]The Court deems this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

from Douglas Wilber to James Brewster at 1 (dated November 24, 2014, 2:56 p.m.), filed April 7, 2017 (Doc. 67-6)("November 24, 2014, 2:56 p.m. Email from Wilber to Brewster").  See MSJ ¶ 8, at 3 (asserting this fact); Response at 1 (admitting this fact).

On November 26, 2014, Mr. Brewster informed Mr. Wilber that the New Mexico Corrections Department's medical service provider, Corizon Health[11], was "already aware" of Gallegos' medical status, had "a protocol in place to treat him," and was treating him.  Email from James Brewster to Douglas Wilber at 1 (dated November 26, 2014, 2:51 p.m.), filed April 7, 2017 (Doc. 67-6)("November 26, 2014, 2:51 p.m. Email from Brewster to Wilber").  See MSJ ¶ 9, at 4 (asserting this fact); Response at 1 (admitting this fact).  Mr. Brewster also advised Mr. Wilber that, as of November 26, 2014, sending Gallegos back to MDC did "not appear to be needful or helpful."  November 26, 2014, 2:51 p.m. Email from Brewster to Wilber at 1.  See MSJ ¶ 9, at 4 (asserting this fact); Response at 1 (admitting this fact).

Mr. Wilber "never made any effort to contact the sentencing judge and never filed any motions" related to Gallegos' transfer to the New Mexico Corrections Department.  MSJ ¶ 10, at 4 (asserting this fact).  See Response at 1 (admitting this fact).  See also Deposition of Douglas Wilber at 15:11-14 (taken February 9, 2017)(Wilber), filed April 7, 2016 (Doc. 67-7)("Wilber Depo.").  Mr. "Wilber did not file any orders or motions 'to petition Gallegos back to MDC because,'" according to Mr. Wilber, "'it was not clear to me that there was anything I could do once he was transported to DOC . . . I should say that was reinforced or that understanding was reinforced by my conversations with Mr. Brewster."  Response ¶ 18, at 3 (alteration

---

[11]Corizon Health is a correctional healthcare provider that provides client partners with healthcare and reentry services with a focus to improve its patients' health and safety and reduce recidivism.  See "About Corizon Health," http://www.corizonhealth.com (last viewed June 21, 2017).

original)(quoting Wilber Depo. at 14:24-15:3 (Wilber)).  See Reply ¶ 18, at 2 (admitting that Mr. Wilber made these statements in his deposition).  According to Mr. Wilber,

> [A]lso it appeared to, by the time I understood what was happening and by the time I was able to start even trying to understand the situation, that it's quite possible that the harm was already done, and, like, I couldn't -- I wouldn't realistically be able to reference anything at this point because perhaps I discovered it somewhat late.

Wilber Depo. at 15:3-10 (Wilber)(alteration added).  Mr. Wilber "'was trying to figure out, as a practical matter, what [he] would be able to do about the best result for [Gallegos], which was [Mr. Wilber's] main concern at the time . . . this was all happening very quickly.'"  Response ¶ 18, at 3 (third alteration added)(quoting Wilber Depo. at 20:6-12 (Wilber)).  See Reply ¶ 19, at 3 (not contesting that Mr. Wilber provided that deposition testimony).  Mr. Wilber believed that it would have been difficult to receive another order from the state court.  See Response ¶ 19, at 3 (alleging this fact); Reply ¶ 19, at 3 (not conceding this fact).  He also questioned whether receiving another order from the  state court would "even help the client who has already, you know, been off of methadone at this point for presumably several days."  Wilber Depo. at 21:17-25 (Wilber).[12]

### 3. After the New Mexico Corrections Department Received Gallegos into its Custody, its Medical Service Provider, Corizon Health, Treated Gallegos for Opiate Withdrawal.

On November 12, 2014, the same day that the New Mexico Corrections Department received Gallegos into its custody, Corizon Health medical personnel evaluated Gallegos' withdrawal symptoms and gave him a "Kick Kit to address his withdrawal symptoms."  Corizon Health Nursing Encounter Tool -- Withdrawal at 1 (dated November 12, 2014), filed May 8,

---

[12]See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").

- 11 -

2017 (Doc. 69-2)("Nursing Encounter Tool -- Withdrawal").  See New Mexico Corrections Department Physician's Orders at 1 (dated November 12, 2014), filed May 8, 2017 (Doc. 69-3)("Physician's Orders").  Further, on November 21, 2014, Gallegos requested another Kick Kit, indicating it "helped some" and was also prescribed Elavil[13] for pain.  See New Mexico Corrections Department Interdisciplinary Progress Notes at 1 (taken November 21, 2014), filed May 8, 2017 (Doc. 69-4)("November 21, 2014 Interdisciplinary Progress Notes").   Next, on November 26, 2014, Corizon Health medical personnel denied Gallegos narcotics, but offered him "Ibuprofen, Tylenol, Mobic[14], Aleve, or Naproxen[15]" to address his pain, but Gallegos refused.  Mexico Corrections Department Interdisciplinary Progress Notes at 1 (taken November 26, 2014), filed May 8, 2017 (Doc. 69-4)("November 26, 2014 Interdisciplinary Progress Notes").  Then, on December 3, 2014, a Corizon Health provider conducted another assessment

---

[13]Amitriptyline, sold under the brand name Elavil among others, is a medicine used to treat a number of mental illnesses. . . . Other uses include prevent of migraines, treatment of neuropathic pain such as fibromyalgia and postherpetic neuralgia, and less commonly insomnia.  It is in the tricyclic antidepressant (TCA) class and its exact mechanism of action is unclear.  Amitriptyline is taken by mouth.

Amitriptyline, https://en.wikipedia.org/w/index.php?title=Amitriptyline&oldid=790223000 (last visited July 31, 2017).

[14]Mobic is the trade name for Meloxicam, which "is a nonsteroidal anti-inflammatory drug (NSAID) with analgesic and fever reducer effects. . . .  Meloxicam starts to relieve pain about 30-60 minutes after administration."  Meloxicam, https://en.wikipedia.org/w/index.php?title=Meloxicam&oldid=790729116 (last visited July 31, 2017).

[15]"Naproxen (brand names: Aleve, Naprosyn, and many others) is a nonsteroidal anti-inflammatory drug (NSAID) of the propionic acid class (the same class as ibuprofen) that relieves pain, fever, swelling, and stiffness."  Naproxen, https://en.wikipedia.org/w/index.php?title=Naproxen&oldid=792026731 (last visited July 31, 2017).

of Gallegos' withdrawal symptoms and ordered one dose of Clonidine.[16]  See Corizon Clinical

Institute Withdrawal Assessment -- Alcohol (dated December 3, 2014), filed May 8, 2017 (Doc.

69-6)("Clinical Institute Withdrawal Assessment – Alcohol"); Corizon Nursing Encounter Tool -

- Headache, filed May 8, 2017 (Doc. 67-7)("Nursing Encounter Tool -- Headache")).[17]

## PROCEDURAL BACKGROUND

Gallegos filed this lawsuit in state district court on August 27, 2015.  See Complaint

(Tort), Gallegos v. Bernalillo Cnty. Bd. of Comm'rs, et al., No. CIV 2015-06829, (filed in

Second Judicial District Court, County of Bernalillo, State of New Mexico August 27, 2015),

filed in federal court February 22, 2016,  (Doc. 1-1)("Complaint").  In the Complaint, Gallegos

asserts claims against Defendants Bernalillo County Board of Commissioners, MDC,[18] the New

Mexico Corrections Department, and Defendants John Does one through five for a violation of §

41-4-12 of the NMTCA.  See Complaint ¶ 1, at 1.  Gallegos then filed an Amended Complaint,

adding a federal claim.  See Amended Complaint ¶¶ 1-19, at 1-4, Gallegos v. Bernalillo Cnty.

Bd. of Comm'rs, et al., No. CIV 2015-6829 (filed in Second Judicial District Court, County of

Bernalillo, State of New Mexico February 1, 2016, filed in federal court February 22, 2016 (Doc.

1-2)("Amended Complaint").  In the Amended Complaint, Gallegos asserts claims against the

Bernalillo County Board of Commissioners, MDC, the New Mexico Corrections Department,

---

[16]Clonidine "is a medication used to treat high blood pressure, attention deficit hyperactivity disorder, anxiety disorders, tic disorders, withdrawal (from either alcohol, opioids, or smoking), migraine, menopausal flushing, diarrhea, and certain pain conditions . . . [and] has been in clinical use for over 40 years." Clonidine, https://en.wikipedia.org/w/index.php?title=Clonidine&oldid=794142685 (last visited Aug. 14, 2017).

[17] See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").

[18]In his Complaint and Amended Complaint, Gallegos names the Bernalillo County Metropolitan Detention Center as the "Bernalillo County Detention Center."  Amended Complaint at 1.  See Complaint at 1.

and John Does one through five -- who Gallegos alleges are "individual defendants working for either the Department of Corrections or Metropolitan Detention Center," Amended Complaint ¶ 12, at 3 -- for: (i) violations of the NMTCA, <u>see</u> Amended Complaint ¶¶ 8-17, at 2-3; and (ii) violations of Gallegos' rights guaranteed by the Eighth and Fourteenth Amendments to the Constitution of the United States of America, <u>see</u> Amended Complaint ¶ 18, at 4. Gallegos seeks "compensatory damages in a yet undetermined amount jointly and severally against all Defendants" and attorney fees. Amended Complaint at 4. Within thirty days of receipt of the Amended Complaint, Bernalillo County Board of Commissioners and MDC removed the lawsuit to federal court pursuant to 28 U.S.C. § 1446(b)(3). <u>See</u> Notice of Removal at 1, filed February 22, 2016 (Doc. 1).

On November 1, 2016, MDC moved to dismiss Gallegos' Amended Complaint, arguing (i) that MDC is not a suable entity under the NMTCA, §§ 41-4-1 to -30; and (ii) that Gallegos may not assert claims for federal constitutional violations against MDC. <u>See</u> Defendant Bernalillo County Metropolitan Detention Center's Motion to Dismiss at 1-4, filed November 1, 2016 (Doc. 34)("November 1, 2016, Motion to Dismiss"). On January 6, 2017, both the Board of County Commissioners and MDC moved to dismiss the Amended Complaint, arguing: (i) that the Board of County Commissioners and MDC have "Absolute Quasi-Judicial Immunity for their Reliance on a Facially Valid Court Order(s)"; (ii) that the Board of County Commissioners' and MDC's vicarious liability is unavailable for Gallegos' constitutional claim; (iii) that the State of New Mexico has not waived the Board of County Commissioners' and MDC's immunity to Gallegos' tort claims against those state entities; and (iv) that the Court lacks jurisdiction to decide Gallegos' tort claim, because Gallegos failed to give notice of the claim to the Board of County Commissioners and MDC. <u>See</u> Defendants Bernalillo County Board of Commissioners'

and Bernalillo County Detention Center's Opposed Motion to Dismiss Plaintiffs' Claims at 4-15, filed January 6, 2017 (Doc. 45)("January 6, 2017, Motion to Dismiss").[19]

### 1.    **The Motion to Amend.**

On February 17, 2017, Gallegos moved to amend his Amended Complaint and to file a Second Amended Complaint.  See Motion to Amend at 1-8.  Gallegos moves to amend his Amended Complaint to "add Clyde Kline, Jovanne King and James Brewster as substitute parties for John Doe No. 1, John Doe No. 2 and John Doe No. 3."  Motion to Amend at 1.[20]  Gallegos states that, as a result of the initial disclosures, he received a supposedly complete file pertaining to his custody from the New Mexico Corrections Department.  See Motion to Amend at 1.  Gallegos maintains that this file did not contain, however, "any correspondence or emails involving James Brewster, the Chief Attorney for the Department of Corrections."  Motion to Amend at 1.  Gallegos later discovered such correspondence involving Mr. Brewster.  See Motion to Amend at 3.  Gallegos states:

---

[19]The November 1, 2016, Motion; the January 6, 2017, Motion; and the New Mexico Corrections Department's Motion to Amend are currently pending with the Court.  The Court agreed with the parties that, to most efficiently adjudicate this litigation, the Court will first decide the issues that the Motion raises.  See Transcript of Hearing at 67:9-20 (taken June 2, 2017)("Tr.")(Court)(The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers)("I probably need to get Ms. Moulton's first [the New Mexico Corrections Department's motion] . . . . So I'll probably stop and do Ms. Moulton's motion, then come back and do the two county's motions back to back, and then do the motion to amend.").

[20]In this Memorandum Order and Opinion, the Court will review Gallegos' Motion to Amend to the extent Gallegos seeks to amend his Amended Complaint to add Brewster, the New Mexico Corrections Department's General Counsel, as a defendant.  As the Court explained at the June 2, 2017, hearing, the Court, in its review of this case, will first address the issues that the New Mexico Corrections Department raises.  See Transcript of Hearing at 67:9-20 (taken June 2, 2017)("Tr.")(Court).  The Court considers Gallegos' Motion to Amend to add Brewster as a defendant to be intertwined with those issues that the New Mexico Corrections Department raises in its MSJ.  The Court will consider Gallegos' Motion to Amend to add Kline and King as defendants in a subsequent opinion.

> Just prior to the deposition of Martin Gallegos on January 18th, the Public Defender, Doug Wilber, gave Plaintiff a copy of emails indicating that he had contacted Jim Brewster as chief lawyer for the Department of Corrections. He indicated he had found these in a separate file involving Martin Gallegos' [sic]. These were presented to [the] opposing side . . . .

Motion to Amend at 3 (alteration added). As a result of the discovered email correspondence involving Mr. Brewster, Gallegos argues that he "should be allowed to file the second amended complaint that is attached to add . . . Brewster as [a] party Defendant[]." Motion at Amend at 4 (alterations added). Specifically, Gallegos contends that "[t]he interests of justice" and "judicial economy" support his Motion to Amend. Motion to Amend at 4 (alteration added).

Pursuant to rule 15.1 of the District of New Mexico Local Rules of Civil Procedure, Gallegos attaches to his Motion to Amend his Second Amended Complaint, filed February 17, 2017 (Doc. 58)("Second Amended Complaint"). D.N.M.LR-Civ. 15.1 ("A proposed amendment to a pleading must accompany the motion to amend."). In the Second Amended Complaint, Gallegos alleges that his "court appointed attorney presented . . . [three central] facts to Defendant James Brewster." Second Amended Complaint ¶ 10, at 6. Gallegos alleges that his "court appointed attorney" apprised Mr. Brewster that:

> 7. On or about November 6, 2014, an order remanding Plaintiff to custody was issued by the Second Judicial District Court Judge Michael Martinez. This order was to remain in effect for six (6) weeks while Plaintiff participated in a Methadone program at BCMDC to decrease his level of dependency so that Plaintiff, Martin Gallegos would not incur life endangering withdrawal symptoms.

> 8. Approximately 6 days after remanded to custody, the court order was presented by Plaintiff to agents Kline and King of the Bernalillo County Metropolitan Detention Center.

> 9. The court order was ignored and Plaintiff was transported to Central New Mexico Correctional Facility (CNMCC) where Plaintiff suffered life threatening withdrawal symptoms for almost two (2) months.

Second Amended Complaint ¶¶ 7-10, at 6. Gallegos alleges that Brewster "ignored the court

order to the detriment of Plaintiff's health." Second Amended Complaint ¶ 13, at 7. On that

basis, Gallegos asserts a tort claim "authorized by the New Mexico Tort Claims [Act], Chapter

41-4-6 NMSA" against Brewster. Second Amendment Complaint ¶ 11, at 6 (alteration added).

> Gallegos additionally alleges:
>
> Defendant James Brewster was contacted by Public Defender for Plaintiff, Doug Wilber through emails on November 24, 2014. (As chief attorney for the Department of Corrections) trying to see what could be done to alleviate the condition of Plaintiff Gallegos at the Department of Corrections and/or return him to MDC to complete his treatment and titration off of methadone. [sic]

Second Amended Complaint ¶ 19, at 8. Based on that allegation, Gallegos asserts that "Brewster

was deliberately indifferent to the entreaties of the Plaintiff's lawyer and as a result of such

negligence and deliberate indifference Plaintiff was damaged . . . ." Second Amended Complaint

¶ 20, at 8. In sum, Gallegos seeks to amend his Amended Complaint to add Brewster as a

defendant, and Gallegos intends to assert the same claims against Brewster as he asserts against

the New Mexico Corrections Department -- namely, a state tort claim and a deliberate-

indifference claim. See Second Amended Complaint ¶¶ 11, 20, at 6, 8. Nowhere in his MSJ to

Amend or in his Second Amended Complaint does Gallegos suggest that he attempts to add

Brewster in his official capacity as the New Mexico Corrections Department's General Counsel

only. See Motion to Amend at 1-4; Second Amended Complaint ¶¶ 1-20, 5-8.

2.    **The MSJ.**

The New Mexico Corrections Department makes three arguments to support its MSJ.

See MSJ at 5-12. The New Mexico Corrections Department argues that it is entitled to summary

judgment, because "(1) there is no waiver for the state law tort claim; (2) the DOC and its

employees are entitled to quasi-judicial immunity as they relied on a facially valid court order

sentencing plaintiff to the custody of the DOC; and (3) plaintiff cannot establish deliberate

indifference." MSJ at 1-2. The Court will rehearse these arguments seriatim.

First, the New Mexico Corrections Department directs the Court's attention to the three orders that the state court issued on November 6, 2014, and November 7, 2014. See MSJ at 5-6 (citing Remand Order at 1; First Order Revoking Probation at 1; State Court Judgment, Sentence, and Order Suspending Sentence at 1). The New Mexico Corrections Department argues that "[t]he court orders . . . were facially valid and any DOC employee who accepted the plaintiff into the Department of Corrections on November 12, 2014, is entitled to absolute quasi-judicial immunity for enforcing the orders that sentenced plaintiff to the custody of the Corrections Department." MSJ at 7 (alteration added). The New Mexico Corrections Department maintains that Gallegos "should not now be allowed to sue the Corrections Department for enforcing the Court's orders," relying on Valdez v. City & County of Denver, 878 F.2d 1285, 1286 (10th Cir. 1989). According to the New Mexico Corrections Department, "'[t]he proper procedure for a party who wishes to contest the legality of a court order enforcing a judgment is to appeal that order and the underlying judgment, not to sue the official responsible for its execution.'" MSJ at 7 (alteration added)(quoting Valdez v. City & Cnty. of Denver, 878 F.2d at 1289-90). The New Mexico Corrections Department concludes, therefore, that it is "entitled to absolute quasi-judicial immunity" and, accordingly, summary judgment in its favor. MSJ at 7.

Second, the New Mexico Corrections Department argues that the Court should grant summary judgment in its favor, because, under N.M. Stat. Ann. § 41-4-6, the NMTCA does not waive the New Mexico Corrections Department's immunity from Gallegos' tort claim. See MSJ at 7. Section 41-4-4(A) of N.M. Stat. Ann. provides that "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by . . . Sections 41-4-5 through 21-2-12." Section 41-4-6(A), in turn, provides:

The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

N.M. Stat. Ann. § 41-4-6(A). The New Mexico Corrections Department argues that, because § 41-4-6(A) does not waive its immunity from Gallegos' tort claim, it is entitled to summary judgment on that claim. See MSJ at 8. The New Mexico Corrections Department also indicates that "New Mexico courts have been reluctant to find waiver under [§ 41-4-6(A)] for the performance of administrative tasks within the corrections system, such as the supervision or classification of inmates." MSJ at 7 (citing Archibeque v. Moya, 1993-NMSC-079, ¶¶ 13-14, 866 P.2d 344, 349; Lessen v. City of Albuquerque, 2008-NMCA-085, 187 P.3d 179; Gallegos v. State, 1987-NMCA-150, ¶¶ 6-10, 758 P.2d 299, 301).

Third, the New Mexico Corrections Department argues that Gallegos cannot maintain an independent claim for relief under the Fourteenth Amendment. See MSJ at 8-9. The New Mexico Corrections Department indicates that Gallegos asserts "claims under both the Eighth Amendment and the Fourteenth Amendment[]." MSJ at 8 (citing Amended Complaint ¶ 18, at 4). The New Mexico Corrections Department relies on Albright v. Oliver, 510 U.S. 266 (1994), for the proposition that, "where a particular amendment 'provides an explicit textual source of Constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notice of substantive due process, must be the guide for analyzing these claims.'" Response at 8 (quoting Albright v. Oliver, 510 U.S. at 273 (internal quotation marks and citation omitted)). The New Mexico Corrections Department further argues that the United States Court of Appeals for the Tenth Circuit also "has stated that the Eighth Amendment is the proper amendment for claims such as those alleged by the plaintiff[.]" Response at 8 (alteration

added)(quoting Berry v. City of Muskogee, Okla., 900 F.2d 1489, 1494 (10th Cir. 1990). The New Mexico Corrections Department concludes, therefore, that it is "entitled to a dismissal of plaintiff's claims under the Fourteenth Amendment." Response at 9.

Fourth, the New Mexico Corrections Department argues that it is entitled to summary judgment on Gallegos' claim of deliberate indifference in violation of the Eighth Amendment. See MSJ at 9-11. The Department of Corrections relies on Farmer v. Brennan, 511 U.S. 858, 834 (1994), for the proposition that "[a]n official violates the Eighth Amendment when two elements are met: (1) the official causes an injury that, objectively is 'sufficient serious,' i.e. an injury that equates to the 'denial of the minimal civilized measure of life's necessities'; and (ii) the official has a 'sufficiently culpable state of mind.'" MSJ at 9 (alteration added)(quoting Farmer v. Brennan, 511 U.S. at 834). The New Mexico Corrections Department argues that Gallegos cannot establish "that his alleged injury was sufficiently serious" to substantiate an Eighth Amendment violation. MSJ at 10. The New Mexico Corrections Department further argues that Gallegos cannot show that it "was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that any individual actually drew such an inference." MSJ at 10. Regarding Mr. Brewster's conduct, the Department of Corrections argues that the email exchanges between Mr. Wilber and Mr. Brewster on November 24, 2014, and November 26, 2014, demonstrate that "Mr. Brewster was neither deliberately indifferent to the plaintiff nor the entreaties of the Plaintiff's lawyer." MSJ at 11 (internal quotation marks and citation omitted). See November 24, 2014, 1:57 p.m. Email from Brewster to Wilber at 1. The New Mexico Corrections Department maintains that "[t]here is nothing in this email exchange that establishes either the objective or subjective component of deliberate indifference." MSJ at

12.   Accordingly, the New Mexico Corrections Department concludes that it is entitled to summary judgment on Gallegos' Eighth Amendment claim.  See MSJ at 12.

Last, the New Mexico Corrections Department argues that John Does one through five are also entitled to summary judgment.  See MSJ at 12.  The New Mexico Corrections Department maintains that, when the discovery deadline passed on February 9, 2017, "no cognizable claims lie against John Does 1-5."  MSJ at 12.  The New Mexico Corrections Department concludes that "Defendants John Does 1-5 are entitled to summary judgment as a matter of law."  MSJ at 12 (citing Williams v. Chicago Police Officer Marcel Rodriguez, 509 F.3d 392 (7th Cir. 2007); Roper v. Grayson, 81 F.3d 124 (10th Cir. 1996)).  Accordingly, the New Mexico Corrections Department argues that the Court should enter "summary judgment in its favor on both counts of plaintiff's Amended Complaint."  MSJ at 12.

### 3.    **The Response.**

In response, Gallegos first asserts that the New Mexico Corrections Department does not enjoy quasi-judicial immunity because it relied on a court order.  See Response at 5.  Gallegos asserts that "the DOC and its employees have provided no testimony that they were relying on another order entered the same day as the titration order as the reason they did nothing in this case."  Response at 5.  See id. ("There is no evidence that Defendants relied on a concurrent court order, signed on November 6th and entered on November 7th, in order to avoid taking any action in this matter.").  Specifically, Gallegos maintains that "there is no evidence that James Brewster relied on one order versus another in order to take no action in this case."  Response at 5.  Gallegos further notes that the state court "titration orders were a regular matter of course for prisoners" and, accordingly, should be read in conjunction.  Response at 5.

Second, Gallegos argues that the New Mexico Corrections Department "is not entitled to

dismissal as there is no waiver of immunity of the New Mexico Tort Claims Act," N.M. Stat. Ann. §§ 41-4-1 to -30. Response at 6. Gallegos asserts that the NMTCA's immunity provision, see N.M. Stat. Ann. § 41-4-4, does not apply, because "[t]his case does not involve classification or supervision of inmates." Response at 6 (alterations added). Instead, Gallegos maintains, "[t]his case involved the Defendant DOC being advised that a set of concurrent orders had required Plaintiff to remain at MDC until his level of methadone treatment had reached a point where Plaintiff would not incur life endangering withdrawal symptoms on transfer to the Department of Corrections." Response at 6 (alterations added). Gallegos asserts that Mr. Wilber alerted Mr. Brewster "that these Titration orders were entered concurrently, and they are frequently entered and that they are read in conjunction with each other." Response at 6.

Gallegos then argues that N.M. Stat. Ann. § 41-4-6(A) waives the New Mexico Corrections Department's immunity to his tort claim. See Response at 6. Gallegos states that Mr. Wilber and Mr. Brewster "discussed how this kind of action could be prevented in the future with proper procedure." Response at 6. Gallegos then argues that "[t]he proper procedure would cover the operation and maintenance of the building with regard to all similarly situated inmates within the Department of Corrections." Response at 6. Cf. N.M. Stat. Ann. § 41-4-6(A)(providing that immunity to tort claims under N.M. Stat. Ann. § 41-4-6(A) does not apply to damages "caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings").

Third, Gallegos argues that the New Mexico Corrections Department is not entitled to dismissal of his Fourteenth Amendment claim. See Response at 6-7. Gallegos states that the Fourteenth Amendment "provides an explicit textual source of constitutional protection against a

particular source of governmental behavior including 'substantive due process.'" Response at 6-7. Gallegos asserts that, in Whitley v. Albers, 475 U.S. 312 (1986), "the Supreme Court recognized that the same facts could give rise to both an Eighth Amendment cruel and unusual punishment claim and a substantive due process claim under the Fourteenth Amendment." Response at 7 (citing Whitley v. Albers, 475 U.S. at 326-27). Gallegos concedes, however, that the Supreme Court of the United States of America stated in Whitley v. Albers that "'the Eighth Amendment, which is specifically concerned wit[h] the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified.'" Response at 7 (alteration added)(quoting Whitley v. Albers, 475 U.S. at 327). Gallegos emphasizes that "[t]his case involves a deprivation of substantive due process in that two concurrent court orders . . . are not being read accurately and not being enforced in the manner to which they were intended." Response at 7. "In addition to the Eighth Amendment," Gallegos concludes, "the Fourteenth comes into play in this matter." Response at 7.

Fourth, Gallegos argues that the New Mexico Corrections Department is not entitled to summary judgment, because he can "establish the objective and subjective elements of deliberate indifference." Response at 7. Gallegos begins his argument by stating that "[t]he titration order itself indicates the seriousness of the situation and the required treatment of Plaintiff is to lower his level of methadone . . . until its reached a point where the Plaintiff would not incur life threatening withdrawal symptoms upon transfer to the Department of Corrections." Response at 7. Gallegos continues by emphasizing that "[t]he order itself shows that a substantial risk of potential harm occurs if the Plaintiff is denied titration off his high methadone level." Response at 7. Gallegos then argues that "[w]hether deliberate indifference has occurred is generally a

'fact' question . . . ." Response at 7-8 (citing Wilson v. Seiter, 501 U.S. 294, 299 (1991); Canton v. Harris, 489 U.S. 378 (1989)). See Response at 9 (arguing that Mr. Brewster's failure to institute "a protocol for Mr. Gallegos' situation is a factual dispute as to whether this constitutes deliberate indifference").

Gallegos also argues that the "seriousness of the situation allows a fact finder to conclude a prison official knew of a substantial risk from the very fact that the risk is obvious." Response at 8. Gallegos maintains that "[s]ubstantial risk of serious harm existed as stated in the particular order that was brought to Mr. Brewster's attention." Response at 8. Gallegos argues not only that Mr. Wilber made Mr. Brewster aware Gallegos' risk of dangerous withdrawal, but also that Mr. "Brewster was also obviously aware that no methadone treatment was available at the Department of Corrections . . . ." Response at 8. Gallegos further maintains that Mr. Brewster "could have easily ordered a change for this particular situation, by telling Corizon and medical providers that they needed to follow the Judge's order and titrate down the Plaintiff so that he would not endure the pain and life threatening situation that he was already starting to undergo." Response at 8. Gallegos additionally emphasizes that Mr. "Brewster could have ordered titration immediately or returned Plaintiff to MDC." Response at 8. In support, Gallegos points to New Mexico Department of Corrections Reg. CD-170100.U-V for the proposition that "detoxification under medical supervision or access to a chemical dependency treatment program . . . was allowed and could be developed and implemented on Mr. Gallegos' behalf." Response at 8 (citing New Mexico Department of Corrections Reg. CD-170100.U-V at 1). "Instead," Gallegos argues, Mr. Brewster took no action "other th[a]n seeing that a doctor was aware of the problem to make sure, in theory, that Mr. Gallegos [did] not die." Response at 8 (alterations added). Gallegos concludes that summary judgment is unwarranted, because there is a factual dispute

whether Mr. Brewster's lack of action to Gallegos' situation constitutes deliberate indifference. <u>See</u> Response at 9.

Last, Gallegos responds that the John Does are not entitled to summary judgment. <u>See</u> Response at 9. Gallegos states that he has attempted to name Mr. Brewster as an individual Defendant. <u>See</u> Response at 9 (citing Motion to Amend at a1-8). Gallegos maintains that he did not know Mr. Brewster's identity until "just before the deposition of Douglas Wilber." Response at 9. Gallegos also states that, as of the filing of the Response, Mr. "Brewster has not been deposed, because he was unavailable during the entire New Mexico legislative session as the General Counsel for the Department of Corrections." Response at 9.

### 4.     <u>The Reply</u>.

In reply, the New Mexico Corrections Department counters that, in the Response, Gallegos does not dispute that the New Mexico Corrections Department enjoys absolute quasi-judicial immunity to Gallegos' tort claim. <u>See</u> Reply at 4 (citing Response at 5). As the New Mexico Corrections Department reads Gallegos' Response, Gallegos' "only argument with regard to . . . [the New Mexico Corrections Department's] assertion for absolute quasi-judicial immunity is that [the New Mexico Corrections Department] has not established which Order they relied on in admitting plaintiff to the Department of Corrections." Reply at 4 (alterations added). The New Mexico Corrections Department adverts to the State Court Judgment, Sentence, and Order Suspending Sentence as "the facially valid order that [it] relied on in admitting the plaintiff when he was brought" into its custody on November 12, 2017. Reply at 4.

The New Mexico Corrections Department further indicates that Gallegos does not cite any legal authority "as to why the DOC would not be entitled to absolute quasi-judicial immunity." Reply at 4. The New Mexico Corrections Department presses that Gallegos does

not "contest that the state district court orders were facially valid." Reply at 4. The New Mexico Corrections Department maintains that, because "the DOC relied on a facially valid Court order when they received plaintiff at the DOC, the DOC is entitled to absolute quasi-judicial immunity . . . ." Reply at 4 (alteration added). The New Mexico Corrections Department accordingly concludes that the Court should grant summary judgment in its favor. See Reply at 4.

Second, the New Mexico Corrections Department replies that it "is entitled to dismissal as there is no waiver of immunity under § 41-4-6 of the New Mexico Tort Claims Act." Reply at 4. The New Mexico Corrections Department posits that "[t]his case does involve the admission of an inmate into the system, which would be an administrative function associated with the operation of the correctional system." Reply at 5 (alteration added). The New Mexico Corrections Department then argues that "[a]dmitting an inmate into the correctional system is akin to the sorts of administrative functions associated with the operation of the corrections system . . . which are not applicable to § 41-4-6 in a correctional setting." Reply at 5 (alteration added)(citing Lessen v. City of Albuquerque, 2008-NMCA-085, 187 P.3d 179). Accordingly, the New Mexico Corrections Department concludes that Gallegos' tort claim against it "should be dismissed as there is no waiver of immunity." Reply at 5.

Third, the New Mexico Corrections Department replies that it is "entitled to dismissal of the Fourteenth Amendment claim because where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." Reply at 5. The New Mexico Corrections Department relies on Graham v. Connor, 490 U.S. 386 (1989), for the proposition that, "when a specific constitutional amendment provides 'an explicit

textual source of constitutional protection against this sort of physically intrusive governmental conduct,' the courts should analyze all constitutional claims under that amendment's standards rather than under 'the more generalized notion of substantive due process.'" Reply at 5 (quoting Graham v. Connor, 490 U.S. at 395). The New Mexico Corrections Department then emphasizes that, in United States v. Lanier, 520 U.S. 259 (1997), the Supreme Court clarified that its holding in Graham v. Connor "'simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" Reply at 6 (quoting United States v. Lanier, 520 U.S. at 272 n.7). Accordingly, the New Mexico Corrections Department concludes that the Court should review Gallegos' constitutional claim under the Eighth Amendment and concomitantly dismiss his independent Fourteenth Amendment claim. See Reply at 6.

Fourth, the New Mexico Corrections Department replies that the Court should grant summary judgment in its favor on Gallegos' Eighth Amendment claim. See Reply at 6-8. The New Mexico Corrections Department argues that it is entitled to summary judgment, "because a governmental entity 'may be held liable under § 1983 only for its own unconstitutional or illegal policies and not for the tortuous acts of its employees.'" Reply at 6 (quoting Lopez v. LeMaster, 172 F.3d 756, 762-63 (10th Cir. 1999)). The New Mexico Corrections Department notes that Gallegos has not established "an unconstitutional or illegal policy of the DOC." Reply at 6. The New Mexico Corrections Department argues, therefore, that it cannot be held liable under § 1983 for Mr. Brewster's actions. See Reply at 6.

Fifth, the New Mexico Corrections Department argues that, "if the Court were to allow an amendment to add Mr. Brewster as a defendant," Gallegos cannot establish a deliberate

indifference claim against him.  Reply at 6.  The New Mexico Corrections Department argues that Gallegos does not demonstrate a "sufficiently serious" injury to support an Eighth Amendment claim.  Reply at 6.  The New Mexico Corrections Department states that Gallegos "has produced no evidence to establish that his condition was sufficiently serious, other than to reference the phrase 'life-endangering withdrawal symptoms' in an Order signed by a Judge, not a physician."  Reply at 6 (quoting Remand Order ¶ 3.C, at 2 ("Defendant shall remain in custody of the Metropolitan Detention Center (MDC) until his level of methadone treatment has reached a point where Defendant will not incur life-endangering withdrawal symptoms upon transfer . . . .")).  The New Mexico Corrections Department maintains that the Remand Order alone does not establish that Gallegos' injury sufficiently establishes an Eighth Amendment claim.  See Reply at 6.

The New Mexico Corrections Department then argues that, even if Gallegos' condition were sufficiently serious to implicate the Eighth Amendment, "a review of plaintiff's medical records establish, however, that plaintiff was seen by medical [personnel] and his withdrawal symptoms were addressed."  Reply at 7 (alteration added).  The New Mexico Corrections Department relies on two Corizon Health documents to argue that, on November 12, 2014, the day that the New Mexico Corrections Department took Gallegos into custody, medical personnel evaluated Gallegos' withdrawal symptoms and gave him a "Kick Kit to address his withdrawal symptoms."  Reply at 7 (citing Nursing Encounter Tool -- Withdrawal at 1; Physician's Orders at 1).  The New Mexico Corrections Department also states that, on November 21, 2014, Gallegos "requested another Kick Kit, indicating it 'helped some' and was also prescribed Elavil for pain."  Reply at 7 (quoting November 21, 2014 Interdisciplinary Progress Notes at 1).  The New Mexico Corrections Department further indicates that, on November 26, 2014, medical personnel denied

Gallegos narcotics, but offered him "Ibuprofen, Tylenol, Mobic, Aleve, or Naproxen" to address his pain, but Gallegos refused. Reply at 7 (quoting November 26, 2014 Interdisciplinary Progress Notes at 1). The New Mexico Corrections Department additionally states that "[o]n December 3, 2014, a provider conducted another withdrawal assessment and one dose of Clonidine was ordered." Reply at 7 (citing Clinical Institute Withdrawal Assessment -- Alcohol at 1; Nursing Encounter Tool -- Headache at 1). The New Mexico Corrections Department asserts not only that Gallegos "was clearly provided with the appropriate medical care," but also that, because Gallegos did not experience lingering medical problems, "his alleged *de minimis* injury does not meet the objective test of an 'unquestioned and serious deprivation[] of basic human needs' to support a constitutional violation." Reply at 7 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). The New Mexico Corrections Department argues that, although Gallegos preferred to have methadone or narcotics, "his medical condition was appropriately addressed." Reply at 7 (citing Free v. Unknown Officers of the Bureau of Prisons, 103 F. App'x 334, 337 (10th Cir. 2004)). The New Mexico Corrections Department accordingly concludes that Gallegos "has failed to establish the objective element of his Eighth Amendment claim." Reply at 7.

Next, the New Mexico Corrections Department replies that Gallegos has failed to establish the deliberate-indifference claim's subjective component. See Reply at 7-10. The New Mexico Corrections Department states that this element "requires 'evidence of the prison official's culpable state of mind.'" Reply at 8 (quoting Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005)). To demonstrate the subjective element of a deliberate-indifference claim, the New Mexico Corrections Department asserts, Gallegos "must show 'that the Defendants knew he faced a substantial risk of harm and disregarded that risk . . . [and that] the official . . . [was]

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also [have] draw[n] the inference." Reply at 8 (first alteration original, second through fourth alterations added)(quoting Martinez v. Beggs, 563 F.3d 1082, 1089 (10th Cir. 2009)).

The New Mexico Corrections Department argues that Gallegos cannot satisfy this subjective element, because "there is no evidence of a culpable state of mind by Mr. Brewster." Reply at 8. The New Mexico Corrections Department presses that "[n]othing Mr. Brewster wrote in his email provides evidence of a culpable state of mind." Reply at 8 (alteration added). The New Mexico Corrections Department adverts to the November 24, 2014, 2:45 p.m. Email from Brewster to Wilber, in which Mr. Brewster represents to Mr. Wilber that Mr. Brewster "could have the medical vendor make[] sure to assess and treat [Gallegos]." Reply at 8 (alterations added)(citing November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1). The New Mexico Corrections Department also adverts to the November 24, 2014, 2:51 p.m. Email from Brewster to Wilber, in which Mr. Brewster represents to Mr. Wilber that "the 'Department's inmate medical services provider (Corizon) is already aware of your client's medical status and has a protocol in place to treat him. It is already treating him.'" Reply at 8 (quoting November 24, 2014, 2:51 p.m. Email from Brewster to Wilber at 1). The New Mexico Corrections Department argues that these electronic communications demonstrate that, "[w]ithin a ten minute period, Mr. Brewster had contacted the medical vendor, advised them of the concern and insured that they had the proper protocol in place to treat the plaintiff[;] Mr. Brewster did not disregard plaintiff's medical status, but actively sought to address it." Reply at 8. The New Mexico Corrections Department emphasizes that "these are not the comments of someone who deliberately disregarded any risk of harm." Reply at 8.

The New Mexico Corrections Department next replies that Gallegos' assertion "that 'Wilber goes on to say that he became aware that any action that he would take on behalf of Plaintiff in this matter would be disputed by Brewster'" misrepresents Mr. Brewster's electronic communications to Mr. Wilber and Mr. Wilber's deposition testimony. Reply at 8. The New Mexico Corrections Department clarifies that "Mr. Brewster initially asked Mr. Wilber if he wanted to bring the issue to the judge's attention or leave [Gallegos] with NMCD." Reply at 8-9 (alteration added)(citing November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1). The New Mexico Corrections Department admits that "Mr. Brewster stated that it would be 'legally and logistically difficult to "unring" this bell and send him back to MDC at this point,'" but asserts that Mr. Brewster "states absolutely nothing to suggest that he would interfere with his efforts to do so." Reply at 9 (quoting Email from James Brewster to Douglas Wilber at 1 (dated November 24, 2014, 3:32 p.m.), filed April 7, 2017 (Doc. 67-6)("November 24, 2014, 3:32 p.m. Email from Brewster to Wilber")). The New Mexico Corrections Department also argues that, even if Mr. Wilber believed that Mr. Brewster would dispute any action that Mr. Wilber took on Gallegos' behalf, Mr. Wilber's state of mind is not determinative of Mr. Brewster's state of mind. See Reply at 9. The New Mexico Corrections Department concludes, therefore, that Gallegos fails to establish the deliberate-indifference claim's subjective element, because Gallegos "has failed to establish that Mr. Brewster would in any way interfere with plaintiff's counsel's efforts to get him back to MDC." Reply at 9.

The New Mexico Corrections Department then turns to Gallegos' "statement that Brewster could 'have easily ordered a change for this particular situation, by telling Corizon and medical providers that they needed to follow the Judge's order and titrate down the Plaintiff.'" Reply at 9 (quoting Response at 8). The New Mexico Corrections Department notes that

Gallegos provides no evidentiary support for this assertion.  See Reply at 9.  The New Mexico Corrections Department further argues that Gallegos ignores "the fact that methadone is not available in the prison system, that the attorney for the Corrections Department cannot order Corizon . . . to provide specific treatment and that withdrawal symptoms can be treated in a number of ways other than with methadone."  Reply at 9.

The New Mexico Corrections Department next addresses Gallegos' allegation that Mr. Brewster could have returned Gallegos to MDC.  See Reply at 9.  See also Response at 8 ("Brewster could have ordered titration immediately or returned Plaintiff to MDC.").  The New Mexico Corrections Department emphasizes that Gallegos' factual assertion is unsubstantiated, stating that Gallegos "has provided no evidence that Mr. Brewster could effectuate the move of any inmate."  Reply at 9.  The New Mexico Corrections Department additionally presses that Gallegos "provided no support for this and offered no explanation as to how he thinks Mr. Brewster, an attorney for the DOC could return an inmate to MDC when they possessed a facially valid order sending him to the custody of the Corrections Department."  Reply at 9.

The New Mexico Corrections Department then directs its attention to Gallegos' allegation that "Mr. Brewster could have ordered detoxification under medical supervision or access to a chemical dependency treatment program."  Reply at 10.  See Response at 8 ("Under the Corrections Department regulations . . . detoxification under medical supervision or access to a chemical dependency treatment program and moving it into an individual treatment plan was allowed and could be . . . implemented on Mr. Gallegos' behalf.")(alterations added).  The New Mexico Corrections Department replies that "[d]ecisions regarding detoxification and chemical dependency treatment programs are made by health care providers, not attorneys."  Reply at 10 (alteration added).  The New Mexico Corrections Department states that Gallegos received

healthcare treatment "from the moment he arrived at the Corrections Department."  Reply at 10.
The New Mexico Corrections Department notes that Mr. Brewster also "took action" concerning
Gallegos' medical treatment.  Reply at 10.  The New Mexico Corrections Department
emphasizes that Mr. Brewster "contacted the medical vendor, made sure they had a protocol to
treat him, and confirmed that they were already treating him."  Reply at 10.  The New Mexico
Corrections Department maintains that "[t]here is absolutely nothing more that Mr. Brewster
could have done to address plaintiff's medical condition."  Reply at 10 (alteration added).
Accordingly, the New Mexico Corrections Department concludes that Gallegos' deliberate-
indifference claim is unsound.  See Reply at 10.

Last, the New Mexico Corrections Department argues that John Does one through five
are entitled to summary judgment, because Gallegos did not identify them before discovery's
close.  See Reply at 10.  The New Mexico Corrections Department notes that Gallegos names
five John Does in the Amended Complaint.  See Reply at 10.  See also Amended Complaint ¶ 4,
at 1 ("Upon information and belief John Doe's [sic] 1 through 5 worked for the Bernalillo
County Metropolitan Detention Center . . . and/or the New Mexico Department of
Corrections . . . as discovery will detail.").  The New Mexico Corrections Department indicates
that Gallegos did not identify these Defendants before discovery's end.  See Reply at 10.
Accordingly, the New Mexico Corrections Department argues that "[s]ummary judgment should
be granted to unnamed defendants at this stage in the proceedings."  Reply at 10 (alteration
added).  The New Mexico Corrections Department concludes that it "is entitled to summary
judgment in its favor on all counts of plaintiff's Amended Complaint."  Reply at 10.

## 5. **The Hearing.**

On June 2, 2017, the Court held a hearing on the MSJ.  See Tr. at 1:1 (Court).  The Court

began by stating its initial views of the case, including its views regarding: (i) the Bernalillo

County Board of Commissioners' and the MDC's motions to dismiss, <u>see</u> November 1, 2016,

Motion to Dismiss; January 6, 2017 Motion to Dismiss; (ii) the Motion to Amend; and (iii) the

New Mexico Corrections Department's MSJ:

> [L]et me give you my thoughts about these motions. It seems to me that the guard, whichever guard it was whether it's Kline or King when he did not explore an order and if I understand the facts as presented by Mr. Gallegos is that he had a copy of the order and showed it to the guard and the guard then in his version said I don't care what you have, that to me is probably enough, given how serious withdrawal from methadone or heroin is, to constitute deliberate indifference. And it's enough evidence of subjective intent and objective intent for that guard. I'm not sure that -- maybe it's for anybody else. And it may have -- we may have to narrow it down to which one it is, and it seems to me that the plaintiff has sufficiently explained why he could not have timely identified those guards. I went through all the attachments and sort of understand the development here. So it seems to me that we ought to bring that guard in, and that's probably about it. It doesn't seem to me that there is a waiver of the New Mexico sovereign immunity of the Tort Claims Act for the department or for the county. And for any subdivision of it. So probably those should be out, and it would just be for this one guard. As far as Mr. Brewster . . . it seems to me that it would be hard for me to look at the emails and correspondence going back and say that he was deliberately indifferent. He may not have made the right decision although I'm not sure what the right decision was at that point. So I'm inclined to dismiss the department out, and . . . just leave the single guard in, and proceed to trial on that. So the summary judgment, the motions to dismiss, that's how I am sort of sorting it out and thinking . . . .

Tr. at 2:8-3:24 (Court). The Court also gave its inclination regarding the MSJ:

> I'm inclined to grant the motion for summary judgment that has been filed, and indicate that I don't think that Brewster ought to be added, because I'm not seeing deliberate indifference with the email exchange. Like I said, I think the most that could be said about Brewster is he didn't handle the situation right. But that seems to me more negligence that it does deliberate indifference.

Tr. at 44:21-45:4 (Court). The Court then invited the parties' argument. <u>See</u> Tr. at 3:25-4:1

(Court)("I'll certainly listen to anything anyone wants to say on necessary motions."); <u>id.</u> at 45:6-

8 (Court)("Ms. Moulton, anything else you want to say on your motion for summary judgment as

to the Department of Corrections?").

The New Mexico Corrections Department began with its "first position . . . that the DOC is entitled to quasi-judicial immunity." Tr. at 46:23-24 (Moulton). The New Mexico Corrections Department argued that it is immune to Gallegos' claims, because it followed "facially valid court orders." Tr. at 46:4 (Moulton). The New Mexico Corrections Department stated that "officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability, just as judges do with relation to their judicial capacity." Tr. at 46:5-8 (Moulton). In support of this argument, the New Mexico Corrections Department recounted the orders it received:

> [I]t's important to note that the first order revoking probation, noting a commitment to the Department of Corrections, which sentenced him to a term of 834 days, was filed on November 7. . . . [T]hat order does not reference the MDC. It's not specifically noted in there. And the judgment, sentence and order pending sentence which also committed him to the custody of the Department of Corrections, those two files, those two orders were in Mr. Gallegos' prison file at the Department of Corrections.

Tr. at 45:16-46:3 (Moulton)(alterations added). The New Mexico Corrections Department then stated that "any DOC employee who accepted plaintiff into the DOC system on November 12, did so pursuant to one of those two court orders that were in his file." Tr. at 46:9-12 (Moulton). "Thus," the New Mexico Corrections Department argued, "they're entitled to absolute quasi-judicial immunity because they were enforcing an order to commit him to the custody of Department of Corrections." Tr. at 46:12-15 (Moulton). The New Mexico Corrections Department reiterated: "[T]he proper procedure to challenge the legality of . . . [official action] enforcing a judgment, such as the judgment sentencing him to 835 days to the custody of the DOC, is to appeal that order and underlying judgment, not to sue the individual or the official responsible for executing the judgment." Tr. at 46:17-23 (Moulton)(alterations added).

The Court then questioned whether the New Mexico Corrections Department, as opposed

to any individual agent, is entitled to quasi-judicial immunity. See Tr. at 47:1-6 (Court). The New Mexico Corrections Department replied that "Mr. Brewster, if he is in fact added into the case would be entitled to that." Tr. at 47:7-9 (Moulton). The Court pressed the New Mexico Corrections Department whether it enjoys quasi-judicial immunity to Gallegos' claims. See Tr. at 47:10-11 (Court)("What about your current motion, though, for summary judgment as to the department?"). The New Mexico Corrections Department conceded that it was uncertain whether the state agency itself is entitled to quasi-judicial immunity, but seemed to suggest that its quasi-judicial immunity argument was to protect Mr. Brewster from any liability. See Tr. at 47:12-13 (Moulton)("Yeah, I don't necessarily know -- the reason I added that in there . . . ."). The Court then redirected the argument, inquiring whether the New Mexico Corrections Department was "really out on Eleventh Amendment immunity." Tr. at 47:18-19 (Court). The New Mexico Corrections Department then suggested that it was immune to Gallegos' claims under the Eleventh Amendment. See Tr. at 47:20 (Moulton)("Exactly. That's right.").

The New Mexico Corrections Department then moved to its argument that, under the NMTCA's § 41-4-4, it is immune to Gallegos' state tort claim, because § 41-4-6 does not waive its immunity. See Tr. at 48:13 (Moulton)("So let's talk about the 41-4-6 [argument].")(alteration added). The New Mexico Corrections Department adverted to Archibeque v. Moya, 1993-NMSC-079, ¶¶ 13-14, 866 P.2d at 349, and Lessen v. City of Albuquerque, 2008-NMCA-085, 187 P.3d 179, to support its conclusion that "the Department is entitled to dismissal of [Gallegos' state tort claim]." Tr. at 49:17-18 (Moulton). The New Mexico Corrections Department argued that, in light of Archibeque v. Moya, 1993-NMSC-079, ¶¶ 13-14, 866 P.2d at 349, and Lessen v. City of Albuquerque, 2008-NMCA-085, 187 P.3d 179, "[a]dmitting an inmate into the correctional facility is akin to the sorts of administrative functions associated with the operation

of a correction system [in] which the Court of Appeals [of New Mexico] and the Supreme Court [of New Mexico] have found [§ 41-4-6's waiver provision] not applicable."  Tr. at 49:1-6 (Moulton).

The New Mexico Corrections Department next turned to its argument that, in light of Gallegos' Eighth Amendment deliberate-indifference claim, Gallegos' independent Fourteenth Amendment substantive-due-process claim is unsound.  <u>See</u> Tr. at 49:19-21 (Moulton).  The New Mexico Corrections Department argued that, in light of <u>Berry v. City of Muskogee, Okla.</u>, 900 F.2d at 1494, "the Eighth Amendment provides the primary source of relie[f] . . . [and the Court should] dismiss[] the Fourteenth Amendment claim."  Tr. at 50:3-8 (Moulton)(alterations added)(citing  <u>Berry v. City of Muskogee, Okla.</u>, 900 F.2d at 1494).   The New Mexico Corrections Department added that, in <u>United States v. Lanier</u>, 520 U.S. at 272 n.7, "the Supreme Court clarified that if a constitutional claim is covered by [a] more specific constitutional provision such as [the] Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision not under the rubric of substantive due process."  Tr. at 50:16-22 (alterations added)(Moulton)(citing <u>United States v. Lanier</u>, 520 U.S. at 272 n.7).  The New Mexico Corrections Department then stated that, with regard to Gallegos' Eighth Amendment claim, a "governmental entity such as the DOC, only can be held liable under § 1983, [and only then for] its own constitutional or legal policies and not for the tortious acts of its employees."  Tr. at 50:24-51:3 (alterations added)(Moulton).  As a result of these arguments, the New Mexico Corrections Department concluded that it is entitled to summary judgment on Gallegos' constitutional claims.  <u>See</u> Tr. at 51:4-5 (Moulton)("So in that regard we a[re] claiming that we are entitled to summary judgment on that basis.")(alteration added).

The New Mexico Department of Corrections next rehearsed its argument that Mr.

Brewster's conduct does not demonstrate deliberate indifference in violation of the Eighth Amendment's guarantees. See Tr. at 51:5-54-13. The New Mexico Department of Corrections argued:

> [E]ven if Mr. Brewster is brought into this, and I make the argument there about Mr. Brewster's actions. . . there has been no testimony that [Gallegos'] medical condition was sufficiently serious. Going to that first objective standard there, we have a [c]ourt order that says life threatening but we don't have any medical testimony about that . . . . [Gallegos] was provided medical care when he arrived at the Department of Corrections, while he did not receive methadone and he admits this in [his] deposition he received a kick kit he received medication that was supposed to help his withdrawals be easier, . . . so while he did not receive methadone, he did receive care.
>
> Now, at some point, [Gallegos] asked for narcotics while he's in there. The Department of Corrections does not give out narcotics or prescribe narcotics. Differences of medical decisions don't rise to the claim of deliberate indifference. It's just a matter of a difference of opinion and then the subject of inquiry, of course involves Mr. Brewster's state of mind. And nothing in his email provides evidence of a culpable state of mind. He responded to the inquiries from Mr. Wilbur. He told Mr. Wilbur he would have a medical provider make sure to evaluate [Gallegos] and treat him, [and] less than 10 minutes after his conversation or one of his conversations with Mr. Wilbur, [Mr. Brewster] wrote back to him and said the department's inmate medical services provider, who at that time was Corizon, was already aware of his medical status, and had a protocol in place to treat [Gallegos]. In fact, [Mr. Brewster] confirmed that they were already treating him. These are not comments of someone who is being deliberately indifferent. He actively sought to address his medical status.
>
> Now, plaintiff argues that Mr. Wilbur was worried that Mr. Brewster would dispute any efforts to return him to MDC. Mr. Wilbur never said that in his deposition. Mr. Brewster never said anything that would suggest that he would interfere with his efforts to get him back there. He, basically, was asking ["]have you brought it to the attention of the sentencing judge?["] You know, [Mr. Brewster] was looking to find out what [could he] do, what [does the New Mexico Corrections Department] need to do here. [Gallegos] also argues that Mr. Brewster could have easily ordered a change for this situation by telling Corizon and the medical providers that they needed to [act.] . . . Plaintiff offers no support for this statement. And further, [Gallegos] ignores the fact that methadone is not available in the prison system, and that an attorney, an attorney for the Department of Corrections cannot order Corizon or any medical provider to provide specific treatment as that would be a medical decision. And withdrawal symptoms also can be treated in multiple what is other than with just methadone.

[Gallegos] argues that Mr. Brewster could have returned him to MDC, but offers no explanation or support as to how an attorney for the DOC could send an inmate back to MDC when he possesses that valid court order sending him to the Department of Corrections. And then the detoxification program [also relate to] decisions regarding issues [that] are made by medical providers not by attorneys. If the plaintiff required more or different care than what he received, a health care provider would make that decision. And he was seeing health care providers throughout his time there. We don't want lawyers or judges making medical decisions.

The reality is Mr. Brewster did take action with regard to plaintiff's medical treatment. He contacted the medical vendor and made sure that they had a medical protocol to treat him. He confirmed that they were treating him. Nothing further could have been done.

Tr. at 51:5-54:9 (alterations added). The New Mexico Corrections Department further stated that, under <u>Valdez v. City & County of Denver</u>, 878 F.2d at 1286, "the proper procedure for a party who wishes to contest the legality of a court order enforcing a judgment is to appeal that order and the underlying judgment, not sue the official responsible." Tr. at 54:14-18 (Moulton)(citing <u>Valdez v. City & County of Denver</u>, 878 F.2d at 1286).

The New Mexico Corrections Department then argued that "Mr. Brewster himself . . . does not possess a culpable state of mind." Tr. at 56:14-16 (Moulton)(alteration added). In support of that contention, the New Mexico Corrections Department adverted to Mr. Brewster's electronic communications with Mr. Wilber. <u>See</u> Tr. at 56:16-17 (Moulton)("And any of his emails certainly don't support that."). Accordingly, the New Mexico Corrections Department concluded that Mr. Brewster's conduct cannot ground a deliberate-indifference claim. <u>See</u> Tr. at 56:14-17 (Moulton).

The Court then invited Gallegos' response to the New Mexico Corrections Department's argument. <u>See</u> Tr. at 71:1 (Court). Gallegos stated that "the order itself says . . . the defendant . . . has been sentenced to a period of incarceration . . . ." Tr. at 57:4-7

(Lawless)(alterations added).  The Court then expressed its view:

> [T]he best you can read these two orders is it's not the Department of Corrections that is violating a court order.  It's the county that's violating a court order. . . .  [A]t least from the Department's standpoint, it's the county that's the problem.  Their order is you got up to six weeks in MDC, and MDC let him go too early.  The department, on the other hand, has got a valid court order that says, well, he's over here.

Tr. at 57:10-21 (Court)(alterations added).  Gallegos replied that the New Mexico Corrections Department nevertheless knew that its receipt of Gallegos was in violation of a court order, because, according to Gallegos, the New Mexico Corrections Department knew that the state court would not have given "six weeks if you only needed six days or five days."  Tr. at 58:3-4 (Lawless).  The Court then asked "[w]hat if Brewster . . . what if he'd picked up the phone and said, MDC, you need to take this guy back; they said we don't want him back . . . six days was enough.  We don't want the guy back."  Tr. at 58:5-9 (Court)(alterations added).  Gallegos then replied that, in light of the November 26, 2014, 2:51 p.m. Email from Brewster to Wilber, Brewster "at least ha[d] . . . in his mind that he could [return Gallegos to MDC]. . . . So I don't know."  Tr. at 58:17-19 (Lawless)(alterations added).

Gallegos then concluded his argument on the New Mexico Corrections Department's summary judgment motion.  Gallegos stated that he "thought under the case law that determining the subjective element of deliberate indifference was a fact question, fact based anyway, and what his state of mind was . . . under the subjective test is generally a fact based question."  Tr. at 7-12 (Lawless).  Gallegos further stated that "nothing would have prevented his immediate return to MDC . . . ."  Tr. at 62:17-18 (Lawless).  Gallegos further contended that Mr. Brewster "didn't ever ask a medical provider for an opinion on what to do, and basically that's my take on why this should not be granted."  Tr. at 62:22-25 (Lawless).

The Court then gave its inclined ruling: "I am inclined to grant the motion and find

that . . . there is no waiver of immunity on the Tort Claims Act; find that there is not sufficient evidence of deliberate indifference; and grant the motion." Tr. at 63:7-11 (Court). The Court further noted its inclination with respect to Mr. Brewster: "I'm inclined to let Ms. Moulton's clients out of the case. So not let Brewster in and grant the motion of the Department." Tr. at 59:3-6 (Court).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. 2:11-cv-757, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex,

477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[21]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must

---

[21]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Wright & Miller")("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." <u>Liberty Lobby</u>, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 550-55 (1999); <u>Liberty Lobby</u>, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In <u>Scott v. Harris</u>, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[22]] explained that the blatant contradictions of the record must be supported by more than other witnesses'

---

[22]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

testimony[.]"   Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.   Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 did not create any substantive rights, but merely enforces existing constitutional and federal statutory rights . . . .")(internal quotation marks, alteration, and citation omitted).  Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Public School Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). The Supreme Court has made clear that, in alleging a § 1983 action against a government agent

in the agent's individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)("Iqbal").

The Supreme Court has made clear that there is no respondeat superior liability under § 1983. See Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[23] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. See Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 689 (1978). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998). The Tenth Circuit has recognized that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)(quoting 42 U.S.C. § 1983; Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))(internal quotation marks omitted).

Before the Supreme Court decided Iqbal, the Tenth Circuit held that supervisors are not liable under § 1983 "unless there is an affirmative link between the constitutional deprivation and the supervisor's exercise of control or direction, his personal participation, or his failure to supervise." Kiesling v. Troughton, 107 F.3d 880, 1997 WL 111256, at *2 (10th Cir. 1997)(unpublished table decision)(citing Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir.

---

[23]See Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)("Bivens").

1988)).  The Tenth Circuit reasoned that, because supervisors can be held liable only for their

own constitutional acts or illegal policies, and not for their employees' torts, supervisory liability

requires a showing that such policies were a "deliberate or conscious choice."  <u>Barney v.</u>

<u>Pulsipher</u>, 143 F.3d at 1307-08 (citations and internal quotation marks omitted).  <u>Cf</u>. <u>Bd. of Cnty.</u>

<u>Comm'rs v. Brown</u>, 520 U.S. 397, 404 (1997)("[I]t is not enough for a § 1983 plaintiff merely to

identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate

that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury

alleged.")(emphasis in original).

    The Tenth Circuit has recognized that <u>Iqbal</u> limited, but did not eliminate, supervisory

liability for government officials based on an employee's or subordinate's constitutional

violations.  <u>See</u> <u>Garcia v. Casuas</u>, 2011 WL 7444745, at *25-26 (D.N.M. 2011)(Browning,

J.)(citing <u>Dodds v. Richardson</u>, 614 F.3d at 1199).  The language that may have altered the

landscape for supervisory liability in <u>Iqbal</u> is as follows: "Because vicarious liability is

inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution."  <u>Iqbal</u>,

556 U.S. at 676.  The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we
> conclude the following basis of § 1983 liability survived it and ultimately resolves
> this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor
> who creates, promulgates, implements, or in some other way possesses
> responsibility for the continued operation of a policy the enforcement (by the
> defendant-supervisor or her subordinates) of which "subjects, or causes to be
> subjected" that plaintiff "to the deprivation of any rights . . . secured by the
> Constitution . . . ."

<u>Dodds v. Richardson</u>, 614 F.3d at 1199.  The Tenth Circuit noted, however, that "*Iqbal* may very

well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in

ways we do not need to address to resolve this case."  614 F.3d at 1200.  It concluded that <u>Iqbal</u>

did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct." 614 F.3d at 1200-01. The specific example that the Tenth Circuit used to illustrate this principle was Rizzo v. Goode, 423 U.S. 362 (1976), where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed. See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371). The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations." Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. Ann. § 41-4-2A. The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2A. As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. §

41-4-2A.  The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty."  N.M. Stat. Ann. § 41-4-2C.

    **1.**    <u>**Section 41-4-4(A)**</u>.

The NMTCA's § 41-4-4(A), which grants immunity and authorizes exceptions thereto, states:

> A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act [N.M. Stat. Ann. §§ 28-22-1 to 28-22-5] and by Sections 41-4-5 through 41-4-12 NMSA 1978.  Waiver of this immunity shall be limited to and governed by the provisions of Sections 41-4-13 through 41-4-25 NMSA 1978, but the waiver of immunity provided in those sections does not waive immunity granted pursuant to the Governmental Immunity Act.

N.M. Stat. Ann. § 41-4-2A.  Accordingly, a plaintiff may not sue a New Mexico governmental entity or its employees or agents, unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for governmental entities and public employees.  <u>See</u> N.M. Stat. Ann. §§ 41-4-5 through 41-4-12.  <u>See also</u> <u>Begay v. State</u>, 1985-NMCA-117, ¶ 10, 723 P.2d 252, 255 ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), <u>rev'd on other grounds by</u> <u>Smialek v. Begay</u>, 1986-NMSC-049, ¶ 10, 721 P.2d 1306 (1986).  A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity.  <u>See</u> <u>Barreras v. N.M. Corr. Dep't</u>, 2003-NMCA-027,  ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."); <u>Chavez v. City of</u>

Albuquerque, 1998-NMCA-004, ¶ 11, 952 P.2d 474, 477 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city, its employees, or its agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127 ¶¶ 11-12, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 257 (finding that no waiver exists in the NMTCA for suit under Article II, § 11 of the New Mexico Constitution).  Thus, if no specific NMTCA waiver can be found, a plaintiff's complaint against the governmental entity or its employees must be dismissed.  See Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 255.  Further, the NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort
> for which immunity has been waived under the Tort Claims Act and no other
> claim, civil action or proceeding for damages, by reason of the same occurrence,
> may be brought against a governmental entity or against the public employee or
> his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).

## 2.    Section 41-4-6.

N.M. Stat. Ann. § 41-4-6 exempts from immunity "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."  N.M. Stat. Ann. § 41-4-6.  This exception balances the principle that "government should not have the duty to do everything that might be done" with the desire "to compensate those injured by the negligence of public employees and to impose duties of reasonable care."  Cobos v. Doña Ana County Hous. Auth., 1998-NMSC-049, ¶ 6, 970 P.2d 1143, 1145 (citations and internal quotations omitted).  To resolve the tension

between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general immunity from tort liability, [and] waives that immunity in certain defined circumstances." Cobos v. Doña Ana County Hous. Auth., 1998-NMSC-049, ¶ 6, 970 P.2d at 1145 (alterations added). The Supreme Court of New Mexico has explained that, "[w]hile 41-4-6 may appropriately be termed a 'premises liability' statute, the liability envisioned by that section is not limited to claims caused by injuries occurring on or off certain 'premises,' as the words 'machinery' and 'equipment' reveal." Cobos v. Doña Ana County Hous. Auth., 1998-NMSC-049, ¶ 9, 970 P.2d at 1146 (alteration added). Section 41-4-6 "contemplate[s] waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government . . . ." Bober v. New Mexico State Fair, 1991-NMSC-031, ¶ 27, 808 P.2d 614, 623 (alterations original)(internal quotation marks and citation omitted). New Mexico courts have concluded that § 41-4-6's waiver of immunity does not extend to negligent supervision, see Pemberton v. Cordova, 1987-NMCA-020, ¶ 5, 734 P.2d 254, 256, negligent design, see Rivera v. King, 1988-NMCA-093, ¶¶ 30-35, 765 P.2d 1187, 1194, negligent inspection, see Martinez v. Kaune, 1987-NMCA-131, ¶ 9, 745 P.2d 714, 716-17, or negligent classification of a prison inmate, see Archibeque v. Moya, 1993-NMSC-079, ¶¶ 11-14, 866 P.2d at 348.

In the prison context, the Supreme Court of New Mexico has held that "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in 41-4-6, does not include the security, custody, and classification of inmates . . . . Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions." Archibeque v. Moya, 1993-NMSC-079, ¶ 8, 866 P.2d at 347 (alterations added)(citations omitted). In Archibeque v. Moya, Chris Archibeque, an inmate at the Central New Mexico

Correction Facility, was transferred to the New Mexico State Penitentiary in Santa Fe, New Mexico. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Before being released into general population, a prison intake officer, Moya-Martinez, met with Archibeque to discuss whether he had any known enemies within the prison's general population. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Archibeque informed Moya-Martinez that another inmate, Gallegos, was one of his enemies, and Moya-Martinez, without checking an available list of current inmates, informed Archibeque that Gallegos was no longer at the prison. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. He was released into general population, and Gallegos assaulted him that night. See 1993-NMSC-079, ¶ 2, 866 P.2d at 346. Archibeque sued Moya-Martinez, other corrections officers, and the New Mexico Corrections Department in federal court for violations under 42 U.S.C. § 1983 and under the NMTCA. See 1993-NMSC-079, ¶ 3, 866 P.2d at 346. The district court interpreted § 41-4-6 narrowly, and held that the statute did not waive immunity for negligent security and custody of inmates at the penitentiary. See 1993-NMSC-079, ¶ 4, 866 P.2d at 346. Thereafter, Archibeque's § 1983 claims were resolved in favor of Moya-Martinez and the other corrections employees. See 1993-NMSC-079, ¶ 4, 866 P.2d at 346. The federal district court denied Archibeque's motion for reconsideration. See 1993-NMSC-079, ¶ 4, 866 P.2d at 346. Archibeque appealed, and the Tenth Circuit certified a question to the Supreme Court of New Mexico:

> Does [NMSA 1978, Section 41-4-6] of the New Mexico Tort Claims Act, [NMSA 1978, Sections 41-4-1 to -29], provide immunity from tort liability to an employee of the state penitentiary whose alleged negligence in releasing a prisoner into the general prison population, which included known enemies of the prisoner, resulted in the prisoner being beaten and injured by one of his enemies?

1993-NMSC-079, ¶ 1, 866 P.2d at 345-46 (alterations original). Archibeque argued that Moya–Martinez was participating in the operation of the penitentiary when she classified Archibeque as

an inmate who could safely be released into the general prison population, and he argued that

Moya-Martinez' alleged negligence in misclassifying him and releasing him into the general

population constituted negligent operation of the penitentiary, thereby waiving immunity under §

41-4-6.  See 1993-NMSC-079, ¶ 5, 866 P.2d at 346-47.  The Supreme Court of New Mexico

concluded that § 41-4-6 did not waive Moya-Martinez' immunity, stating that "[t]he 'operation'

and 'maintenance' of the penitentiary premises, as these terms are used in Section 41-4-6, does

not include the security, custody, and classification of inmates."  1993-NMSC-079, ¶ 6, 866 P.2d

at 347 (alteration added).  The Supreme Court of New Mexico reasoned that Moya-Martinez was

not operating and maintaining the prison's physical premises when she negligently classified

Archibeque.  See 1993-NMSC-079, ¶ 8, 866 P.2d at 347.  Rather, the Supreme Court of New

Mexico explained that

> [Moya-Martinez] was performing an administrative function associated with the
> operation of the corrections system.  Section 41-4-6 does not waive immunity
> when public employees negligently perform such administrative functions.  To
> read Section 41-4-6 as waiving immunity for negligent performance of
> administrative functions would be contrary to the plain language and intended
> purpose of the statute.

1993-NMSC-079, ¶ 8, 866 P.2d at 347 (alteration added)(citation omitted).  The Supreme Court

of New Mexico further explained:

> While Moya-Martinez's misclassification of Archibeque put him at risk, the
> negligence did not create an unsafe condition on the prison premises as to the
> general prison population.  Reading Section 41-4-6 to waive immunity every time
> a public employee's negligence creates a risk of harm for a single individual
> would subvert the purpose of the Tort Claims Act, which recognizes that
> government, acting for the public good, "should not have the duty to do
> everything that might be done," and limits government liability accordingly.

1993-NMSC-079, ¶ 8, 866 P.2d at 348 (quoting N.M. Stat. § 41-4-2(A))(citation omitted).

According to the Supreme Court of New Mexico, to permit a waiver of immunity under § 41-4-6

whenever injury results from a negligently performed administrative task "would undermine the

purpose of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate." 1993-NMSC-079, ¶ 14, 866 P.2d at 349. The Supreme Court of New Mexico noted that, "[w]hile a segment of the population at risk might justify waiver of immunity under Section 41-4-6, a situation in which a single inmate is put at risk is not comparable." 1993-NMSC-079, ¶ 14, n.3, 866 P.2d at 349 n.3. The Honorable Richard Ransom, then-Chief Justice of the Supreme Court of New Mexico, in his concurring opinion, noted:

> I concur because there was no showing that the general prison population reflected anything but the reasonable and expected risks of prison life. The classification of Archibeque did not change the condition of the premises. I see Archibeque's injuries as having been proximately caused by a discrete administrative decision. As an alternative to releasing Archibeque into the general population, he could have been placed in administrative segregation, a form of protective custody. The risk arose not from a condition of the premises (as with the wild dogs in Castillo [v. County of Santa Fe, 1988-NMSC-037, 755 P.2d 48] or, arguably, the inadequate health care facilities in Silva [v. State, 1987-NMSC-107, 745 P.2d 380]); it arose from the classification itself.

Archibeque v. Moya, 1993-NMSC-079, ¶ 17, 866 P.2d at 350 (Ransom, C.J., concurring).

In Callaway v. New Mexico Department of Corrections, 1994-NMCA-049, ¶ 19, 875 P.2d 393, 398, the Court of Appeals of New Mexico concluded that the plaintiff had "stated a claim sufficient to waive immunity under Section 41-4-6," because the New Mexico Corrections Department "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." 1994-NMCA-049, ¶ 19, 875 P.2d at 399. The Court of Appeals of New Mexico additionally noted, in "support for [its] holding[,]" that the "inmate assailant was unusually dangerous and the prison authorities had knowledge of the danger posed by the inmate." 1994-NMCA-049, ¶ 19, 875 P.2d at 399 (alterations added). See Lymon v. Aramark

Corp., 728 F. Supp. 2d 1222, 1251-56 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach must be a cause-in-fact and proximate cause of the plaintiff's damages. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86 ("Herrera"). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249. Generally, negligence is a question of fact for the jury. See Schear v. Bd. of County Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729. "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." Schear v. Bd. of County Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729. "Whether a duty exists is a question of law for the courts to decide." Schear v. Bd. of County Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted). Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons." Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owed a duty to the plaintiff. See Herrera, 2003-NMSC-018, ¶ 8, 73 P.3d at 186. The New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted). To determine

whether the obligation of the defendant is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera, 2003-NMSC-018, ¶ 9, 73 P.3d at 187.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187 (internal quotation marks and citation omitted). "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187 (alterations in original)(internal quotation marks and citation omitted). "It need not be the only cause, nor the last nor nearest cause." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187 (internal quotation marks and citation omitted). "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." Herrera, 2003-NMSC-018, ¶ 33, 73 P.3d at 187 (internal quotation marks and citation omitted).

## LAW REGARDING QUASI-JUDICIAL IMMUNITY

The Supreme Court has held that, if claims against hearing officers presiding over an adjudication arise out of their adjudicatory acts, they are entitled to absolute quasi-judicial

immunity.  In Butz v. Economou, 438 U.S. 478 (1978), the Supreme Court held that agency hearing examiners were entitled to absolute quasi-judicial immunity because their role was "functionally comparable" to that of judge.  Butz v. Economou, 438 U.S. at 512-14.  The Tenth Circuit recognizes that "officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion."  Guttman v. Khalsa, 446 F.3d 1027, 1033 (10th Cir. 2006)(citing Butz v. Economou, 438 U.S. at 514).  For an official at an administrative hearing to enjoy absolute immunity, "(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct."  Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examr's, 822 F.2d 1508, 1513 (10th Cir. 1987))(internal quotation marks omitted).  For example, in Hennelly v. Flor de Maria Oliva, 237 F. App'x 318 (10th Cir. 2007), the Tenth Circuit affirmed the district court's dismissal of § 1983 claims against both the New Mexico State Court Judge presiding over a child-custody case and the Hearing Officer who issued recommended rulings in that case after holding a hearing.  See Hennelly v. Flor de Maria Oliva, 237 F. App'x at 320.  The Court held that the judge and hearing officer both "were entitled to absolute judicial immunity, as [the plaintiff's] allegations concerned actions [the] Judge [ ] and Officer [ ] took in their judicial capacities within the jurisdiction of the state court."  Hennelly v. Flor de Maria Oliva, 237 F. App'x at 320.

In addition to hearing officers, the Tenth Circuit has also explained that government officials enjoy quasi-judicial immunity when executing facially valid court orders.  See Whitesel v. Sengenberger, 222 F.3d 861, 867-70 (10th Cir. 2000)(recognizing that, "[a]lthough absolute immunity generally extends to non-judicial officers performing discretionary judicial acts, some

circuits, including our own, have held that those performing ministerial acts at the direction of a judge are also entitled to absolute immunity," and holding that a pretrial service officer, who, acting as a bond commissioner, issued a Temporary Restraining Order, was entitled to qualified immunity).   See also Zamora v. City of Belen, 383 F. Supp. 2d 1315, 1325 (D.N.M. 2005)(Browning, J.)("[L]aw enforcement officers are also entitled to absolute 'quasi-judicial' immunity for their actions in executing facially valid warrants, writs, and other court orders, such as bench warrants.").   "A key requirement that [the Tenth Circuit] ha[s] found necessary to the application of quasi-judicial immunity where government officials are executing court orders is the requirement that the order be 'facially valid.'"   Moss v. Kopp, 559 F.3d 1155, 1164 (10th Cir. 2009)(alterations added)(quoting Turney v. O'Toole, 898 F.2d 1470, 1472 (1990)(holding that officials charged with the duty of executing a facially valid court order enjoy absolute immunity)).   In Moss v. Kopp, the Tenth Circuit elaborates:

> [W]e have acknowledged that even assuming that an order is infirm as a matter of state law, it may be facially valid, as "facially valid" does not mean "lawful," and erroneous orders can be valid.  We explained: State officials must not be required to act as pseudo-appellate courts scrutinizing the orders of judges, but subjecting them to liability for executing an order because the order did not measure up to statutory standards would have just that effect.  Further, [t]o allow plaintiffs to bring suit any time a state agent executes a judicial order which does not fulfill every legal requirement would make the agent a lightning rod for harassing litigation aimed at judicial orders.  Simple fairness requires that state officers not be called upon to answer for the legality of decisions which they are powerless to control.

> We have also noted that a narrow conception of facial validity would deprive the court of most of the benefit it derives from the existence of quasi-judicial immunity for officers carrying out its orders because the unhesitating execution of court orders is essential to the court's authority and ability to function, and state officers subject to litigation might neglect to execute these orders.  Even worse, a fear of bringing down litigation on the [officer executing the order] might color a court's judgment in some cases.  In short, [t]he public interest demands strict adherence to judicial decrees.

Moss v. Kopp, 559 F.3d at 1165 (first alteration added, second through fourth alterations original)(internal quotation marks and citations omitted). "To force officials performing ministerial acts intimately related to the judicial process to answer in court every time a litigant believes the judge acted improperly is unacceptable. Officials must not be called upon to answer for the legality of decisions which they are powerless to control." Valdez v. City & Cty. of Denver, 878 F.2d 1285, 1288-89 (10th Cir. 1989). The Tenth Circuit explains that "[t]ension between trial judges and those officials responsible for enforcing their orders inevitably would result were there not absolute immunity for both." Valdez v. City & Cty. of Denver, 878 F.2d at 1289 (alteration added)(citing T & W Inv. Co., Inc. v. Kurtz, 588 F.2d 901, 802 (10th Cir. 1978)).

> Officials employed to implement facially valid court orders could choose: They may disregard the judge's orders and face discharge, or worse yet criminal contempt, or they may fulfill their duty and risk being hauled into court. Judge Learned Hand recognized years ago that the fear of suit will "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."

Valdez v. City & Cty. of Denver, 878 F.2d at 1289 (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)). The Tenth Circuit accordingly concluded that "[a]bsolute immunity [for officials who execute facially valid court orders] will ensure the public's trust and confidence in courts' ability to completely, effectively and finally adjudicate the controversies before them." Valdez v. City & Cty. of Denver, 878 F.2d at 1289. See Zamora v. City of Belen, 383 F. Supp. 2d at 1325.

## LAW REGARDING ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S.

Const. amend. XI. The Supreme Court has construed Eleventh Amendment immunity to prohibit federal courts from entertaining suits against states brought by their own citizens or citizens of another state without their consent. See Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990). State agencies are likewise provided immunity as "an arm of the state." Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 280-81 (1977). See Williams v. Bd. of Regents of Univ. of N.M., 990 F. Supp. 2d 1121, 1142-43 (D.N.M. 2014)(Browning, J.).

### 1.      The Consent and Abrogation Exceptions to Eleventh Amendment Immunity.

Exceptions to a state's Eleventh Amendment immunity are few. A state may, however, voluntarily waive its immunity. See Edelman v. Jordan, 415 U.S. 651, 673 (1974). Congress may also abrogate Eleventh Amendment immunity pursuant to section 5 of the Fourteenth Amendment, where the statute explicitly manifests Congress' intent to do so. See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976). Congress did not, however, abrogate Eleventh Amendment immunity when enacting 42 U.S.C. § 1983. See Quern v. Jordan, 440 U.S. 332, 340 (1979). Section 1983 creates a cause of action against any person who, acting under color of state law, abridges rights created by the Constitution and federal law. See 42 U.S.C. § 1983. Consequently, Eleventh Amendment immunity extends to state-governments under that statute, and claims pursuant thereto in the federal courts are barred as a matter of law. See Williams v. Bd. of Regents of Univ. of N.M., 990 F. Supp. 2d at 1143.

### 2.      Removal as a Waiver of Sovereign Immunity.

When a state removes a case to federal court, it invokes federal jurisdiction and waives Eleventh Amendment immunity. See Lapides v. Board of Regents of Univ. Sys. of Ga., 535 U.S. 613, 624 (2002). In Lapides v. Board of Regents, the Supreme Court held that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's

otherwise valid objection to litigation of a matter . . . in a federal forum."  535 U.S. at 624.  The

Supreme Court noted: "[I]t is easy enough to presume that an attorney authorized to represent the

State can bind it to the jurisdiction of the federal court (for Eleventh Amendment purposes) by

the consent to removal."  535 U.S. at 624 (internal quotation marks omitted).

While Lapides v. Board of Regents was arguably limited to the context of state law

claims for which the state had explicitly waived immunity to suit in state court, the Tenth Circuit

has held that consent to remove a case to federal court also constitutes waiver in the context of

federal claims.  See Estes v. Wyoming Dep't of Transp., 302 F.3d 1200, 1206 (2002).  In other

words, when a state removes federal-law claims from state court to federal court, the state

unequivocally invokes the jurisdiction of the federal court.  See Estes v. Wyoming Dep't of

Transp., 302 F.3d at 1206.

In Abreu v. N.M. Children, Youth & Families Dep't, 646 F. Supp. 2d 1259 (D.N.M.

2009)(Browning, J.), the Court addressed the issue "whether removal constitutes a waiver of

immunity if private attorneys, representing state agencies or officials, rather than the state's

Attorney General, carry out removal."  646 F. Supp. 2d at 1264.  The Court determined that, "at

least where counsel for the state agency are authorized to carry out the representation, their act of

removing a case to federal court will be sufficiently authoritative to constitute a waiver of

Eleventh Amendment immunity."  646 F. Supp. 2d at 1264.  The Court explained that, in

Lapides v. Board of Regents, the Supreme Court "framed and decided the issue without

reference to whether the state agency's counsel must be the Attorney General."  Abreu v. N.M.

Children, Youth & Families Dep't, 646 F. Supp. 2d at 1265.  Reviewing the cases on which the

Supreme Court relied in Lapides v. Board of Regents, the Court noted that the focus was not on

the identity of the officer or on whether the officer had the authority to waive immunity, but

"was on the right to represent the state in the matter in question." <u>Abreu v. N.M. Children,</u> <u>Youth & Families Dep't</u>, 646 F. Supp. 2d at 1267. "In sum, if the Defendants' counsel has the authority, under state law, to represent the Defendants -- who are state agencies -- then counsel may waive the Eleventh Amendment immunity defense by consenting to remove this case to federal court." 646 F. Supp. 2d at 1268. Turning to whether the defendants' counsel had such authority, the Court noted that Risk Management Division, a division of the General Services Department, had the statutory authority to hire legal counsel, and that Risk Management's advisory board includes the Attorney General or his designee; thus, "the Risk Management Division does not operate totally divorced from the Attorney General's authority and supervision." 646 F. Supp. 2d at 1268. The Court determined that the New Mexico Children, Youth, & Families Department's ("CYFD") private counsel were authorized to represent CYFD and could waive Eleventh Amendment immunity on CYFD's behalf. <u>See</u> 646 F. Supp. 2d at 1268. Additionally, CYFD's counsel obtained a commission from the Attorney General, which indicated that the Attorney General consented "not only to private counsels' representation in this case, but to their litigating the case in federal court." 646 F. Supp. 2d at 1269. Counsel in that case also "agreed to obtain the Attorney General's express waiver of the State's Eleventh Amendment immunity." 646 F. Supp. 2d at 1270. The Court determined that New Mexico had validly waived its Eleventh Amendment immunity, exercised jurisdiction, and denied the motion to remand in that case. <u>See</u> 646 F. Supp. 2d at 1270.

In <u>Armijo v. State, Department of Transportation</u>, the Court again held that a state department waives Eleventh Amendment immunity by consenting to remove the case to federal court. <u>See</u> <u>Armijo v. State, Department of Transportation</u>, 2009 WL 1329192, at *4 (D.N.M. April 6, 2009)(Browning, J.). Noting that "[n]either party has contended that the attorney

representing the Department lacks authority to represent the Department in this case," the Court said it "presumes the representation is valid and finds that counsel had the authority to remove this case to federal court."  2009 WL 1329192, at *5.  See Williams v. Bd. of Regents of Univ. of N.M., 990 F. Supp. 2d at 1143-44.

      **3.**      **Ex Parte Young.**

Although not properly characterized as an exception to a state's Eleventh Amendment immunity, the doctrine announced in Ex parte Young, 209 U.S. 123, 128 (1908), allows for suits against state officials under certain circumstances.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d 602, 607-08 (10th Cir. 1998)("The Ex parte Young doctrine is not actually an exception to Eleventh Amendment state immunity because it applies only when the lawsuit involves an action against state officials, not against the state.").  In Ex parte Young, the Supreme Court held that the Eleventh Amendment bar generally does not apply to state officials defending suit in federal court which seeks only prospective relief from violations of federal law. Ex parte Young, 209 U.S. at 28.  The Ex parte Young doctrine allows suit to proceed against defendant state officials if the following requirements are met: (i) the plaintiffs are suing state officials rather the state itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the state treasury; and (iv) the suit does not implicate special sovereignty interests.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 609 (10th Cir. 1998); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1086 (D.N.M. 2016).

## LAW REGARDING MOTIONS TO AMEND

"While Rule 15 governs amendments to pleadings generally, rule 16 of the Federal Rules of Civil Procedure governs amendments to scheduling orders."  Bylin v. Billings, 568 F.3d 1224,

1231 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)).  When a court has not entered a scheduling

order in a particular case, rule 15 governs amendments to a plaintiff's complaint.  <u>See</u> Fed. R.

Civ. P. 15.  When a scheduling order governs the case's pace, however, amending the complaint

after the deadline for such amendments implicitly requires an amendment to the scheduling

order, and rule 16(b)(4) governs changes to the scheduling order.  <u>See</u> <u>Bylin v. Billings</u>, 568 F.3d

at 1231.

Rule 15(a) of the Federal Rules of Civil Procedure provides:

**(1) Amending as a Matter of Course.**  A party may amend its pleading once as a matter of course within:

**(A)** 21 days after serving it, or

**(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under rule 12(b), (e), or (f), whichever is earlier.

**(2) Other Amendments.**  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(bold in original).  Further, the local rules provide that, with respect to

motions to amend a pleading, "[a] proposed amendment to a pleading must accompany the

motion to amend."  D.N.M.LR-Civ. 15.1.

Under rule 15(a), the court should freely grant leave to amend a pleading where justice so

requires.  <u>See</u> <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. 571, 579-80 (D.N.M.

2010)(Browning, J.); <u>Youell v. Russell</u>, 2007 WL 709041, at *1-2 (D.N.M. 2007)(Browning, J.);

<u>Burleson v. ENMR-Plateau Tele. Coop.</u>, 2005 WL 3664299, at *1-2 (D.N.M. 2005)(Browning,

J.).  The Supreme Court has stated that, in the absence of an apparent reason such as "undue

delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Fomen v. Davis, 371 U.S. 178, 182 (1962).  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001). See  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile."  Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An amendment is "futile" if the pleading "as amended, would be subject to dismissal."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)).  See Youell v. Russell, 2007 WL 709041, at *2-3 (D.N.M. 2007)(Browning, J.); Lymon v. Aramark Corp., 2009 WL 1299842 (D.N.M. 2009)(Browning, J.).  The Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no adequate explanation for the delay, Woolsey, 934 F.2d at 1462. Furthermore, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." Las Vegas Ice, 893 F.2d at 1185.

Frank v. U.S. W., Inc., 3 F.3d at 1365-66.[24]  The longer the delay, "the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend."  Minter v. Prime Equip. Co., 451 F.3d at 1205 (citing Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)).  Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'"  Minter v. Prime Equip. Co., 451 F.3d at 1206 (quoting Viernow v. Euripides Dev. Corp., 157 F.3d 785, 799-800 (10th Cir. 1998)).  "[P]rejudice to the opposing party need not also be shown."  Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185.  "Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."  Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185 (quoting State Distribs., Inc. v. Glenmore  Distilleries Co., 738 F.2d 405 (10th Cir. 1984)).  Along the same vein, the court will deny amendment if the party learned of the facts upon which its proposed amendment is based and nevertheless unreasonably delayed in moving to amend its complaint.  See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

Refusing leave to amend is generally justified only upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies

---

[24]The Court notes that there is older authority in the Tenth Circuit that seems to be to the contrary.  See R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir. 1975)("Lateness does not of itself justify the denial of the amendment.").  Minter v. Prime Equipment Co. seems to clarify that the distinction is between "delay" and "undue delay."  Minter v. Prime Equipment Co., 451 F.3d at 1205-06.  Delay is undue "when the party filing the motion has no adequate explanation for the delay."  Minter v. Prime Equipment Co., 451 F.3d at 1206.

by amendments previously allowed, or futility of amendment.  See Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993)(citing Foman v. Davis, 371 U.S. at 182).  Again, the matter is left to the Court's discretion.  See Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc., 3 F.3d at 1365-66, and stating that resolving the issue whether to allow a plaintiff to file a supplement to his complaint is "well within the discretion of the district court").  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Schs., 2007 WL 1306814, at *2 (D.N.M. 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).  "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim."  Burleson v. ENMR-Plateau Tel. Co-op., 2005 WL 3664299 at *2 (D.N.M. 2005)(Browning, J.)(citing Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)).  See Benavidez v. Sandia Nat'l Labs., 2017 WL 2266854, at *16-17 (D.N.M. Jan. 17, 2017)(Browning, J.).

## LAW REGARDING EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIMS

When a prisoner is incarcerated, the Eighth Amendment protects him from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as from the intentional use of excessive force.  Farmer v. Brennan, 511 U.S. 825, 828 (1994)(quoting Helling v. McKinney, 509 U.S. 25, 28 (1993)).  "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates."  Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).  An official violates the Eighth Amendment when two elements are met: (i) the

official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The second condition represents the functional application of the deliberate-indifference standard. See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.")(quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. 25, 36 (1993). Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36. "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36. The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action."). The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which

protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'" United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006). Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." United States v. LaVallee, 439 F.3d at 688. See Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks."). Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury." United States v. LaVallee, 439 F.3d at 688.

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. at 298. Courts apply this subjective inquiry to determine whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For Eighth Amendment purposes, the Tenth Circuit has

equated deliberate indifference with recklessness.  See Belcher v. United States, 216 F. App'x at 823-24 (quoting Smith v. Cummings, 445 F.3d at 1258).

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court addressed whether a plaintiff could assert both Eighth Amendment violations and substantive due-process violations in the same suit against government officials alleging that they engaged in physically abusive conduct.  See 490 U.S. at 394-95.  More specifically, it held that, when a specific constitutional amendment provides "an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," courts should analyze all constitutional claims under that amendment's standards rather than under "the more generalized notion of 'substantive due process.'"  490 U.S. at 395.  The Supreme Court gave as an example for this principle "the Eighth Amendment's ban on cruel and unusual punishments," because it is one of the "two primary sources of constitutional protection against physically abusive governmental conduct."  490 U.S. at 395.  The Supreme Court later clarified that its holding in Graham v. Connor "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  United States v. Lanier, 520 U.S. 259, 272 n.7 (1997).  To illustrate this point, the Supreme Court has recognized that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory.  See Cty. of Sacramento v. Lewis, 523 U.S. 833, 843-844 (1998)("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . .  Graham's more-specific-provision rule is therefore no bar to respondents' suit.")(quoting U.S. Const. amend. IV).

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments." 83 F.3d at 1202. In determining whether to apply Eighth Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." 83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990)). Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory. See Riddle v. Monragon, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment."). See also Salazar v. San Juan Cty. Det. Ctr., No. CIV 15-0417 JB/LF, 2016 WL 335447, at *30-32 (D.N.M. Jan. 15, 2016)(Browning, J.).

## ANALYSIS

The Court concludes that: (i) the New Mexico Corrections Department is entitled to summary judgment on Gallegos' claims, because the New Mexico Corrections Department enjoys sovereign immunity from those claims; (ii) the NMTCA does not waive the New Mexico Corrections Department's Eleventh Amendment immunity from Gallegos' state tort claim; (iii) even if the NMTCA waives the New Mexico Corrections Department's Eleventh Amendment immunity from Gallegos' state tort claim, § 41-4-6(A)'s waiver provision does not apply, because Gallegos has not sufficiently demonstrated that the New Mexico Corrections

Department failed to implement a safety policy necessary to protect those who use the building that housed him; and (iv) even if the NMTCA waives the New Mexico Corrections Department's Eleventh Amendment immunity from Gallegos' state tort claims, § 41-4-6(A)'s waiver provision does not apply, because § 41-4-6(A) does not waive the New Mexico Corrections Department's immunity from Gallegos' state tort claim to the extent that Gallegos' claim is predicated on a single, discrete administrative act affecting only himself. Turning to the Motion to Amend, the Court concludes that: (v) Gallegos' proposed amendment to add Mr. Brewster as a defendant is futile, because Mr. Brewster is immune from Gallegos' claims to the extent that Gallegos' claims are based on Brewster's enforcement of facially-valid court orders; and (vi) Gallegos' proposed amendment to add Mr. Brewster as a defendant is also futile, because Mr. Brewster was neither negligent nor deliberately indifferent to Gallegos' withdrawal symptoms. The Court will proceed with its analysis in that order.

## I.  THE NEW MEXICO CORRECTIONS DEPARTMENT HAS SOVEREIGN IMMUNITY FROM GALLEGOS' CLAIMS.

The New Mexico Corrections Department enjoys sovereign immunity from Gallegos' claims. Both the federal Constitution's structure and the Eleventh Amendment guarantee state sovereign immunity from private suits. See U.S. Const. amend. XI; Alden v. Maine, 527 U.S. 706, 713 (1999).[25] The Eleventh Amendment provides that "[t]he judicial power of the United

---

[25]In Alden v. Maine, the Supreme Court explained:

[T]he sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.

States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."  U.S. Const. amend. XI.  A state is also immune from suit brought by one of its own citizens.  See Hans v. Louisiana, 134 U.S. 1, 13 (1890).  "It is well established," therefore, "that under the Eleventh Amendment, sovereign immunity prohibits federal courts from entertaining suits against states brought by their own citizens or citizens of another state without their consent."  Hunt v. Colo. Dep't of Corr., 271 F. App'x 778, 780 (10th Cir. 2008).

Although the Supreme Court has refrained from deciding whether "Eleventh Amendment immunity is a matter of subject-matter jurisdiction," Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 391 (1998), state sovereign immunity is jurisdictional in important respects.[26]  First, the

_____

Alden v. Maine, 527 U.S. at 713.

[26]For its part, the Tenth Circuit has noted that Eleventh Amendment immunity "is not easy to characterize," because "[i]t shares features with affirmative defenses, while also containing traits more akin to subject-matter jurisdiction."  U.S. ex rel. Burlbaw v. Orenduff, 548 F.3d at 941 (10th Cir. 2008)(citing Fent v. Okla Water Res. Bd., 235 F.3d 553, 558 (10th Cir. 2000)).  As such, the Tenth Circuit has opined that Eleventh Amendment immunity "is best understood according to its own unique identity, rather than through its similarities with other legal doctrines."  U.S. ex rel. Burlbaw v. Orenduff, 548 F.3d at 941.  "In other words," the Tenth Circuit has stated, "'the Eleventh Amendment occupies its own unique territory.'"  U.S. ex rel. Burlbaw v. Orenduff, 548 F.3d at 941 (quoting Floyd v. Thompson, 227 F.3d 1029, 1035 (7th Cir. 2000)).
Although the Supreme Court has refrained from deciding whether "Eleventh Amendment immunity is a matter of subject-matter jurisdiction," Wis. Dep't of Corr. v. Schacht, 524 U.S. at 391, the Supreme Court has indicated that, even if it were jurisdictional, the Eleventh Amendment inquiry does not necessarily take pride of place among other inquiries concerning the federal judicial power to adjudicate claims.  See Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 779-80 (2000); Calderon v. Ashmus, 523 U.S. 740, 745 n.2 (1998).  A federal court's subject-matter jurisdiction must be addressed before the merits of a claim that the court is called to adjudicate.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998)(quoting Ex parte McCardle, 7 Wall. 506, 514 (1868))("Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").  The Supreme Court has not expressly decided whether the Eleventh Amendment must

be decided "before the merits." Wright & Miller § 3524.1, at 264. In two cases, the Supreme Court has held that federal courts should address other questions regarding the federal judicial power before addressing an Eleventh Amendment immunity inquiry. See Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. at 779-80; Calderon v. Ashmus, 523 U.S. at 745 n.2. Hence, even if Eleventh Amendment immunity bears upon the federal courts' jurisdiction, among questions involving the federal courts' judicial power, it does not take pride of place. See Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. at 779-80; Calderon v. Ashmus, 523 U.S. at 745 n.2.

First, in Calderon v. Ashmus, the Supreme Court granted certiorari on an Eleventh Amendment issue, but decided that it "must first address whether this action for a declaratory judgment is the sort of 'Article III' 'case or controversy' to which federal courts are limited." Calderon v. Ashmus, 523 U.S. at 745. The Supreme Court explained this sequence of inquiry by noting that, "[w]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings, we have recognized that it is not coextensive with the limitations on judicial power in Article III." Calderon v. Ashmus, 523 U.S. at 748 n.2 (citing Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Patsy v. Board of Regents of Fla., 457 U.S. 496, 515 n.19 (1982)). In Calderon v. Ashmus, the Eleventh Amendment immunity question took a back seat to a justiciability question, but not to the merits. See Calderon v. Ashmus, 523 U.S. at 749 ("We conclude that this action for a declaratory judgment and injunctive relief is not a justiciable case within the meaning of Article III."). Calderon v. Ashmus, therefore, suggests that Eleventh Amendment immunity is not, strictly speaking, a limitation on the federal courts' judicial power. See Calderon v. Ashmus, 523 U.S. at 748 n.2 ("While the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings, we have recognized that it is not coextensive with the limitations on judicial power in Article III.").

Second, in Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000), the Supreme Court stated that it has

> routinely addressed *before* the question whether the Eleventh Amendment forbids a particular statutory cause of action to be asserted against States, the question whether the statute itself *permits* the cause of action it creates to be asserted against States (which it can do only by clearly expressing such an intent).

Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. at 779 (emphases original)(citing Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73-78 (2000); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55-57 (1996); Hafer v. Melo, 502 U.S. 21, 25-31 (1991); Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 277-81 (1977)). The Supreme Court further noted that, "[w]hen these two questions are at issue, not only is the statutory question 'logically antecedent to the existence of" the Eleventh Amendment question, but also there is no realistic possibility that addressing the statutory question will expand the Court's power beyond the limits that the jurisdictional restriction has imposed.'" Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. at 779 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 612 (1997)). The Supreme Court explained:

The question whether the statute provides for suits against the States (as opposed, for example, to the broader question whether the statute creates any private cause of action whatever, or the question whether the facts alleged make out a "false claim" under the statute) does not, as a practical matter, permit the court to pronounce upon any issue, or upon the rights of any person, beyond the issues and persons that would be reached under the Eleventh Amendment inquiry anyway. The ultimate issue in the statutory inquiry is whether States can be sued under this statute; and the ultimate issue in the Eleventh Amendment inquiry is whether unconsenting States can be sued under this statute. This combination of logical priority and virtual coincidence of scope makes it possible, and indeed appropriate, to decide the statutory issue first. We therefore begin (and will end) with the statutory question.

Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. at 779-80. The Supreme Court's inclination to address the justiciability questions and statutory questions regarding whether a statute that creates a cause of action also applies to the States suggests that Eleventh Amendment immunity, when raised, is not necessarily the first question regarding a court's jurisdiction. See Calderon v. Ashmus, 523 U.S. at 748 n.2 ("While the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings, we have recognized that it is not coextensive with the limitations on judicial power in Article III."); Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. at 779-80 ("This combination of logical priority and virtual coincidence of scope makes it possible, and indeed appropriate, to decide the statutory issue first. We therefore begin (and will end) with the statutory question."). See also Wright & Miller § 3524.1, at 264-65.

Justices Stevens has suggested, however, that the Eleventh Amendment is a straightforward restriction on the federal courts' subject-matter jurisdiction. Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 770-71 (2002)(Stevens, J., dissenting). In Federal Maritime Commission v. South Carolina State Ports Authority, writing in dissent, Justice Stevens explained his own view that the Eleventh Amendment clearly restricts the federal court's diversity jurisdiction. See Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. at 770-71. In Justice Stevens' estimation, the Eleventh Amendment's legislative history illuminates its bearing on the federal courts' subject-matter jurisdiction. See Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. at 771. Justice Stevens observes:

It is familiar learning that the Amendment was a response to this Court's decision in *Chisholm v. Georgia*. Less recognized, however, is that *Chisholm* necessarily decided two jurisdictional issues: that the Court had personal jurisdiction over the state defendant, and that it had subject-matter jurisdiction over the case. The first proposed draft of a constitutional amendment responding to *Chisholm* -- introduced in the House of Representatives in February 1793, on the day after *Chisholm* was decided -- would have overruled the first holding, but not the second. That proposal was not adopted. Rather, a proposal introduced the following day in the Senate, which was "cast in terms that we associate with subject matter jurisdiction," provided the basis for the present text of the Eleventh Amendment.

Eleventh Amendment protects states not only from liability but also from being subject to judicial process at a private litigant's instance. See Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 766 (2002)("Sovereign immunity does not merely constitute a defense to monetary liability or even to all types of liability. Rather, it provides an immunity from suit."). Second, like other jurisdictional defenses, a state's sovereign immunity defense may be asserted at any stage of proceedings, including for the first time on appeal. See Edelman v. Jordan, 415 U.S. at 678 ("[T]he Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court . . . ."). Third, the Court may raise sua sponte the sovereign-immunity issue, see V-1 Oil Co. v. Utah State Dep't of Pub. Safety, 131 F.3d 1415, 1420 (10th Cir. 1997)(raising the Eleventh Amendment issue sua sponte), but -- unlike other defenses to subject matter jurisdiction -- a court is not required to do so, see Nelson v. Geringer, 295 F.3d at 1098 ("[J]udicial consideration of Eleventh Amendment issues sua sponte is discretionary, not mandatory.")(alteration added)(citing Wis. Dep't of Corr. v. Schacht, 524 U.S. at 389 ("Nor need a court raise [an Eleventh Amendment] defect on its own. Unless the State raises the matter, a court can ignore it."). But cf. Archibeque v. Wylie, 16 F.3d 415 (10th Cir. 1994)(stating that, "[a]s an initial matter, we must determine whether we have jurisdiction, though neither the parties nor the district court raised this issue," where the case involved an official-capacity claim against a New Mexico Department of Corrections employee)(citing

---

This legislative history suggests that the Eleventh Amendment is best understood as having overruled *Chisholm's* subject-matter jurisdiction holding, thereby restricting the federal courts' diversity jurisdiction. . . . Moreover, as Chief Justice Marshall recognized, a subject-matter reading of the Amendment makes sense, considering the States' interest in avoiding their creditors.

Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. at 772 (Stevens, J., dissenting)(citations and footnotes omitted). The Court is inclined to agree with Justice Stevens' view that the Eleventh Amendment limits the federal courts' subject-matter jurisdiction.

McGeorge v. Cont'l Airlines, Inc., 871 F.2d 952, 953 (10th Cir. 1989)).[27]  "The net effect of these characteristics is that a state defendant retains broad discretion over whether a court must hear an Eleventh Amendment argument that may end the litigation."  U.S. ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 942 (10th Cir. 2008).  As the Supreme Court has succinctly stated the proposition, "[u]nless the State raises the matter, a court can ignore it."  Wis. Dep't of Corr. v. Schacht, 524 U.S. at 389.

In this case, the Court does not raise the issue of sovereign immunity sua sponte, because the New Mexico Corrections Department asserts the defense itself.  See Defendant New Mexico Department of Corrections' Answer to Amended Complaint ¶ 1, at 4, filed May 5, 2016 (Doc. 9)("Answer"); Tr. at 47:20 (Moulton).  In its Answer, as its first affirmative defense, the New Mexico Corrections Department argues that "absolute immunity" bars Gallegos' claims.  Answer ¶ 1, at 4.  At the hearing, the New Mexico Department of Corrections clarified that the Eleventh Amendment provides that immunity.  See Tr. at 47:20 (Moulton).  The defense is sound.

The New Mexico Corrections Department partakes in New Mexico's state sovereign immunity.  State sovereign immunity "extends to state agencies functioning as an arm of the state."  Hunt v. Colo. Dep't of Corr., 271 F. App'x at 780 (citation omitted).  See Bishop v. John Doe 1, 902 F.2d 809, 810 (10th Cir. 1990)("The eleventh amendment generally bars lawsuits in

---

[27]Because a party may raise a state sovereign immunity defense for the first time on appeal, the Court reasons that both prudence and judicial economy generally counsel considering state sovereign immunity sua sponte in those instances where a defendant does not assert the issue in trial court; otherwise, the Court risks what might amount to unnecessary resources in considering the merits of a plaintiff's claims.  The Court notes, for example, that, in Archibeque v. Wylie, 16 F.3d 415, 1994 WL 41272 (10th Cir. 1994)(Table), because state sovereign immunity barred an official capacity claim against a New Mexico Corrections Department employee, the Tenth Circuit held that the district court lacked jurisdiction over that claim and, accordingly, "vacate[d] the district court's orders as they pertain to Mr. Archibeque's 1983 claim and state law claim against Ms. Moya-Martinez in her official capacity and remand[ed] to the district court for dismissal for lack of jurisdiction."  Archibeque v. Wylie, 16 F.3d 415, 1994 WL 41272, at *1.

federal court seeking damages against states as well as against state agencies, departments, and employees acting in their official capacity.").[28]   The Tenth Circuit has settled that the New Mexico Corrections Department is an arm of the state for the purposes of state sovereign immunity.  See Bishop v. John Doe 1, 902 F.2d at 810.  In Bishop v. John Doe 1, the Tenth Circuit affirmed the dismissal of the plaintiff-appellant's claims against the New Mexico Corrections Department, because sovereign immunity protected the state agency and New Mexico had not waived immunity to the plaintiff-appellant's claims.  See Bishop v. John Doe 1, 902 F.2d at 810.  See also, e.g., Archibeque v. Wylie, 16 F.3d 415, 1994 WL 41272, at *1 (10th Cir. 1994)(Table)(holding that state sovereign immunity barred official-capacity claim against New Mexico Corrections Department employee).  By the same reasoning, in Hunt v. Colorado Department of Corrections, the Tenth Circuit held that the "Colorado Department of Correction . . . is an agency of the State of Colorado," 271 F. App'x at 780-81, and, consequently, concluded that the plaintiff's claim against that state agency "is barred as a matter of law," 271 F. App'x at 781.  Accordingly, the New Mexico Corrections Department is immune from Gallegos' claims, unless an exception to sovereign immunity applies.  No exception, however, applies.

First, because Gallegos does not seek injunctive relief against a state officer, see Amended Complaint ¶¶ 1-19, at 1-4, the Ex Parte Young doctrine does not apply, see Ex Parte Young, 209 U.S. at 128.  See also Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 607-08 ("The Ex parte Young doctrine . . . applies only when the lawsuit involves an action against state officials, not against the state.")(omission added).  Second, no exception applies for Gallegos' § 1983 claims.  It is settled that "Congress did not abrogate Eleventh

_____

[28]Counties and municipal corporations, by contrast, do not enjoy state sovereign immunity.  See Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 280 (1977).

Amendment immunity through Section 1983 . . . ."  Hunt v. Colorado Dep't of Corr., 271 F.

App'x at 781 (citing Quern v. Jordan, 440 U.S. at 345).  Further, New Mexico has not, by way of

statute, waived its sovereign immunity from § 1983 claims.  See, e.g., Archibeque v. Wylie, 16

F.3d 415, 1994 WL 41272, at *1 (holding that "New Mexico has not waived its immunity" to §

1983 claims asserting an Eighth Amendment violation).  Cf. Ramirez v. N.M. Children, Youth

and Families Dep't, 2016-NMSC-016, ¶ 29, 372 P.3d 497 (holding that, by statute, New Mexico

waived state sovereign immunity to claims asserted under the Uniformed Services Employment

and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301-35).  Third, on the record before the

Court, the New Mexico Corrections Department did not expressly consent to suit or otherwise

advert to an authorization by the New Mexico Attorney General consenting to suit in federal

court.  Cf. Abreu v. N.M. Children, Youth & Families Dep't, 646 F. Supp. 2d at 1269

(concluding that private counsel waived state agency's sovereign immunity where private

counsel received the New Mexico Attorney General's authorization).[29]  On the contrary, the state

agency asserts a sovereign immunity defense.  See Answer ¶ 1, at 4; Tr. at 47:20 (Moulton).

Furthermore, the New Mexico Corrections Department did not implicitly consent to suit

in federal court by either participating in removal or other litigation conduct.  Cf. Lapides v. Bd.

of Regents of Univ. Sys. of Ga., 535 U.S. at 619-20.  The Court cannot soundly conclude that the

Notice of Removal that the Bernalillo County Board of Commissioners and MDC filed pursuant

---

[29]In Lapides v. Board of Regents of the University System of Georgia, the Supreme Court
made clear that "[a] State remains free to waive its Eleventh Amendment immunity from suit in a
federal court."  Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. at 618 (alteration
added).  In Abreu v. New Mexico Children, Youth & Families Department, the Court concluded
that private counsel representing a state agency may waive New Mexico's sovereign immunity
when private counsel obtains authorization from the Attorney General, indicating that the
Attorney General consents "not only to private counsels' representation in th[e] case, but to their
litigating the case in federal court."  Abreu v. N.M. Children, Youth & Families Dep't, 646 F.
Supp. 2d at 1269 (alteration added).

to 28 U.S.C. § 1446(b)(3) waives the New Mexico Corrections Department's sovereign immunity.  See Notice of Removal ¶¶ 1-11, at 1-2.  Although "[a] State remains free to waive its Eleventh Amendment immunity from suit in a federal court," Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. at 618 (alteration added), "a State's Eleventh Amendment immunity may be waived if a state actor with the power to bring suit in federal court invokes federal jurisdiction in a *clear* and *voluntary* manner," Union Elec. Co. v. Mo. Dep't of Conservation, 366 F.3d 655, 659-60 (8th Cir. 2004)(emphasis in original).  Accordingly, although a state or state agency waives immunity from suit by removing to federal court, see Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. at 619-20, states do not waive immunity from suit where the state does not voluntarily participate in the removal to federal court, see Kozaczek v. N.Y. Higher Educ. Servs. Corp., 503 F. App'x 60, 62 (2d Cir. 2012)("Kozaczek's arguments that HESC waived Eleventh Amendment immunity are equally ineffectual.  Although a state or state agency waives immunity from suit by removing to federal court, HESC had not been properly served at the time Defendant GC Services removed this case and therefore did not consent to removal."); Frazier v. Pioneer Americas LLC, 455 F.3d 542, 547 (5th Cir. 2006)("[A] state may find itself in a case removed to federal court without having joined in the removal. Such a state, having taken no affirmative act, has not waived immunity and can still assert it.")(alteration added); Matson v. Tippecanoe Cty., Ind., No. 4:14 CV 79, 2016 WL 912692, at *1 (N.D. Ind. Mar. 9, 2016)(Moody, J.)(holding "that IDOC, having not voluntarily participated in the removal of this case, did not waive its sovereign immunity rights when the case was removed to this forum by other parties"); Shelley v. Colo. State Univ., No. A-14-CA-516 LY, 2015 WL 1004292, at *6 (W.D. Tex. Mar. 6, 2015)(Austin, M.J.)(concluding that a state agency did not waive sovereign immunity, because "[w]hile the Court has found that CSU has waived its sovereign immunity by

removing this case to federal court, the Board -- which is a separate entity from CSU -- was not a defendant in the case at the time of removal and thus was not a party to the removal of the case to federal court"); Mink v. Arizona, No. CV09-2582, 2010 WL 2594355, at *4 (D. Ariz. June 23, 2010)(Campbell, J.)(holding that state defendants "never acted in the removal" of the case to federal court where co-defendant had actually removed case and thus state defendants did not waive their sovereign immunity). Additionally, the mere fact of removal to federal court by any party to a case is insufficient to negate a state or state agency's sovereign immunity, because, by the Eleventh Amendment's plain language, the Eleventh Amendment bars jurisdiction to suits "commenced or prosecuted against one of the United States . . . ." U.S. Const. amend. XI (emphasis added). See Kozaczek v. N.Y. Higher Educ. Servs. Corp., 503 F. App'x at 62; Frazier v. Pioneer Americas LLC, 455 F.3d at 547.

Here, the New Mexico Corrections Department did not voluntary participate in this case's removal. The Bernalillo County Board of Commissioners and MDC -- not the New Mexico Corrections Department -- removed this case to federal court, and they did so before either Gallegos served the New Mexico Corrections Department or counsel for the New Mexico Corrections Department entered an appearance. See Notice of Removal ¶ 10, at 2 ("To the best of County Defendant[s'] knowledge, none of the other Defendants have been served in this action, nor filed an entry of appearance.")(alteration added). Nor has the New Mexico Corrections Department filed any notice consenting to or joining the removal; also, neither the Bernalillo County Board of Commissioners nor MDC has requested that the New Mexico Corrections Department consent to or join the Notice of Removal. Consequently, the New Mexico Corrections Department does not waive its immunity from suit, because the New Mexico Corrections Department did not voluntarily participate in the removal of this case to federal

court.  See Kozaczek v. N.Y. Higher Educ. Servs. Corp., 503 F. App'x at 62; Frazier v. Pioneer Americas LLC, 455 F.3d at 547.  Accordingly, the Notice of Removal does not waive the New Mexico Corrections Department's sovereign immunity from Gallegos' claims.

The New Mexico Corrections Department, as an arm of the state, partakes in New Mexico's state sovereign immunity.  See Archibeque v. Wylie, 16 F.3d 415, 1994 WL 41272, at *1; Bishop v. John Doe 1, 902 F.2d at 810.  No traditional exception to state sovereign immunity applies.  Accordingly, the New Mexico Corrections Department's sovereign immunity supplies a jurisdictional bar to Gallegos' claims.

## II.    THE NMTCA DOES NOT WAIVE THE NEW MEXICO CORRECTIONS DEPARTMENT'S ELEVENTH AMENDMENT IMMUNITY FROM GALLEGOS' TORT CLAIMS.

Gallegos asserts a state tort claim under the NMTCA against the New Mexico Corrections Department.  See Amended Complaint ¶¶ 8-17, at 2-3.  NMTCA § 41-4-4(A) "preserves" New Mexico's sovereign immunity from torts suits against state governmental entities and public employees acting in the scope of their duties, except as explicitly waived.  Fernandez v. Mora-San Miguel Elec. Co-op., Inc., 462 F.3d 1244, 1250 (10th Cir. 2006).  See N.M. Stat. Ann. § 41-4-4(A)("A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act and by Sections 41-4-5 through 41-4-12 NMSA 1978.").  For Gallegos' state tort claim against the New Mexico Corrections Department to be viable, the NTMCA's immunity-waiver provisions, N.M. Stat. Ann. §§ 41-4-5 to 41-4-12, must waive not only the sovereign immunity that the NMTCA preserves by statute in § 41-4-4(A), but also New Mexico's constitutional sovereign immunity as both the Eleventh Amendment and, according to Alden v. Maine, 527 U.S. at 713, the structure of the Constitution

reflect.  The latter species of immunity is a bar to suit in federal court.  See U.S. Const. amend. XI.  The Court concludes that the NMTCA's immunity-waiver provisions, N.M. Stat. Ann. §§ 41-4-5 to -12, do not waive New Mexico's Eleventh Amendment immunity.  Consequently, the New Mexico Corrections Department is also immune from Gallegos' state tort claim that he asserts under the NMTCA.  The Court pauses to explain its view that the NMTCA does not waive New Mexico's Eleventh Amendment immunity.

The Tenth Circuit has expressed equivocal views whether the NMTCA's immunity-waiver provisions, N.M. Stat. Ann. §§ 41-4-5 to 41-4-12, waive New Mexico's Eleventh Amendment immunity from suit and, accordingly, whether federal courts have jurisdiction over state tort claims asserted against a state entity under a specific NMTCA waiver provision. Compare Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d 1114, 1117 (10th Cir. 2010), and Garcia v. Bd. of Educ. of Socorro Consol. Sch. Dist., 777 F.2d 1403, 1406-07 (10th Cir. 1985), with Mescalero Apache Tribe v. State of N.M., 131 F.3d 1379, 1384 (10th Cir. 1997), and Bishop v. John Doe 1, 902 F.2d 809, 810 (10th Cir. 1990).  First, in Ross v. the Board of Regents of the University of New Mexico, the Tenth Circuit stated:

> [W]e must consider whether the plaintiffs are barred from bringing claims under the New Mexico Tort Claims Act by the doctrine of sovereign immunity and the Eleventh Amendment. The Eleventh Amendment bars suits for damages against a state or state agency absent congressional abrogation or waiver and consent by the state.  Under New Mexico law, the state's "[c]onsent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."

Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d at 1117 (alteration added)(citations omitted).  The Tenth Circuit proceeded to ascertain whether a state defendant in the case, the University of New Mexico's Office of the Medical Investigator, was "a 'like facility' under an exception to the Tort Claims Act [i.e., the NMTCA] that waives immunity for suits arising from

the negligence of public employees working in 'any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.'" Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d at 1117 (quoting N.M. Stat. Ann. § 41-4-9(A)). The Tenth Circuit concluded that, in light of Begay v. State, 1985-NMCA-117, ¶ 11, 723 P.2d 252, 256, rev'd on other grounds sub nom. Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306, the University of New Mexico's Office of the Medical Investigator is not a "like facility" under the § 41-4-9(A) waiver. Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d at 1117. Accordingly, the Tenth Circuit held that the "plaintiffs are barred from bringing claims under the New Mexico Tort Claims Act by the doctrine of sovereign immunity and the Eleventh Amendment." Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d at 1117.

Second, in Garcia v. Board of Education of Socorro Consolidated School District, the Tenth Circuit explained:

> However, the parties fail to address the issue of whether the school board's attorney has the authority to waive sovereign immunity. Sovereign immunity in New Mexico is now a statutory creation. In *Hicks v. State* [1975-NMSC-056, 544 P.2d 1153], the New Mexico Supreme Court abolished common law sovereign immunity. In response, the legislature enacted the Tort Claims Act, reinstating governmental immunity except in eight classes of activity. None of the eight exceptions apply to this case. Under section 41-4-4, waiver of immunity is limited to and governed by N.M. Stat. Ann. §§ 41-4-13 to -25 (1978). These sections do not authorize the school board's attorney to waive sovereign immunity. Thus we find that the school board is not estopped from raising eleventh amendment immunity at this time.

Garcia v. Bd. of Educ. of Socorro Consol. Sch. Dist., 777 F.2d at 1406-07 (citations omitted). In both Ross v. the Board of Regents of the University of New Mexico, 599 F.3d at 1117, and Garcia v. Board of Education of Socorro Consolidated School District, 777 F.2d at 1406-07, the Tenth Circuit reasons as though the NMTCA immunity-waiver provisions, when applicable, waive not only the immunity that § 41-4-4(A) creates, but also New Mexico's Eleventh

Amendment immunity.

By contrast, in <u>Mescalero Apache Tribe v. State of New Mexico</u>, 131 F.3d at 1384, and <u>Bishop v. John Doe 1</u>, 902 F.2d at 810, the Tenth Circuit adhered to the opposing view that, while the NMTCA waiver provisions, N.M. Stat. Ann. §§ 41-4-5 to -12, waive the immunity that § 41-4-4(A) creates, those same provision do not waive the Eleventh Amendment immunity from suit in federal court that New Mexico enjoys. In <u>Mescalero Apache Tribe v. State of New Mexico</u>, the Tenth Circuit stated that "[t]he fact that New Mexico judicially abolished general common-law sovereign immunity, and then, by statute, reinstated it in selected areas does not affect whether New Mexico enjoys Eleventh Amendment immunity from actions in federal court." <u>Mescalero Apache Tribe v. State of N.M.</u>, 131 F.3d at 1384 (citing <u>Palotai v. Univ. of Md. College Park</u>, 959 F. Supp. 714, 719 (D. Md. 1997)(Chasanow, J.)("[A] general waiver of sovereign immunity is not a waiver of a State's immunity from federal-court jurisdiction.")). Further, in <u>Bishop v. John Doe 1</u>, the Tenth Circuit explained:

> The eleventh amendment generally bars lawsuits in federal court seeking damages against states as well as against state agencies, departments, and employees acting in their official capacity. A state, however, may waive its eleventh amendment immunity and consent to suit against itself, related entities and employees. Under its Tort Claims Act, the State of New Mexico has consented to suits against its entities and employees acting within the scope of their duty for enumerated unintentional torts including negligence in the maintenance of machinery and equipment. But that consent is limited to actions commenced in the state district courts. Section 41-4-18A of the Act provides: "Exclusive original jurisdiction for any claim under the Tort Claims Act shall be in the district courts of New Mexico."

<u>Bishop v. John Doe 1</u>, 902 F.2d at 810 (quoting N.M. Stat. Ann. § 41-4-18A).

United States District Courts in the District of New Mexico, by contrast, have consistently reasoned that the NMTCA immunity-waiver provisions do not waive New Mexico's Eleventh Amendment immunity. <u>See Ysais v. N.M. Judicial Standard Comm'n</u>, 616

F. Supp. 2d 1176, 1186 (D.N.M. 2009)(Browning, J.); <u>Flores v. Long</u>, 926 F. Supp. 166, 167-68

(D.N.M. 1995)(Hansen, J.); <u>Wojciechowski v. Harriman</u>, 607 F. Supp. 631, 634 (D.N.M.

1985)(Baldock, J.). In <u>Flores v. Long</u>, Judge Hansen stated:

> Under the Tort Claims Act, New Mexico has waived its immunity from suit in its own state courts for actions of law enforcement officers. However, New Mexico has not waived its Eleventh Amendment immunity from suit in federal court. Consequently, this Court lacks jurisdiction to hear Plaintiff's claims against the New Mexico Department of Public Safety and the defendant officers of the New Mexico Department of Public Safety in their official capacities. These claims must be remanded to the state court from which they were removed.

<u>Flores v. Long</u>, 926 F. Supp. 166, 167-68 (citations omitted). Similarly, in <u>Wojciechowski v.</u>

<u>Harriman</u>, Judge Baldock stated:

> A state may waive its eleventh amendment immunity and consent to be sued in federal court. A waiver of a state's eleventh amendment immunity will be found only where stated by the most express language or by the overwhelming implications of such language where there is no room for any other reasonable construction. Providing for a limited waiver of its sovereign immunity, the State of New Mexico has expressly reserved its immunity from suit in federal court under the eleventh amendment. Thus, any tort claims suit against the State would lie in the district courts of New Mexico in accordance with section 41-4-18. Essentially, the State has consented to be sued in its own courts without waiving its immunity in the federal courts.

<u>Wojciechowski v. Harriman</u>, 607 F. Supp. at 634.

The Court concludes that the view that Judge Baldock expressed in <u>Wojciechowski v.</u>

<u>Harriman</u>, 607 F. Supp. at 634, and which the Tenth Circuit echoed in <u>Mescalero Apache Tribe</u>

<u>v. State of New Mexico</u>, 131 F.3d at 1384, is sound. <u>See Ysais v. New Mexico Judicial Standard</u>

<u>Comm'n</u>, 616 F. Supp. 2d 1176, 1186 (D.N.M. 2009)(Browning, J.)(citing <u>Mescalero Apache</u>

<u>Tribe v. State of New Mexico</u>, 131 F.3d at 1384)("New Mexico has not waived its Eleventh-

Amendment immunity by enacting the New Mexico Tort Claims Act . . . .")). The Court further

concludes that the view that Judge Baldock expressed in <u>Wojciechowski v. Harriman</u>, 607 F.

Supp. at 634, is consistent with the principles that the Supreme Court has established to

determine waivers of Eleventh Amendment immunity. See, e.g., Atascadero State Hospital v. Scanlon, 473 U.S. 234, 241 (1985). In Atascadero State Hospital v. Scanlon, the Supreme Court explained:

> The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment. . . . "[A] State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." Thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court.*

Atascadero State Hosp. v. Scanlon, 473 U.S. at 241 (alteration added)(emphases in original)(citations omitted). Under this "stringent" standard, Atascadero State Hosp. v. Scanlon, 473 U.S. at 241, the NMTCA, N.M. Stat. Ann. §§ 41-4-1 to -30, does not manifest New Mexico's "intention to subject itself to suit in *federal court*," Atascadero State Hosp. v. Scanlon, 473 U.S. at 241(emphasis in original).

The Court apprehends why there has been some equivocation in the case law regarding whether the NMTCA's waiver provisions waive New Mexico's Eleventh Amendment immunity from suit in federal court. Unlike analogous state tort claim statutes, the NMTCA does not include an explicit statement that its waiver provisions do not waive New Mexico's Eleventh Amendment immunity from suit in federal court. Compare, e.g., N.M. Stat. Ann. §§ 41-4-1 to -30, with Okla. Stat. Ann. tit. 51, § 152.1(B)("The state, only to the extent and in the manner provided in this act, waives its immunity and that of its political subdivisions. In so waiving immunity, it is not the intent of the state to waive any rights under the Eleventh Amendment to the United States Constitution."), and Kan. Stat. Ann. § 75-6116(g)("Nothing in this section or in the Kansas tort claims act shall be construed as a waiver by the state of Kansas of immunity from

suit under the 11th amendment to the constitution of the United States.").[30]  The NMTCA

mentions the State's Eleventh Amendment immunity exclusively in § 41-4-4(F), and the

statutory text's treatment of the Eleventh Amendment relates to prior subsections of § 41-4-4

only.  Sections 41-4-4(A) through 41-4-4(F) provide:

> A.  A governmental entity and any public employee while acting within the scope
> of duty are granted immunity from liability for any tort except as waived by the
> New Mexico Religious Freedom Restoration Act[1] and by Sections 41-4-5 through
> 41-4-12 NMSA 1978. Waiver of this immunity shall be limited to and governed
> by the provisions of Sections 41-4-13 through 41-4-25 NMSA 1978, but the
> waiver of immunity provided in those sections does not waive immunity granted
> pursuant to the Governmental Immunity Act.

> B.  Unless an insurance carrier provides a defense, a governmental entity shall
> provide a defense, including costs and attorney fees, for any public employee
> when liability is sought for:

>> (1) any tort alleged to have been committed by the public
>> employee while acting within the scope of his duty; or

>> (2) any violation of property rights or any rights, privileges or
>> immunities secured by the constitution and laws of the United
>> States or the constitution and laws of New Mexico when alleged to
>> have been committed by the public employee while acting within
>> the scope of his duty.

> C.  A governmental entity shall pay any award for punitive or exemplary damages
> awarded against a public employee under the substantive law of a jurisdiction
> other than New Mexico, including other states, territories and possessions and the
> United States of America, if the public employee was acting within the scope of
> his duty.

> D.  A governmental entity shall pay any settlement or any final judgment entered
> against a public employee for:

>> (1) any tort that was committed by the public employee while
>> acting within the scope of his duty; or

---

[30]The Tenth Circuit has relied on the cited Oklahoma and Kansas tort claims statutory
provisions to hold that those respective tort claims statutes do not waive the sovereign immunity
from suit in federal court that Oklahoma and Kansas respectively enjoy.  See, e.g., Harris v.
Okla. Office of Juvenile Affairs ex rel. Cent. Okla. Juvenile Ctr., 519 F. App'x 978, 980 (10th
Cir. 2013); Jones v. Courtney, 466 F. App'x 696, 700-01 (10th Cir. 2012).

(2) a violation of property rights or any rights, privileges or immunities secured by the constitution and laws of the United States or the constitution and laws of New Mexico that occurred while the public employee was acting within the scope of his duty.

E.  A governmental entity shall have the right to recover from a public employee the amount expended by the public entity to provide a defense and pay a settlement agreed to by the public employee or to pay a final judgment if it is shown that, while acting within the scope of his duty, the public employee acted fraudulently or with actual intentional malice causing the bodily injury, wrongful death or property damage resulting in the settlement or final judgment.

F.  Nothing in Subsections B, C and D of this section shall be construed as a waiver of the immunity from liability granted by Subsection A of this section or as a waiver of the state's immunity from suit in federal court under the eleventh amendment to the United States constitution.

Section 41-4-4(F) does not provide that nothing in the NMTCA shall be construed as a waiver of the immunity from suit in federal court that the Eleventh Amendment provides.  In Mescalero Apache Tribe v. State of New Mexico, the Tenth Circuit stated in footnote 3 of its opinion that "the Act specifically states that it shall not 'be construed . . . as a waiver of the state's immunity from suit in federal court under the eleventh amendment to the United States constitution.'" Mescalero Apache Tribe v. State of N.M., 131 F.3d at 1386 n.3 (quoting N.M. Stat. Ann. § 41-4-4(F)).  Mescalero Apache Tribe v. State of New Mexico's reliance on § 41-4-4(F) is misplaced, however.  Following the statutory text, § 41-4-4(F) states, in full, that, "[n]othing in Subsections B, C and D of this section [i.e., § 41-4-4] shall be construed as a waiver of the immunity from liability granted by Subsection A of this section or as a waiver of the state's immunity from suit in in federal court under the eleventh amendment to the United States constitution."  N.M. Stat. Ann. § 41-4-4(F)(emphasis added).  Sections 41-4-4(B) through 41-4-4(D) are not the NMTCA's immunity-waiver provisions.  Compare N.M. Stat. Ann. § 41-4-4(B)-(D), with N.M. Stat. Ann. §§ 41-4-5 to -12.  Rather, the NMTCA provides its waiver provisions in §§ 41-4-5 through 41-4-

12.    Neither § 41-4-4(F), nor any other NMTCA section, expressly states that the NMTCA's waiver provisions waive only the immunity that § 41-4-4(A) creates, and not the immunity that the Eleventh Amendment creates.  Cf., e.g., Okla. Stat. Ann. tit. 51, § 152.1(B)("The state, only to the extent and in the manner provided in this act, waives its immunity and that of its political subdivisions. In so waiving immunity, it is not the intent of the state to waive any rights under the Eleventh Amendment to the United States Constitution."); Kan. Stat. Ann. § 75-6116(g)("Nothing in this section or in the Kansas tort claims act shall be construed as a waiver by the state of Kansas of immunity from suit under the 11th amendment to the constitution of the United States.").  Moreover, under the *expressio unius* canon of statutory construction, § 41-4-4(F)'s explicit statement that §§ 41-4-4(B) through 41-4-4(F) cannot be construed to waive Eleventh Amendment immunity, raises the negative implication that other NMTCA provisions, including the NMTCA's waiver provisions, which § 41-4-4(F) does not mention, might be construed to waive Eleventh Amendment immunity.  See N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 940 (2017)(stating that "the interpretative canon, *expressio unius est exclusio alterius*, [means] expressing one item of [an] associated group or series excludes another left unmentioned")(first alteration added)(internal quotation marks and citations omitted).  The Court ultimately does not find this application of *expressio unius* to be the correct reading of the statute.  See N.L.R.B. v. SW Gen., Inc., 137 S. Ct. at 940 (alteration original)(stating that the *expressio unius* canon applies only when "circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded")(citation omitted).  The Court notes the *expressio unius* argument, however, to illustrate that § 41-4-4(F) does not itself resolve whether the NTMCA's immunity-waiver provisions waive New Mexico's Eleventh Amendment immunity from suit in federal court, contrary to the Tenth Circuit's analysis in Mescalero

Apache Tribe v. State of N.M., 131 F.3d at 1386 n.3. Section 41-4-4(F) does not concern the NMTCA's waiver provisions, much less the statute in its entirety. See N.M. Stat. Ann. § 41-4-4(F). Therefore, the Court understands the equivocation in the case law regarding whether the NMTCA's waiver provisions waive New Mexico's Eleventh Amendment immunity from suit in federal court.

Nevertheless, the Court concludes that the NMTCA's waiver provisions do not waive New Mexico's Eleventh Amendment immunity. Under Atascadero State Hospital v. Scanlon, 473 U.S. at 241, the NMTCA's most significant aspect is not what § 41-4-4(F) says with respect to New Mexico's Eleventh Amendment immunity, but what the NMTCA, as a whole, does not say. No NMTCA provision expressly states that it waives New Mexico's Eleventh Amendment immunity from suit in federal court for a delimited species of tort claims. See N.M. Stat. Ann. §§ 41-4-1 through 41-4-30. By Atascadero State Hospital v. Scanlon's lights, only an express statement of "the State's intention to subject itself to suit in *federal court*" is sufficient. 473 U.S. at 241 (emphasis original). The NMTCA does not provide that express statement; rather, it provides that "[e]xclusive original jurisdiction for any claim under the Tort Claims Act shall be in the district courts of New Mexico." N.M. Stat. Ann. § 41-4-18(A). See Bishop v. John Doe 1, 902 F.2d at 810 (relying on N.M. Stat. Ann. § 41-4-18(A) to support its holding that the Eleventh Amendment barred plaintiffs' NMTCA claim against the New Mexico Corrections Department). The NMTCA's waiver provisions -- §§ 41-4-5 through 41-4-12 -- do not waive New Mexico's Eleventh Amendment immunity from suit in federal court, because nothing in the NMTCA expressly says that the State intends such a waiver. See Atascadero State Hospital v. Scanlon, 473 U.S. at 241. Accordingly, the New Mexico Corrections Department enjoys Eleventh Amendment immunity from Gallegos' suit, including suit on his state tort claim.

**III. EVEN IF THE NMTCA WAIVES THE NEW MEXICO DEPARTMENT OF CORRECTIONS' ELEVENTH AMENDMENT IMMUNITY FROM GALLEGOS' STATE TORT CLAIM, § 41-4-6(A)'S WAIVER PROVISION DOES NOT APPLY.**

Even if the NMTCA waiver provisions waive New Mexico's Eleventh Amendment immunity from suit on state tort claims in federal court, the New Mexico Corrections Department would still be immune from Gallegos' state tort claim, because the specific waiver provision on which Gallegos relies, § 41-4-6(A), does not apply. "The NMTCA preserves sovereign immunity against tort claims for state governmental entities and public employees acting in the scope of their duties, except as specifically waived." Fernandez v. Mora-San Miguel Elec. Co-op., Inc., 462 F.3d at 1250. See N.M. Stat. Ann. § 41-4-4(A)("A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act and by Sections 41-4-5 through 41-4-12 NMSA 1978."); Oryem v. Richardson, 499 F. App'x 778, 781 (10th Cir. 2012)("NMTCA preserves sovereign immunity for tort claims unless specifically waived."). The NMCTA places a burden on Gallegos to demonstrate that his state tort claim against the New Mexico Corrections Department falls within one of the immunity-waiver provisions that N.M. Stat. Ann. §§ 41-4-4 to -12 create. See Oryem v. Richardson, 499 F. App'x at 781. Gallegos does not, however, successfully carry that burden.

Gallegos attempts to pass his negligence claim through the aperture that § 41-4-6(A) creates in the New Mexico Corrections Department's immunity. Section 41-4-6(A) provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

N.M. Stat. Ann. § 41-4-6(A). The Supreme Court of New Mexico interprets § 41-4-6(A) "to waive immunity 'where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government.'" Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 10, 310 P.3d 611, 616-17 (quoting Castillo v. Cnty. of Santa Fe, 1988-NMSC-037, ¶ 3, 755 P.2d 48). The Supreme Court of New Mexico has further explained that "'[t]he waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building.'" Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 10, 310 P.3d at 617 (alteration added)(quoting Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 9, 141 P.3d 1259). Section 41-4-6(A), therefore, waives immunity from torts arising from "a dangerous condition affecting the general public," Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 17, 141 P.3d at 1263, including the failure to implement "safety policies necessary to protect the people who use the building," Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 9, 141 P.3d at 1261. The Court concludes that the policies that the New Mexico Corrections Department has with respect to the treatment of similarly situated methadone-dependent and opioid-dependent inmates that it receives into its custody are safety policies "necessary to protect" those inmates who use the buildings that the New Mexico Corrections Department operates from dangerous opiate-withdrawal symptoms. Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 9, 141 P.3d at 1261. The salient question in this case, however, is whether the record shows that the New Mexico Corrections Department failed to implement such policies. See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 10, 310 P.3d at 617; Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 9, 141 P.3d at 1259.

## A. GALLEGOS HAS NOT SUFFICIENTLY DEMONSTRATED THAT THE NEW MEXICO CORRECTIONS DEPARTMENT FAILED TO IMPLEMENT A SAFETY POLICY NECESSARY TO PROTECT THOSE WHO USE THE BUILDING THAT HOUSED HIM.

The Court first addresses whether, in the light most favorable to Gallegos, record evidence demonstrates that the New Mexico Corrections Department failed to implement a "safety polic[y] necessary to protect the people who use the building . . . ." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 9, 141 P.3d at 1261 (alteration added). To benefit from § 41-4-6(A)'s waiver, Gallegos must show a "general failure to implement promised safety polices," Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 18, 141 P.3d at 1263, or some other "dangerous condition affecting the general public," Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 17, 141 P.3d at 1263. Gallegos alleges that the "proper procedure" regarding the treatment of similarly situated methadone-dependent inmates who are transferred from MDC to New Mexico Corrections Department would have prevented his injuries. Response at 6. Even in the light most favorable to Gallegos, however, the record does not reflect that the New Mexico Corrections Department failed to implement a safety policy regarding the receipt and care of methadone-dependent inmates.

Gallegos cannot soundly argue that, in light of the record evidence, the New Mexico Corrections Department failed to implement a policy designed to treat his methadone withdrawal. On November 7, 2107, Judge Martinez committed Gallegos to the New Mexico Corrections Department for an 834-day sentence beginning on November 6, 2014. See First Order Revoking Probation at 1; State Court Judgment, Sentence, and Order Suspending Sentence at 1. Pursuant to these orders, the New Mexico Corrections Department received Gallegos on November 12, 2014, at 9:00 a.m. See Receipt of State Prisoner at 1. On November 24, 2014, Gallegos' counsel, Mr. Wilber, contacted the New Mexico Corrections Department, stating that

Gallegos "was apparently transported [to the New Mexico Corrections Department] with NO methadone step down . . . and he is in pretty bad shape."  November 24, 2014, 1:51 p.m. Email from Wilber to Brewster at 1.  By then, the New Mexico Corrections Department's medical service provider, Corizon Health, was aware of Gallegos' medical status, had "a protocol in place to treat him," and was treating him.  November 26, 2014, 2:51 p.m. Email from Brewster to Wilber at 1.  Indeed, the record indicates that on November 12, 2014, the same day that the New Mexico Corrections Department received Gallegos into its custody, Corizon Health medical personnel evaluated Gallegos' withdrawal symptoms and gave him a "Kick Kit to address his withdrawal symptoms."  Nursing Encounter Tool -- Withdrawal at 1; Physician's Orders at 1.  Further, on November 21, 2014, Gallegos requested another Kick Kit, indicating it "helped some" and was also prescribed Elavil for pain.  November 21, 2014 Interdisciplinary Progress Notes.  Next, on November 26, 2014, medical personnel denied Gallegos narcotics, but offered him "Ibuprofen, Tylenol, Mobic, Aleve, or Naproxen" to address his pain, but Gallegos refused these drugs.  November 26, 2014 Interdisciplinary Progress Notes at 1.  Then, on December 3, 2014, a Corizon Health provider conducted another assessment of Gallegos' withdrawal symptoms and ordered one dose of Clonidine.  Clinical Institute Withdrawal Assessment -- Alcohol at 1; Nursing Encounter Tool -- Headache at 1.  This record evidence does not show the New Mexico Corrections Department's failure to implement a general safety policy regarding the treatment of inmates suffering from opiate withdrawal.  To the contrary, the record demonstrates that, after the New Mexico Corrections Department received Gallegos, the New Mexico Corrections Department sufficiently evaluated Gallegos for withdrawal symptoms and treated those same symptoms.  See Nursing Encounter Tool -- Withdrawal at 1; Physician's Orders at 1.  The New Mexico Corrections Department had a safety policy in place to treat

inmates suffering from opiate withdrawal and applied that policy to Gallegos.  See Nursing

Encounter Tool -- Withdrawal at 1; Physician's Orders at 1.  The record does not show that the

New Mexico Corrections Department failed to implement a "safety polic[y] necessary to protect

the people who use the building" by not providing methadone to inmates, like Gallegos, who are

experiencing opiate withdrawal.  Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 9, 141

P.3d at 1261 (alteration added).   The record does show that the New Mexico Corrections

Department did not provide Gallegos with methadone, as he had received at MDC pursuant to

the Remand Order.  See Remand Order at 1-2; Gallegos Medication History at 1 (showing that

Gallegos received 155 mg of Methadone on the morning of November 12, 2014, before being

transferred to the New Mexico Corrections Department).

Gallegos cannot demonstrate, even as a nonmovant in the summary judgment posture,

that the New Mexico Corrections Department failed to implement a safety policy regarding

opiate withdrawal.  What he really argues is that the only reasonable safety policy -- the "proper

procedure" as he describes it -- available to the New Mexico Corrections Department is to treat

opiate withdrawal symptoms with methadone.  Response at 6.  Section 41-4-6(A) does not,

however, waive tort liability solely because the New Mexico Corrections Department's policy

for treating opiate withdrawal does not include a methadone dosage.  See Nursing Encounter

Tool -- Withdrawal at 1; Physician's Orders at 1.[31]  Even in the light most favorable to Gallegos,

---

[31]The New Mexico Corrections Department's policy is not aberrational:

In the United States, few jail or prison inmates receive medication assisted
treatment for opioid use disorder during incarceration.  In 2008, fewer than 2000
prisoners, less than 0.1% of the total prison population, received buprenorphine or
methadone.  Though 28 state prison systems report offering methadone, over half
limit treatment to select populations, such as pregnant women or individuals with
chronic pain.   Major reasons for not offering medication during incarceration
include strict federal laws governing administration of [medicated assisted

the record does not suggest -- much less sufficiently demonstrate on a summary judgment posture -- that the New Mexico Corrections Department's general policy for treating opiate withdrawal is abjectly unsafe because, in his case, it does not include a methadone dosage. Although Gallegos did not receive methadone, the New Mexico Corrections Department, through its medical provider, evaluated and treated Gallegos' withdrawal symptoms, and Gallegos requested the same treatment, noting that it "helped some." Nursing Encounter Tool -- Withdrawal at 1; Physician's Orders at 1; November 21, 2014 Interdisciplinary Progress Notes.

### B. SECTION 41-4-6(A) DOES NOT WAIVE THE NEW MEXICO CORRECTIONS DEPARTMENT'S IMMUNITY FROM GALLEGOS' STATE TORT CLAIM TO THE EXTENT THAT GALLEGOS' CLAIM IS PREDICATED ON A SINGLE, DISCRETE ADMINISTRATIVE ACT AFFECTING ONLY HIMSELF.

Section 41-4-6(A) does not waive the New Mexico Corrections Departments' immunity from Gallegos' state tort claim for another, independent reason. To the extent that Gallegos' tort claim is predicated not upon general allegations regarding the New Mexico Corrections Department's policies to treat similarly situated methadone-dependent inmates, but rather upon the specific allegation that the New Mexico Corrections Department wrongfully admitted him into custody in light of the Remand Order, then § 41-4-6(A) does not waive the New Mexico Corrections Department's immunity from Gallegos' state tort claim. Section 41-4-6(A) does not waive the New Mexico Corrections Departments' immunity from state tort claims that are

---

treatment], preference for drug free detoxification, as well as ideological opposition to [medication assisted treatment].

Jeronimo A. Maradiaga, Shadi Nahvi, Chinazo O. Cunningham, Jennifer Sanchez, & Aaron D. Fox, "'I Kicked the Hard Way. I Got Incarcerated.' Withdrawal from Methadone During Incarceration and Subsequent Aversion to Medicated Assisted Treatments," J. SUBST. ABUSE TREAT. 62:49-54 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4888768/ (last viewed June 21, 2017)(alterations added).

grounded on single, discrete actions that the New Mexico Corrections Department takes affecting a single inmate.  See Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 17, 141 P.3d at 1263.

The Supreme Court of New Mexico has explained that § 41-4-6(A) does not "waive immunity for a single, discrete administrative decision affecting only a single person . . . ." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 17, 141 P.3d at 1263 (citing Espinoza v. Town of Taos, 1995-NMSC-070, ¶ 12, 905 P.2d 718, 721-22).  The Supreme Court of New Mexico applied this interpretation of § 41-4-6(A) to tort claims that inmates have asserted against state correctional facilities.  See, e.g., Archibeque v. Moya, 1993-NMSC-079, 866 P.2d 344.  In Archibeque v. Moya, the Supreme Court of New Mexico held that § 41-4-6(A) does not provide a waiver for tort claims that allege the negligent performance of an administrative task or procedure that detrimentally affects a single inmate.  See 1993-NMSC-079, ¶ 14, 866 P.2d at 349.  There, the Tenth Circuit had certified to the Supreme Court of New Mexico the question whether § 41-4-6 "provide[s] immunity from tort liability to an employee of the state penitentiary whose alleged negligence in releasing a prisoner into the general prison population, which included known enemies of the prisoner, resulted in the prisoner being beaten and injured by one of his enemies?"  1993-NMSC-079, ¶ 1, 866 P.2d at 345-46.  The plaintiff, Archibeque, argued that the defendant, Moya-Martinez, an intake officer at the New Mexico State Penitentiary, was "participating in the operation of the penitentiary when she classified Archibeque as an inmate that could safely be released into the general prison population."  1993-NMSC-079, ¶ 5, 866 P.2d at 346.  Archibeque contended that "Moya-Martinez's alleged negligence in misclassifying . . . and releasing him into the general population constituted negligent operation of the penitentiary and was effective to waive immunity under Section 41-4-

6." 1993-NMSC-079, ¶ 5, 866 P.2d at 346-47. The Supreme Court of New Mexico rejected Archibeque's argument, because "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in Section 41-4-6, does not include the security, custody, and classification of inmates." 1993-NMSC-079, ¶ 8, 866 P.2d at 347. The Supreme Court of New Mexico explained that "[t]he purpose of Section 41-4-6 is to ensure the general public's safety by requiring public employees to exercise reasonable care in maintaining and operating the physical premises owned and operated by the government." 1993-NMSC-079, ¶ 8, 866 P.2d at 347. The Supreme Court of New Mexico applied that rationale, concluding:

> Moya-Martinez was not operating and maintaining the prison's physical premises when she negligently classified Archibeque as an inmate that could be released into the general prison population. Rather, she was performing an administrative function associated with the operation of the corrections system. Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions.

1993-NMSC-079, ¶ 8, 866 P.2d at 347. Accordingly, the Supreme Court of New Mexico held that § 41-4-6(A) does not waive "immunity whenever injury results from a negligently performed administrative task affecting a single inmate . . . ." 1993-NMSC-079, ¶ 14, 866 P.2d at 349.

Similarly, in Lessen v. City of Albuquerque, 2008-NMCA-085, 187 P.3d 179, the Court of Appeals of New Mexico held that § 41-4-6(A) did not waive immunity from a tort claim that the plaintiff asserted against MDC. In Lessen v. City of Albuquerque, the plaintiff asserted that her son, an inmate at MDC, was experiencing the effects of heroin withdrawal, was initially released from MDC to be transported to downtown Albuquerque, re-entered MDC, was released again to MDC's parking lot, and then "apparently wandered off into the nearby desert and died of hypothermia." 2008-NMCA-085, ¶ 1, 187 P.3d at 179. The plaintiff argued that "the City negligently operated and maintained MDC by failing to ensure that released inmates had proper

transportation and by failing to attend properly to inmates' medical needs." 2008-NMCA-085, ¶ 18, 187 P.3d at 183. The Court of Appeals of New Mexico rejected this argument, because "Plaintiff's allegations directed against the City are specific to the City's treatment of Decedent." 2008-NMCA-085, ¶ 27, 187 P.3d at 184. The Court of Appeals of New Mexico highlighted the plaintiff's contentions "that MDC employees should have known that Decedent was coming out of detoxification and may have been disoriented and that they should have taken extra steps to protect him from his own inability to care for himself." Lessen v. City of Albuquerque, 2008-NMCA-085, ¶ 27, 187 P.3d at 184. The Court of Appeals of New Mexico elaborated that "there is nothing in the record suggesting that this was a danger to which all released inmates were exposed." 2008-NMCA-085, ¶ 25, 187 P.3d at 184. The Court of Appeals of New Mexico stated:

> At most, MDC employees' permitting Decedent to exit to the parking lot without a transportation waiver, a circumstance not established to pose a danger to the general population of released inmates, was "a single, discrete administrative decision affecting only a single person, as opposed to a dangerous condition affecting the general public."

2008-NMCA-085, ¶ 27, 187 P.3d at 184-85 (quoting Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 17, 141 P.3d at 1263). "Section 41-4-6," the Court of Appeals of New Mexico held, "does not waive immunity for such decisions." Lessen v. City of Albuquerque, 2008-NMCA-085, ¶ 27, 187 P.3d at 184-85 (citing Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 17, 141 P.3d at 1263).

In the absence of demonstrating a general failure to implement a safety policy, Gallegos' tort claim against the New Mexico Corrections Department hinges on his transfer from MDC, where he was receiving gradually lower dosages of methadone, see Gallegos Medication History at 1, to the New Mexico Corrections Department, where he received no methadone. The

Remand Order ordered Gallegos' continued detention at MDC, and the First Order Revoking Probation ordered his transfer and commitment to the New Mexico Corrections Department. See Remand Order at 1; First Order Revoking Probation at 1. Yet, Gallegos' § 41-4-6(A) waiver argument has no force to the extent it relies on New Mexico Corrections Department's receipt of Gallegos pursuant to the First Order Revoking Probation. See Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 17, 141 P.3d at 1263 (citation omitted). Section 41-4-6(A) does not "waive immunity for a single, discrete administrative decision affecting only a single person . . . ." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 17, 141 P.3d at 1263 (citation omitted). See Archibeque v. Moya, 1993-NMSC-079, ¶ 14, 866 P.2d at 349 (holding that § 41-4-6(A) does not waive "immunity whenever injury results from a negligently performed administrative task [regarding intake and] affecting a single inmate"). Accordingly, § 41-4-6(A) does not waive the New Mexico Corrections Department's immunity from Gallegos' state tort claim to the extent that Gallegos' claim is predicated on the single, discrete administrative act of the New Mexico Corrections Department receiving him into custody.

## IV. THE COURT DENIES GALLEGOS' MOTION TO AMEND TO ADD MR. BREWSTER AS A DEFENDANT, BECAUSE GALLEGOS' PROPOSED AMENDMENT WOULD BE SUBJECT TO DISMISSAL AND CONSEQUENTLY FUTILE.

Gallegos seeks to amend his Amended Complaint to add Mr. Brewster as a defendant, and Gallegos intends to assert the same claims against Mr. Brewster as he asserts against the New Mexico Corrections Department -- namely, a state tort claim and an Eighth Amendment deliberate-indifference claim. See Motion to Amend; Second Amended Complaint ¶¶ 11, 20, at 6, 8. A court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile." Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d at 859. An amendment is "futile" if the pleading "as amended, would be subject to dismissal." TV

Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d at 1028. Under this standard, Gallegos proposed amendment to add Mr. Brewster as a defendant is futile. The record sufficiently shows that Mr. Brewster relied on a facially valid court order when reviewing the conditions of Gallegos' confinement and medical treatment and, therefore, enjoys quasi-judicial immunity from Gallegos' claims. See Turney v. O'Toole, 898 F.2d at 1472. Moreover, the record sufficiently demonstrates that Mr. Brewster was neither negligent nor deliberately indifferent with respect to Gallegos' withdrawal symptoms. Because Gallegos' claims against Mr. Brewster would be subject to dismissal, Gallegos' proposed amendment to add Mr. Brewster as a defendant is futile. See TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d at 1028. Accordingly, the Court denies in part Gallegos' Motion to Amend to the extent that Gallegos seeks bring Mr. Brewster into the case.

A. **GALLEGOS' PROPOSED AMENDMENT TO ADD MR. BREWSTER AS A DEFENDANT WOULD BE SUBJECT TO DISMISSAL AND IS ACCORDINGLY FUTILE, BECAUSE MR. BREWSTER IS IMMUNE FROM GALLEGOS' CLAIMS TO THE EXTENT THAT GALLEGOS' CLAIMS ARE BASED ON BREWSTER'S ENFORCEMENT OF FACIALLY VALID COURT ORDERS.**

The Court denies Gallegos leave to amend his Amended Complaint to add Mr. Brewster as a defendant, because Gallegos' proposed amendment would be subject to dismissal and is consequently futile. See Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d at 859 (concluding that a court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile"). Gallegos' proposed amendment is futile, because Mr. Brewster enjoys quasi-judicial civil immunity from Gallegos' claims to the extent that Gallegos' claims are predicated on the assertion that Mr. Brewster or the New Mexico Corrections Department wrongfully received Gallegos into custody on November 12, 2014, or wrongfully kept Gallegos in state custody after that date. "Just as judges acting in their judicial capacity are absolutely

immune from liability under section 1983, official[s] charged with the duty of executing a facially valid court order enjoy[] absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." Turney v. O'Toole, 898 F.2d at 1472 (alterations original)(citing, inter alia, Valdez v. City & County of Denver, 878 F.2d at 1286; Wiggins v. N.M. State Supreme Court Clerk, 664 F.2d 812, 815 (10th Cir. 1981); T & W Inv. Co. v. Kurtz, 588 F.2d at 802). The Tenth Circuit has explained that "the power to execute judicial decrees is no less an important and integral part of the judicial process than the roles of those officials previously afforded absolute immunity . . . ." Valdez v. City & Cty. of Denver, 878 F.2d at 1287-88. "Enforcing a court order or judgment is intrinsically associated with a judicial proceeding." Valdez v. City & Cty. of Denver, 878 F.2d at 1288 (citing Henry v. Farmer City State Bank, 808 F.2d 1228, 1239 (7th Cir. 1986)).

Mr. Brewster enjoys quasi-judicial immunity from claims predicated on the straightforward enforcement of facially valid court orders. The record includes two facially valid court orders committing Gallegos to the New Mexico Corrections Department -- namely, the First Order Revoking Probation and the State Court Judgment, Sentence, and Order Suspending Sentence. See First Order Revoking Probation at 1 (ordering Gallegos' transfer and commitment to the New Mexico Corrections Department); State Court Judgment, Sentence, and Order Suspending Sentence at 1 (same). By contrast, the state court's November 6, 2014, Remand Order provides that Gallegos "shall remain in custody of the Metropolitan Detention Center (MDC) until his level of methadone treatment has reached a point where Defendant will not incur life-endangering withdrawal symptoms upon transfer to the Department of Corrections, where he is to serve the remainder of his sentence." Remand Order at 1-2. Despite the Remand Order, the state court's November 7, 2017, First Order Revoking Probation committed Gallegos

to the New Mexico Corrections Department, noting that Gallegos "is sentenced to serve a term of 834 days beginning 11/6/14 in . . . Department of Corrections." First Order Revoking Probation at 2. The First Order Revoking Probation also reflects a handwritten "X" through the MDC portion of the incarceration order and includes a handwritten note: "No MDC." First Order Revoking Probation at 2. Hence, even though the state court issued a Remand Order on November 6, 2014, ordering that Gallegos should remain confined at MDC until his "methadone treatment has reached a point where Defendant will not incur life-endangering withdrawal symptoms upon transfer to the Department of Corrections," on November 7, 2014, the state court issued two facially valid orders committing him, without condition, to the New Mexico Corrections Department. First Order Revoking Probation at 1-2 (ordering Gallegos' transfer and commitment to the New Mexico Corrections Department); State Court Judgment, Sentence, and Order Suspending Sentence at 1 (same).

The New Mexico Corrections Department contends that it relied on the State Court Judgment, Sentence, and Order Suspending Sentence when admitting Gallegos into its custody on November 12, 2017. See Reply at 4. Gallegos argues that the New Mexico Corrections Department's contention lacks support, because the record does not contain evidence that the New Mexico Corrections Department relied on either of the two facially valid court orders committing Gallegos to its custody. See Response at 5. The Court concludes, however, that the record, even when read in Gallegos' favor, sufficiently reflects that the New Mexico Corrections Department admitted Gallegos pursuant to these orders. See Receipt of State Prisoner at 1; First Order Revoking Probation at 1-2; Judgment, Sentence, and Order Suspending Sentence at 1. The New Mexico Corrections Department received Gallegos into its custody on November 12, 2014, a few days after the state court issued the two orders committing Gallegos into the New

Mexico Corrections Department's custody. See Receipt of State Prisoner at 1; First Order Revoking Probation at 1-2; Judgment, Sentence, and Order Suspending Sentence at 1. Moreover, on November 24, 2014, after Mr. Wilber apprised Mr. Brewster of Gallegos' transfer to the New Mexico Corrections Department and sent Mr. Brewster orders relevant to Gallegos' custody, Mr. Wilber did not contend that the New Mexico Corrections Department held Gallegos in custody pursuant to an invalid order. See November 24, 2014, 1:57 p.m. Email from Brewster to Wilber at 1; November 24, 2014, 2:07 p.m. Email from Wilber to Brewster at 1.

Gallegos additionally argues that "there is no evidence that James Brewster relied on one order versus another in order to take no action in this case." Response at 5. The Court cannot soundly conclude, however, that Mr. Brewster's involvement in the case supports Gallegos' claims. On November 24, 2014, Gallegos' counsel, Mr. Wilber, contacted Mr. Brewster, the New Mexico Corrections Department general counsel, to alert the New Mexico Corrections Department that Gallegos had been transferred from MDC, where Gallegos had received methadone. See November 24, 2014, 1:51 p.m. Email from Wilber to Brewster at 1. Mr. Wilber also sent Mr. Brewster the court orders that pertained to Gallegos' custody. See November 24, 2014, 1:57 p.m. Email from Brewster to Wilber at 1; November 24, 2014, 2:07 p.m. Email from Wilber to Brewster at 1. Mr. Brewster received this information, responded that he would direct the New Mexico Corrections Department's medical provider, Corizon Health, to assess Gallegos, see November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1, and, later, reported that Corizon Health was already aware that Gallegos needed withdrawal-symptom treatment and had, in fact, provided such treatment, see November 26, 2014, 2:51 p.m. Email from Brewster to Wilber at 1. The record does not show that either Mr. Brewster or the New Mexico Corrections Department failed to rely on facially valid court orders when the agency received Gallegos into

its custody or when Mr. Brewster, upon Mr. Wilber's notification, investigated Gallegos' custody, condition, and plan of treatment. To the contrary, both Mr. Brewster and the New Mexico Corrections Department relied on facially valid court orders. See First Order Revoking Probation at 1; State Court Judgment, Sentence, and Order Suspending Sentence at 1; November 24, 2014, 1:57 p.m. Email from Brewster to Wilber at 1; November 24, 2014, 2:07 p.m. Email from Wilber to Brewster at 1; November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1; November 26, 2014, 2:51 p.m. Email from Brewster to Wilber a 1.

The record sufficiently indicates that the New Mexico Corrections Department received Gallegos into custody pursuant to the First Order Revoking Probation and the Judgment, Sentence, and Order Suspending Sentence, both of which duly committed Gallegos to the New Mexico Corrections Department. See First Order Revoking Probation at 1-2; Judgment, Sentence, and Order Suspending Sentence at 1. The record also sufficiently indicates that Mr. Brewster relied on facially valid court orders when investigating Gallegos' status and medical treatment. See November 24, 2014, 1:57 p.m. Email from Brewster to Wilber at 1; November 24, 2014, 2:07 p.m. Email from Wilber to Brewster at 1; November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1; November 26, 2014, 2:51 p.m. Email from Brewster to Wilber a 1. The First Order Revoking Probation and the Judgment, Sentence, and Order Suspending Sentence, each committing Gallegos to the New Mexico Corrections Department's custody, are valid on their face. See First Order Revoking Probation at 1-2; Judgment, Sentence, and Order Suspending Sentence at 1. Consequently, Mr. Brewster enjoys quasi-judicial civil immunity from Gallegos' claims to the extent that Gallegos' claims are predicated on the assertion that the New Mexico Corrections Department wrongfully received Gallegos into custody on November 12, 2014, or that either Mr. Brewster or the New Mexico Corrections Department wrongfully

kept Gallegos in its custody after Mr. Wilber notified Mr. Brewster of Gallegos' transfer from MDC. See Turney v. O'Toole, 898 F.2d at 1472. Given those court orders, it is unclear what, if anything, Mr. Brewster or the New Mexico Corrections Department could lawfully do other than what they did. It does not appear, based on the court orders, that they could return Gallegos to the MDC. Mr. Brewster or the New Mexico Corrections Department did what the First Order Revoking Probation and the Judgment, Sentence, and Order Suspending Sentence ordered.

Last, Gallegos argues that the state court "titration orders were a regular matter of course for prisoners" and, accordingly, should be read in conjunction with the two facially valid court orders committing him to the New Mexico Corrections Department's custody. Response at 5. This argument does not impugn either Mr. Brewster's quasi-judicial immunity, because it does not question either Mr. Brewster's or the New Mexico Corrections Department's reliance on the facially valid court orders. At bottom, Gallegos' argument that the "titration order," i.e., the Remand Order, should have been given more attention illustrates that his claim hinges on facts relating to his transfer from MDC, and not upon the New Mexico Corrections Department's receiving him into custody pursuant to facially valid court orders or upon Mr. Brewster's investigation into Gallegos' status and medical treatment.

In sum, Mr. Brewster and the New Mexico Corrections Department had facially valid court orders that said that Gallegos was in the right place. The New Mexico Corrections Department did not violate the facially valid court orders that applied to it. Given the facially valid orders, neither Mr. Brewster nor the New Mexico Corrections Department returned Gallegos to MDC. Mr. Brewster did the only thing that he could do -- keep Gallegos at the state prison. Mr. Brewster enjoys quasi-judicial civil immunity from Gallegos' claims to the extent that Gallegos' claims are predicated on the assertion that the New Mexico Corrections

Department wrongfully received Gallegos into custody on November 12, 2014, or kept Gallegos in its custody after that date.  See Turney v. O'Toole, 898 F.2d at 1472.  The Court therefore denies Gallegos leave to amend his Amended Complaint to add Mr. Brewster as a defendant, because such amendment would be futile.  See Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d at 859; TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d at 1028.

**B.  GALLEGOS' PROPOSED AMENDMENT TO ADD MR. BREWSTER AS A DEFENDANT WOULD BE SUBJECT TO DISMISSAL AND IS ACCORDINGLY FUTILE, BECAUSE MR. BREWSTER WAS NEITHER NEGLIGENT NOR DELIBERATELY INDIFFERENT TO GALLEGOS' WITHDRAWAL SYMPTOMS.**

Gallegos' proposed amendment to add Mr. Brewster as a defendant is futile.  The law and record facts do not support Gallegos' negligence or deliberate-indifference claims against Mr. Brewster.  Because Mr. Brewster was neither negligent nor deliberately indifferent to Gallegos' withdrawal symptoms, Gallegos' claims would be subject to dismissal.

An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).  See Smith v. Cummings, 445 F.3d at 1258 ("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.")(quoting Verdecia v. Adams, 327 F.3d at 1175).  The second element regarding the government official's state of mind is a subjective inquiry.  See Wilson v. Seiter, 501 U.S. at

298.  The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836.  The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837.  For Eighth Amendment purposes, the Tenth Circuit has equated deliberate indifference with recklessness.  See Belcher v. United States, 216 F. App'x at 823-24 (quoting Smith v. Cummings, 445 F.3d at 1258).

In comparison to his deliberate-indifference claim, Gallegos' tort claim would require a lesser showing.   Whereas "the Courts of Appeals have routinely equated deliberate indifference with recklessness," Farmer v. Brennan, 511 U.S. at 836, the NMTCA is "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty," N.M. Stat. Ann. § 41-4-2C.  Thus, to make out his tort claim against Mr. Brewster, Gallegos would need to show that Mr. Brewster failed to act with reasonable care given Gallegos' risk of suffering dangerous opiate-withdrawal symptoms.  See Archibeque v. Moya, 1993-NMSC-079, ¶ 8, 886 P.2d at 347 ("The purpose of Section 41-4-6 is to ensure the general public's safety by requiring public employees to exercise reasonable care . . . .").  Gallegos has not shown either Mr. Brewster's deliberate indifference or negligence.

The record does not support that Mr. Brewster was negligent, much less reckless, with respect to risk of harm that Gallegos incurred after being transferred to the New Mexico

Corrections Department. <u>See</u> November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1. On November 24, 2014, Gallegos' counsel, Mr. Wilber, contacted Mr. Brewster, the New Mexico Corrections Department general counsel, to alert the New Mexico Corrections Department that Gallegos had been transferred from MDC, where Gallegos had received methadone. <u>See</u> November 24, 2014, 1:51 p.m. Email from Wilber to Brewster at 1. Mr. Wilber also sent Mr. Brewster the court orders that pertained to Gallegos' custody. <u>See</u> November 24, 2014, 1:57 p.m. Email from Brewster to Wilber at 1; November 24, 2014, 2:07 p.m. Email from Wilber to Brewster at 1. Mr. Brewster received this information, responded that he would direct the New Mexico Corrections Department's medical provider, Corizon Health, to assess Gallegos, <u>see</u> November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1, and, later, reported that Corizon Health was already aware that Gallegos needed withdrawal-symptom treatment and had, in fact, provided such treatment, <u>see</u> November 26, 2014, 2:51 p.m. Email from Brewster to Wilber a 1. This record evidence demonstrates that Mr. Brewster was not negligent, much less deliberately indifferent, to the risk that Gallegos might suffer dangerous opiate-withdrawal symptom. Mr. Brewster responded to the information concerning Gallegos' methadone dependence by contacting Corizon Health and ensuring that Corizon Health was treating Gallegos. <u>See</u> November 24, 2014, 2:45 p.m. Email from Brewster to Wilber at 1; November 26, 2014, 2:51 p.m. Email from Brewster to Wilber a 1.

Moreover, in his Motion to Amend, Gallegos neither directs the Court to record evidence or makes allegations specific to Mr. Brewster that controverts the record evidence showing that Mr. Brewster did not negligently or recklessly respond to Gallegos' condition. <u>See</u> Motion to Amend at 1-4; Second Amendment Complaint ¶¶ 1-17, at 5-7. There is no record fact that suggests Mr. Brewster failed to discharge a duty of care he owed Gallegos. <u>See</u> <u>Liberty Lobby</u>,

477 U.S. at 256 (concluding that it is insufficient for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings"). When Gallegos arrived at the New Mexico Corrections Department on November 12, 2014, Corizon Health medical personnel evaluated Gallegos' withdrawal symptoms and gave him a "Kick Kit to address his withdrawal symptoms." Nursing Encounter Tool -- Withdrawal at 1. Mr. Wilber did not inform Mr. Brewster of Gallegos' transfer to the New Mexico Corrections Department until November 24, 2014. See November 24, 2014, 1:51 p.m. Email from Wilber to Brewster at 1. At that point, Mr. Brewster's actions were constrained by the two state court orders committing Gallegos to the New Mexico Corrections Department's custody, and, again, Mr. Brewster discharged his duty of care to Gallegos by responding to the information concerning Gallegos' methadone dependence, by contacting Corizon Health, and by ensuring that Corizon Health was treating Gallegos. Gallegos points to no record fact which, even as a nonmovant in the summary judgment posture, supports his allegation of Mr. Brewster's negligence. See Motion to Amend at 1-4. Perhaps on November 24, 2014, Mr. Brewster could have called MDC to inquire about returning Gallegos to MDC where Gallegos received methadone, but two court orders committing Gallegos to the New Mexico Corrections Department constrained Brewster from effectively returning Gallegos. Moreover, when Brewster learned on November 24, 2014, that Corizon Health had already been treating Gallegos for withdrawal symptoms since November 12, 2014, the duty of reasonable care did not require Brewster to seek Gallegos' return to MDC in contravention of the court orders that constrained Brewster's conduct. There is no record fact to which Gallegos points, or which the Court has independently identified, that supports Brewster's negligence in this matter. Because the facts and law do not support Gallegos' negligence and deliberate-indifference claims against Mr. Brewster, those claims

would be subject to dismissal. Accordingly, Gallegos' proposed amendment to add Mr. Brewster as a defendant is futile. See TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d at 1028.

**IT IS ORDERED** that: (i) Defendant New Mexico Department of Corrections' Motion for Summary Judgment and Memorandum Brief in Support Thereof, filed April 7, 2017 (Doc. 67), is granted; and (ii) Plaintiff's Motion to File a Second Amended Complaint, filed February 17, 2017 (Doc. 58), is denied in part, to the extent that Gallegos proposes to add Mr. Brewster as a defendant.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Stephen F. Lawless
Stephen F. Lawless, P.A.
Albuquerque, New Mexico

　　*Attorneys for the Plaintiff*

Carlos M. Quiñones
Quiñones Law Firm
Albuquerque, New Mexico

　　*Attorneys for Defendants Bernalillo County Board of*
　　　*Commissioners and Bernalillo County Metropolitan Detention Center*

Debra J. Moulton
Deborah D. Wells
Kennedy, Moulton & Wells PC
Albuquerque, New Mexico

　　*Attorneys for Defendants New Mexico Corrections Department*