## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARTIN GALLEGOS,

      Plaintiff,

vs.                                            No. CIV 16-0127 JB/JHR

BERNALILLO COUNTY BOARD OF
COUNTY COMMISSIONERS, BERNALILLO
COUNTY DETENTION CENTER, NEW
MEXICO DEPARTMENT OF
CORRECTIONS, CLYDE KLINE, and
JOVANNE KING,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion to File a Second Amended Complaint, filed February 17, 2017 (Doc. 58)("Motion"); and (ii) Defendants Kline's and King's Motion for Summary Judgment on the Basis of Qualified Immunity and Other Grounds, and Supporting Memorandum, filed October 18, 2017 (Doc. 90)("MSJ"). The Court held a hearing regarding the Motion on June 2, 2017 and held a hearing regarding the MSJ on June 12, 2018. The primary issues are: (i) whether the Court should permit Plaintiff Martin Gallegos to file a Second Amended Complaint adding Bernalillo County Metropolitan Detention

---

[1]The Court previously issued an Order that granted in part the Plaintiff's Motion to File a Second Amended Complaint, filed February 17, 2017 (Doc. 58), to the extent that it requests to add Jovonne King and Clyde Kline as substitute parties for Defendants John Does No. 1-2. <u>See</u> Order at 7, filed September 29, 2017 (Doc. 86)("Order"). In the Order, the Court stated that it would later issue a Memorandum Opinion more fully detailing its rational for this decision. <u>See</u> Order at 1 n.1. This Memorandum Opinion and Order is the promised opinion and details the Court's rationale for the previous Order, and also rules on Defendants Kline's and King's Motion for Summary Judgment on the Basis of Qualified Immunity and Other Grounds, and Supporting Memorandum, filed October 18, 2017 (Doc. 90).

Center Corrections Officers Clyde Kline and Jovonne King[2] as Defendants, because Gallegos was in jail and could not adequately work with his attorney to timely identify Kline and King; (ii) whether Kline and King acted with deliberate indifference in violation of the Eighth Amendment of the Constitution of the United States of America, because they disregarded Gallegos' court order providing him with medical treatment; and (iii) whether Kline and King are entitled to qualified immunity vis-a-vis Gallegos' deliberate indifference claim. The Court concludes that: (i) Gallegos may amend his complaint, because he has shown good cause by demonstrating that he was in jail and could not adequately work with his attorney to timely identify Kline and King; (ii) Kline and King did not act with deliberate indifference; and (iii) Kline and King are entitled to qualified immunity, because Gallegos has not met his burden of demonstrating that his asserted right is clearly established. Accordingly, the Court will grant the MSJ and grant the Motion in part.[3]

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' assertions of undisputed material facts in their summary judgment motion papers. See MSJ ¶¶ 1-41, at 2-7; Plaintiff's Response to Defendants Kline's and King's Motion for Summary Judgment on the Basis of Qualified Immunity and Other Grounds ¶¶ 1-17, at 1-7, filed November 1, 2017 (Doc. 92)("MSJ Response"); Reply to Plaintiff's Response to Defendants Kline's and King's Motion for Summary Judgment on the Basis of Qualified Immunity and Other Grounds at 2-3, filed November 24, 2017 (Doc. 94)("MSJ Reply").

---

[2]As the MSJ notes, the case's caption misspells "Jovonne" as "Jovanne." MSJ ¶ 28, at 6.

[3]The Court previously issued an opinion in which it denied the Motion in part to the extent that Gallegos proposed to add New Mexico Corrections Department General Counsel James Brewster. See Memorandum Opinion and Order at 113, filed August 17, 2017 (Doc. 82).

Gallegos is a former inmate at the Bernalillo County Metropolitan Detention Center ("MDC") and was detained there until November 12, 2014. See MSJ ¶ 1, at 2 (asserting this fact)(citing Inmate Release Form at 1, filed October 18, 2017 (Doc. 90-1)("Release Form")); MSJ Response ¶ 1, at 1 (admitting this fact). On November 6, 2014, a state district judge remanded Gallegos to MDC and ordered that Gallegos remain there until "'his level of methadone treatment has reached a point where [he] will not incur life-endangering withdrawal symptoms upon transfer to the Department of Corrections.'" MSJ ¶ 2, at 3 (asserting this fact)(quoting Order Remanding Defendant to Metropolitan Detention Center at 2, filed November 6, 2014, in State of New Mexico v. Martin Gallegos, Nos. CR 14-4787, CR 13-5315 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court October 18, 2017 (Doc. 90-2)("Methadone Order"). See MSJ Response ¶ 1, at 1 (admitting this fact). The Methadone Order was to remain in effect "'for six weeks maximum [before Gallegos] will be transported to Department of Corrections.'" MSJ ¶ 2, at 3 (asserting this fact)(quoting Methadone Order at 2)(alteration added). See MSJ Response ¶ 1, at 1 (admitting this fact). Essentially, the Methadone Order provided that Gallegos would be titrated[4] down from his current dosage of methadone over a six-week period at MDC before being transferred to the Corrections Department, so that he would not endure severe withdrawal systems associated with immediately stopping methadone. See MSJ Response ¶ 8, at 3-4 (asserting this fact).[5] Gallegos uses methadone to control pain that he has experienced since age

---

[4]In medicine, dose titration is a "stepwise adjustment of doses until a desired level of effect is reached." "Dosing," Wikipedia, https://en.wikipedia.org/wiki/Dosing (last viewed September 22, 2017).

[5]The Defendants assert that this fact is irrelevant, but they do not dispute it. See MSJ Reply at 3. The Court will therefore consider this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless

thirteen, when he was injured in an electrical accident and lost half of his right arm.  See MSJ

Response ¶ 11, at 4-5 (asserting this fact); Deposition of Martin Gallegos at 90:17-22 (taken

January 18, 2017), filed November 1, 2017 (Doc. 92-3)("Gallegos Depo.").[6]

Unlike the Corrections Department, MDC maintains a methadone program, which has

existed since at least 2013 and is administered through the Recovery Services Company of New

Mexico.  See MSJ Response ¶ 9, at 4 (asserting this fact)(citing Administrative Meeting Agenda

at 1 (dated December 10, 2013), filed November 1, 2017 (Doc. 92-1)).[7]  Methadone orders are

common at MDC, and MDC has received these orders for many years and typically sends them

to Recovery Services.  See MSJ Response 10, at 4 (asserting this fact); Deposition of Alexis

Iverson at 7:1-8:25 (taken January 20, 2017), filed November 1, 2017 (Doc. 92-4)("Iverson

Depo").[8]

---

specifically controverted.").  The Court has previously held that a "relevance argument similarly
does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis
Section" of this opinion.  S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n.
95  (D.N.M. 2015)(Browning, J.).

[6]The Defendants assert that this fact is irrelevant, but they do not dispute it.  See MSJ
Reply at 3.  The Court will therefore consider this fact undisputed.  See D.N.M.L.R.-Civ.
56.1(b)("All material facts set forth in the Response will be deemed undisputed unless
specifically controverted.").  The Court has previously held that a "relevance argument similarly
does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis
Section" of this opinion.  S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n.
95  (D.N.M. 2015)(Browning, J.).

[7]The Defendants assert that this fact is irrelevant, but they do not dispute it.  See MSJ
Reply at 3.  The Court will therefore consider this fact undisputed.  See D.N.M.L.R.-Civ.
56.1(b)("All material facts set forth in the Response will be deemed undisputed unless
specifically controverted.").  The Court has previously held that a "relevance argument similarly
does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis
Section" of this opinion.  S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n.
95  (D.N.M. 2015)(Browning, J.).

[8]The Defendants assert that this fact is irrelevant, but they do not dispute it.  See MSJ
Reply at 3.  The Court will therefore consider this fact undisputed.  See D.N.M.L.R.-Civ.

Kline is an MDC Corrections Officer who assists in releasing MDC detainees or transferring them to other prisons. See MSJ ¶ 4, at 3 (asserting this fact)(citing Deposition of Clyde Kline at 3:9-25 (taken December 7, 2016), filed October 18, 2017 (Doc. 90-7)("Kline Depo.").[9] Kline sees MDC detainees only when they are getting ready to leave MDC. See MSJ ¶ 5, at 4 (asserting this fact)(citing Kline Depo. at 5:17-6:1); MSJ Response ¶ 2, at 2 (admitting this fact). When MDC detainees leave the facility, they are removed from their cells by rovers -- MDC officers on another shift -- and taken to a cell near Kline's office. See MSJ ¶ 6, at 4 (asserting this fact)(citing Kline Depo. at 6-7); MSJ Response ¶ 2, at 2 (admitting this fact). The detainees then await sheriff's deputies, who transport them to prisons. See MSJ ¶ 7, at 4 (asserting this fact)(citing Kline Depo. at 6:5-10); MSJ Response ¶ 2, at 2 (admitting this fact). Kline checks paperwork to verify that each detainee being transported is the correct individual before the sheriff's deputies take them. See MSJ ¶ 8, at 4 (asserting this fact)(citing Kline Depo. at 15:6-12); MSJ Response ¶ 2, at 2 (admitting this fact). By the time Kline verifies the detainees' identities, the detainees "'have already gotten all of their property and everything is done and they are just sitting in there waiting to leave.'" MSJ ¶ 9, at 4 (asserting this fact)(quoting Kline Depo. at 7:6-8). See MSJ Response ¶ 2, at 2 (admitting this fact).

The paperwork that Kline reviews consists of a transport list and the detainees' face sheets. See MSJ ¶ 10, at 4 (asserting this fact)(citing Kline Depo. at 8:12-18); MSJ Response

---

56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion. S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95 (D.N.M. 2015)(Browning, J.).

[9]Gallegos does not address this fact in his MSJ Response. The Court therefore deems this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the [MSJ] will be deemed undisputed unless specifically controverted.").

¶ 2, at 2 (admitting this fact). The transport list contains the detainees' names, and the face sheet shows the individual detainees' faces and names. See MSJ ¶¶ 11-12, at 4 (asserting this fact)(citing Kline Depo. at 8:12-18); MSJ Response ¶ 2, at 2 (admitting this fact). Kline's job is to ask a detainee for his name and to examine the face sheet to verify the detainee's identity. See MSJ ¶ 13, at 4 (asserting this fact)(citing Kline Depo. at 14:12-23); MSJ Response ¶ 2, at 2 (admitting this fact). If the photograph on the face sheet does not look like the detainee, Kline asks the detainee for his date of birth and gathers additional information to verify the detainee's identity. See MSJ ¶ 13, at 4-5 (citing Kline Depo. at 14:12-23); MSJ Response ¶ 2, at 2 (admitting this fact).

Kline does not verify court orders relating to detainees; the MDC records clerk verifies "'case numbers and matching of all these orders.'" MSJ ¶ 14, at 5 (asserting this fact)(quoting Kline Depo. at 13:10-11). See MSJ Response ¶ 2, at 2 (admitting this fact). Kline does not verify these things and does not have "'computer access to all that information.'" MSJ ¶¶ 15-16, at 5 (asserting this fact)(quoting Kline Depo. at 13:22). See MSJ Response ¶ 2, at 2 (admitting this fact). Kline verifies only that a detainee is leaving MDC. See MSJ ¶ 17, at 5 (asserting this fact)(citing Kline Depo. at 15:7-8); MSJ Response ¶ 2, at 2 (admitting this fact).

The person who initialed the section on Gallegos' Release Form labeled "file checked to ensure release is valid" was a records clerk. MSJ ¶ 18, at 5 (asserting this fact)(quoting Release Form at 1; citing Kline Depo. at 13:23-25). See MSJ Response ¶ 2, at 2 (admitting this fact). Kline signed the Release Form only in the space labeled "'releasing officer.'" MSJ ¶ 19, at 5 (asserting this fact)(quoting Release Form at 1; citing Kline Depo. at 13:16-17). See MSJ Response ¶ 2, at 2 (admitting this fact). Kline does not have the knowledge or the computer access to confirm any of the information in the detainees' paperwork, although he knows that the

records department prepares the paperwork. See MSJ ¶ 20, at 5 (asserting this fact)(citing Kline Depo. at 15:6-19); Response ¶ 2, at 2 (admitting this fact). The records department has "'the transport orders and all the orders get given to the sheriffs. . . . We hand it to them and I make sure [that what] I'm giving them matches [the person who] is leaving.'" MSJ ¶ 21, at 5 (asserting this fact)(quoting Kline Depo. at 15:21-25)(alterations added). See MSJ Response ¶ 2, at 2 (admitting this fact). Kline does not deeply research the information in the detainees' paperwork. See MSJ ¶ 21, at 5 (asserting this fact)(citing Kline Depo. at 15:25-16:2); Response ¶ 2, at 2 (admitting this fact). All Kline does is ensure that "'Gallegos is going on this transport order that's prepared before, like who knows, days before they get their orders to go to prison.'" MSJ ¶ 22, at 5 (asserting this fact)(quoting Kline Depo. at 17:18-21). See MSJ Response ¶ 2, at 2 (admitting this fact).

Kline's only knowledge of MDC's methadone treatment program is that a subcontractor runs it and keeps track of who takes methadone. See MSJ ¶ 23, at 6 (asserting this fact)(citing Kline Depo. at 21:14-19); MSJ Response ¶ 2, at 2 (admitting this fact). Security personnel like Kline have nothing to do with the methadone program. See MSJ ¶ 23, at 6 (asserting this fact)(citing Kline Depo. at 21:14-19); MSJ Response ¶ 2, at 2 (admitting this fact). Kline would not know whether a particular detainee was participating in the methadone program. See MSJ ¶ 24, at 6 (asserting this fact)(citing Kline Depo. at 22:19-23); MSJ Response ¶ 2, at 2 (admitting this fact).[10] No one working for the methadone contractor, however, complained to Kline about

---

[10]The parties dispute whether Gallegos complained to Kline about the Methadone Order. The Defendants assert that the "Plaintiff did not complain to Kline about the methadone order." MSJ ¶ 25, at 6. The Defendants cite the following section of the Kline Depo. as support for their assertion:

Q: Did anything -- let's start with Mr. Gallegos. Did he ever complain that he was being sent to the Department of Corrections when he had an order to keep

him there to complete the treatment program?

. . . .

A: There would be no reason for him to tell me that. No, I don't recall anything like that.

. . . .

Q: And he didn't complain to you, is basically the question.

A: No. No, sir.

Kline Depo. at 22:24-23:19. In contrast, Gallegos denies the Defendants' assertion, see MSJ Response ¶ 3, at 2, citing the following section of the Gallegos Depo.:

Q: Did you have any communications with that officer?

A: Yes, I told him about -- I showed them the order, too, but they said, "you have to go. Transport is here for you. You're going."

Q: You showed it to the officer you called Kline?

A: Yes.

Q: Anything else that he said besides what you mentioned?

A: No, he just said, "I can't do nothing. The court order is here, the transport order is here. You're leaving right now and that's all there is to it. I don't know what to tell you."

Q: Okay. So you brought up the methadone order first to the female officer who came to your cell who told you you were being transported?

A: Yes.

Q: And then you also told this corrections officer in the releasing area about the methadone order?

A: Yes.

Gallegos Depo. at 74:7-75:3. In short, Kline specifically testified that Gallegos did not complain to him about the Methadone Order. See Kline Depo. at 22:24-23:19. Gallegos, conversely, testified that he told Kline about the Methadone Order, and showed it to him, but Kline said that there was nothing he could do about it. See Gallegos Depo. at 74:7-75:3. From this information,

Gallegos' Methadone Order.  See MSJ ¶ 26, at 6 (asserting this fact)(citing Kline Depo. at 23:20-22).[11]  As an MDC Corrections Officer, Kline does not read methadone orders.  See MSJ ¶ 27, at

the Court can infer that, according to Gallegos, Gallegos complained to Kline about the Methadone Order.  The Court will therefore consider this fact disputed.

[11]Gallegos purports to dispute this fact, citing pages 74-76 of the Gallegos Depo.  The relevant sections of the cited pages state as follows:

Q: And then [the methadone order] also came up in your communications with this female nurse from Recovery Services?

A: Yes.

Q: Did you talk about the methadone order with anyone else we haven't mentioned?

A: No.  Just her.  Because she went in and goes, "I'm giving you your last dose.  I don't know why they're taking you."  And I showed her this. She said, "I've already tried to contact them and let them know but it's security and I have nothing to do with it."

Q: All right.  If you go back to Exhibit 1, your affidavit.  Towards the middle you see where it says, "on the day of transfer?"

A. Yeah

Q: There it says, "On the day of transfer I showed this court order to both officers of the jail and DOC transport officers who both ignored it.  Also the methadone administering nurse told both officers as well and they again ignored it."  So again, did you see this nurse talk to -- you said talk to the person at the front.  Did you see her talk to anyone else?

A: Well, the transporting officers that were there, she tried to tell them that they shouldn't take me because I was on a high dose and it was very dangerous but they told her something and she just left.

Q: Who were the DOC transport officers?

A: I have no idea of their names.

Q: Were they in uniform?

A: Yes.

6 (asserting this fact)(citing Kline Depo. at 23:13-16).[12]

King is an MDC Corrections Officer who works in the booking area, and her main job deals with fingerprints. See MSJ ¶ 28, at 6 (asserting this fact)(citing Deposition of Jovonne King at 3:9-4:3 (taken December 7, 2016), filed October 18, 2017 (Doc. 90-8)("King Depo.").[13] King did not escort Gallegos on the date of his release. See MSJ ¶ 29, at 6 (asserting this

---

Q: Were they Bernalillo County Sheriff's deputies?

A: Yes.

Gallegos Depo. at 75:4-76:14. None of this information, however, contradicts the Defendants' assertion that no one working for the methadone contractor complained to Kline about Gallegos' methadone order. See MSJ ¶ 26, at 6. First, that the nurse stated, "I've already tried to contact them and let them know but it's security and I have nothing to do with it," Gallegos Depo. at 75:13-15, does not show that the nurse tried to contact Kline specifically. Second, the passage stating, "also the methadone administering nurse told both officers as well and they again ignored it," Gallegos Depo. at 75:23-24, is an attorney reading from an affidavit and then asking Gallegos a question; it is not Gallegos' testimony at the deposition. Finally, Gallegos' testimony regarding the transport officers, see Gallegos Depo. at 76:3-14, shows only that the nurse told the transport officers about the Methadone Order, but Gallegos describes the transport officers as Bernalillo County Sheriff's deputies, see Gallegos Depo. at 76:8-14, and Kline is not a sheriff's deputy. The cited portions of the Gallegos Depo. therefore do not specifically controvert the Defendants' assertion that no one working for the methadone contractor complained to Kline about Gallegos' methadone order. The Court will therefore consider this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the [MSJ] will be deemed undisputed unless specifically controverted.").

[12]Gallegos purports to dispute this fact, citing pages 68-73 of the Gallegos Depo. The cited pages do not, however, discuss Kline, or, more particularly, what his job duties are as an MDC Corrections Officer. The Court will therefore consider this fact undisputed. See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

[13]Gallegos purports to dispute this fact, citing pages 68-73 of the Gallegos Depo. The cited pages do not, however, discuss King's job duties. The Court will therefore consider this fact undisputed. See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

fact)(citing King Depo. at 4:12-14).[14]  In fact, King does not recall Gallegos.  See MSJ ¶ 30, at 6

(asserting this fact)(citing King Depo. at 4-5).[15]  Regarding the methadone program, King knows

only that it exists and administers methadone doses to inmates.  See MSJ ¶ 31, at 6 (asserting this

fact)(citing King Depo. at 7:6-18).[16]

     The document referenced as "exhibit 2" in the King Depo. is the Methadone Order.  MSJ

---

[14]Gallegos purports to dispute this fact, citing pages 68-73 of the Gallegos Depo.  The relevant section of the cited pages states:

    Q: When you say the releasing area, can you briefly describe what that is?

    A:  There's an area where they take you and give you your property when you get released from the jail.  It's a part of the jail where they give you your belongings [] when [you] are getting released to get out they give you your property.

    Q: So you were taken out of your cell and then taken to this releasing area?

    A: Yes, sir.

Gallegos Depo. at 71:15-24 (alterations added).  This testimony does not, however, contradict the Defendants' assertion that King did not escort Gallegos on the date of his release, because it does not say who did or did not escort Gallegos to the releasing area.  The Court will therefore consider this fact undisputed.  See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

[15]Gallegos purports to dispute this fact, citing pages 68-73 of the Gallegos Depo.  Those pages do not, however, controvert the Defendants' assertion that King does not recall Gallegos.  As an initial matter, Gallegos testified that he is not sure that the events discussed on those pages involved King.  See Gallegos Depo. at 69:7-16.  More importantly, however, the cited pages have nothing to say regarding whether, in 2016, when King's deposition was taken, she remembered interactions with Gallegos in 2014.  The Court will therefore consider this fact undisputed.  See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

[16]Gallegos purports to dispute this fact, citing pages 68-73 of the Gallegos Depo.  Those pages do not, however, address King's knowledge of the methadone program.  The Court will therefore consider this fact undisputed.  See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

¶ 32, at 6 (asserting this fact)(citing Order Remanding Defendant to Metropolitan Detention Center, filed November 6, 2014, in State of New Mexico v. Martin Gallegos, Nos. CR 14-4787, CR 13-5315 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court October 18, 2017 (Doc. 90-9).[17]

King occasionally helps release detainees. See MSJ ¶ 34, at 7 (asserting this fact)(citing King Depo. at 12:3-4); MSJ Response ¶ 6, at 3 (admitting this fact). When helping release detainees, the only documents that she sees are the order committing the detainee to prison, the detainee's face sheet, and a cover page containing detainee names. See MSJ ¶ 35, at 7 (asserting this fact)(citing King Depo. at 12:9-13:8); MSJ Response ¶ 6, at 3 (admitting this fact).

Exhibit 6 that is referenced in the King Depo. is the Order Revoking Probation, filed November 7, 2014 in State of New Mexico v. Martin Gallegos, No. CR 2013-05315 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court October 18, 2017 (Doc. 90-10)("Order Revoking Probation"). See MSJ ¶ 36, at 7 (asserting this fact)(citing Order Revoking Probation at 1).[18] King does not escort detainees to the releasing

---

[17]Gallegos purports to dispute this fact, citing pages 68-73 of the Gallegos Depo. The cited pages do not, however, mention exhibit 2. The Court will therefore consider this fact undisputed. See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . ."). To clarify, Doc. 90-2 and Doc. 90-9 are identical copies of the Methadone Order. The only difference is that Doc. 90-9 has a sticker showing that it was labeled "exhibit 2" during the depositions.

[18]Gallegos purports to dispute this fact, citing pages 68-77 of the Gallegos Depo. The Court has carefully reviewed those pages, and nothing in them controverts the Defendants' simple assertion that Exhibit 6 referenced in the King Depo. is the Order Revoking Probation. The Court will therefore consider this fact undisputed. See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

area.  See MSJ ¶ 37, at 7 (asserting this fact)(citing King Depo. at 13:9-15; id. at 17:5-16).[19]

King did not escort Gallegos.  See MSJ ¶ 38, at 7 (asserting this fact)(citing King Depo. at 20:15-19).[20]  King might, however, "see detainees when they are sent to the dress-out room to get their

---

[19]Gallegos purports to dispute this fact, citing pages 68-77 of the Gallegos Depo.  The cited pages show that, according to Gallegos, when he was inside his cell, King said that she did not care about the Methadone Order and that Gallegos had to leave MDC.  See Gallegos Depo. at 70:14-20.  The Gallegos Depo. then states:

> Q: So after these communications with that female MDC officer, what happened next?
>
> A: She just -- she let me take a shower.  I asked her to call the lieutenant or the shift commander so I could present this to them and show them that I had the court order and she closed the door on me and I had to go or they were going to mace me and I had no choice but to leave.
>
> . . . .
>
> Q: When you say the releasing area, can you briefly describe what that is?
>
> A: There's an area where they take you and give you your property when you get released from the jail.  It's a part of the jail where they give you your belongings [] when [you] are getting released to get out they give you your property.
>
> Q: So you were taken out of your cell and then taken to this releasing area?
>
> A: Yes, sir.

Gallegos Depo. at 71:3-24.  In other words, Gallegos testified that King told him that he had to leave and that he was escorted to the releasing area, but the cited pages do not show that Gallegos testified regarding who did or did not escort him to the releasing area.  Because the cited pages do not controvert the Defendants' assertion that King does not escort detainees to the releasing area, the Court will consider this fact undisputed.  See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

[20]Gallegos purports to dispute this fact, citing pages 68-77 of the Gallegos Depo.  For the same reasons discussed in the previous footnote, the cited pages do not controvert the Defendants' assertion that King did not escort Gallegos, so the Court will consider this fact undisputed.  See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

shoes and sign for their property; then they are placed in a cell until the sheriff's deputies arrive."
MSJ ¶ 39, at 7 (asserting this fact)(citing King Depo. at 14:6-10).[21]  King does not have access to
detainees' computer files.  <u>See</u> MSJ ¶ 40, at 7 (asserting this fact)(citing King. Depo. at 15:11-
20).[22]

---

[21] Gallegos purports to dispute this fact, citing pages 68-77 of the Gallegos Depo.  The
relevant sections of the Gallegos Depo. state:

> Q: When you say the releasing area, can you briefly describe what that is?
>
> A: There's an area where they take you and give you your property when you get
> released from the jail.  It's a part of the jail where they give you your belongings
> [] when [you] are getting released to get out they give you your property.
>
> Q: So you were taken out of your cell and then taken to this releasing area?
>
> A: Yes, sir.
>
> . . . .
>
> Q: Okay. So you brought up the methadone order first to the female officer who
> came to your cell who told you you were being transported?
>
> A: Yes.
>
> Q: And then you also told this corrections officer in the releasing area about the
> methadone order?
>
> A: Yes

Gallegos Depo. at 71:15-24; <u>id.</u> at 74:21-75:3.  The cited pages do not, however, address the
Defendants' assertion that King might "see detainees when they are sent to the dress-out room to
get their shoes and sign for their property; then they are placed in a cell until the sheriff's
deputies arrive."  MSJ ¶ 39, at 7.  The Court will therefore consider this fact undisputed.  <u>See</u>
Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must
support the assertion by . . . citing to particular parts of materials in the record, including
depositions . . . .").

[22] Gallegos does not address the Defendants' MSJ ¶ 40.  The Court will therefore consider
this fact undisputed.  <u>See</u> D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the [MSJ] will
be deemed undisputed unless specifically controverted.").

The parties dispute, however, whether Gallegos told King about the Methadone Order

and that he should not be released from MDC.  See MSJ ¶ 41, at 7; MSJ Response ¶ 7, at 3.  The Defendants assert that Gallegos did not tell King about the Methadone Order.  See MSJ ¶ 41, at 7.  In support of this contention, the Defendants cite pages 16 and 18 of the King Depo.  The cited sections state:

> Q: I'm saying specifically there's another court order that says I'm not supposed to go.
>
> A: If you don't have the copy, there's nothing we can do about it. Or if records doesn't have it.  You can call the records supervisor to ask them, but if there's nothing else filed that you know of, you're going to go.
>
> Q: I understand.  Who can call?  I say, "Wait a minute, you're wrong."
>
> A: I would call the records supervisor and say, "This guy says that he has another order," and they will check the file.  If it's not there he's going.
>
> Q: What if it is there?
>
> A: They will pull him and put him back where he goes if it's there.
>
> Q: Do you recall Mr. Gallegos or anyone saying "There is another order and I'm not supposed to go?"
>
> A: No.
>
> . . . .
>
> Q: So you wouldn't have been there the day this happened? Is that a fair statement?
>
> A: If I was not working overtime, no.
>
> Q: So if my client claims he complained to somebody escorting him and he said it was a female --
>
> A: It was not me.
>
> Q: It was not you?
>
> A: No.

King Depo. at 16:2-21; id. at 18:17-25.  In response, Gallegos cites pages 68-77 of the Gallegos Depo., which state in relevant part:

Q: Okay. You mentioned it was a female officer?

A: Yes, sir.

Q: A female MDC officer?

A: Yes, sir.

Q: You don't recall her name?

A: I think it was Ms. King that I can recall but I know it was a female officer.

Q: You're not sure if it was Ms. King?

A: I'm not sure.

Q: It was just one officer at that time, it wasn't two or three?

A: No, it was just her that was running the unit that day, that morning. We did get into an argument over this because I did, in fact, tell her that I had this court order and that she needed to call somebody in the front and let them know that I had a court order to stay in the detention center until I lower my dosage. And when she told me, "I don't give a shit," I said, "I'm going to contact my attorney and file a lawsuit against you guys because you guys are transporting me on a court order that was given to me and my understanding was I would be there for a period of six weeks so I wouldn't have to go through the withdrawal symptoms."

Q: At that time did you have a copy of the methadone order?

A: Yes, I did.

Q: Did you show it to the officer?

A: Yes, I did.

Q: Did she read it?

A: No, she didn't.

Q: Did she take it in her hand?

A: No, she didn't. I tried to give it to her and she said, "I don't give a shit. You're leaving."

Gallegos Depo. at 69:7-70:17. In short, King testified that Gallegos did not complain to her

about the Methadone order, see King Depo. at 16:2-21; id. at 18:17-25, but Gallegos testified that he complained to King, see Gallegos Depo. at 69:7-70:17. The Court will therefore consider this fact disputed. The Court further notes that Gallegos testified that he thought the corrections officer to whom he complained was King, but he was not sure. See Gallegos Depo. at 69:7-16. Because the Court "must view the evidence in the light most favorable to the . . . party [opposing summary judgment]," and because "qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant," Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014)(internal quotation marks omitted), the Court will infer that, according to Gallegos, the officer he described was King.

The parties further dispute whether King saw the Methadone Order. See MSJ ¶ 33, at 6; MSJ Reply ¶ 4, at 2. The Defendants assert that King did not see the Methadone Order, citing the following section of the King Depo.:

> Q: Okay. How about let's take a look at Exhibit 2 [the Methadone Order]. Do you ever see stuff like this?
>
> . . . .
>
> A: No, we don't see this.
>
> Q: You don't see stuff like this?
>
> A: No.

King Depo. at 9:18-10:1 (alteration added). In contrast, Gallegos asserts that King did see the Methadone Order, citing the following section of the Gallegos Depo.:

> Q: At the time did you have a copy of the Methadone Order?
>
> A: Yes, I did.
>
> Q: Did you show it to the officer?
>
> A: Yes, I did.
>
> Q: Did she read it?
>
> A: No, she didn't.
>
> Q: Did she take it in her hand?
>
> A: No she didn't. I tried to give it to her and she said, "I don't give a shit. You're leaving."

Gallegos Depo. at 70:7-17. In short, King testified that she did not see the Methadone Order, see

The Methadone Order should have been in Gallegos' file. See MSJ Response ¶ 14, at 5-6 (asserting this fact); Iverson Depo. at 6:14-25.[23] MDC Corrections Record Supervisor Alexis Iverson has received orders similar to the Methadone Order for many years and sends them to a nurse from Recovery Services. See MSJ Response ¶ 14, at 6 (asserting this fact); Iverson Depo. at 7:4-8:10.[24] If someone complains about an order to transfer an inmate, the inmate's corrections officer brings the matter to Iverson's attention. See MSJ Response ¶ 15, at 6 (asserting this fact); Iverson Depo. at 12:1-8.[25] If Iverson sees a Methadone Order, she recommends that the inmate stay at MDC until she receives further clearance. See MSJ

---

King Depo. at 9:18-10:1, but Gallegos testified that he showed her the Methadone Order, see Gallegos Depo. at 70:7-17. The Court will therefore consider this fact disputed.

[23]The Defendants assert that this fact is irrelevant, but they do not dispute it. See MSJ Reply at 3. The Court will therefore consider this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion. S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95  (D.N.M. 2015)(Browning, J.).

[24]The Defendants assert that this fact is irrelevant, but they do not dispute it. See MSJ Reply at 3. The Court will therefore consider this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion. S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95  (D.N.M. 2015)(Browning, J.).

[25]The Defendants assert that this fact is irrelevant, but they do not dispute it. See MSJ Reply at 3. The Court will therefore consider this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion. S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95  (D.N.M. 2015)(Browning, J.).

Response ¶ 15, at 6 (asserting this fact); Iverson Depo. at 12:9-12.[26]  In such a situation, the proper procedure is to wait to transfer an inmate "and see what the story was and she would not let Mr. Gallegos be transferred instantly at that point and she would check with the court to see what to do."  MSJ Response ¶ 15, at 6 (asserting this fact); Iverson Depo. at 12:13-13:6.[27] Iverson would stop the transfer procedure if presented with a Methadone Order.  See MSJ Response ¶ 15, at 6 (asserting this fact); Iverson Depo. at 13:7-10.[28]  If conflicting court orders exist, Iverson's job is to "figure it out" and not to be indifferent to an inmate's care.  MSJ Response ¶ 16, at 6 (asserting this fact); Iverson Depo. at 14:7-24.[29]  If someone wanted to

---

[26]The Defendants assert that this fact is irrelevant, but they do not dispute it.  See MSJ Reply at 3.  The Court will therefore consider this fact undisputed.  See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95  (D.N.M. 2015)(Browning, J.).

[27]The Defendants assert that this fact is irrelevant, but they do not dispute it.  See MSJ Reply at 3.  The Court will therefore consider this fact undisputed.  See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95  (D.N.M. 2015)(Browning, J.).

[28]The Defendants assert that this fact is irrelevant, but they do not dispute it.  See MSJ Reply at 3.  The Court will therefore consider this fact undisputed.  See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95  (D.N.M. 2015)(Browning, J.).

[29] The Defendants assert that this fact is irrelevant, but they do not dispute it.  See MSJ Reply at 3.  The Court will therefore consider this fact undisputed.  See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis

transport Gallegos, he or she should have asked Recovery Services whether Gallegos was cleared to transport. See MSJ Response ¶ 17, at 6 (asserting this fact)(citing Iverson Depo. at 30:6-13).[30]

## PROCEDURAL BACKGROUND

Gallegos filed this lawsuit in state district court on August 27, 2015. See Complaint, Gallegos v. Bernalillo Cnty. Bd. of Comm'rs, No. CIV 15-06829, filed August 27, 2015, (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court February 22, 2016 (Doc. 1-1). While in state court, Gallegos amended his Complaint. See Amended Complaint Gallegos v. Bernalillo Cnty. Bd. of Comm'rs, No. CIV 15-06829, filed February 1, 2016, (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court February 22, 2016 (Doc. 1-2)("Complaint"). The case was later removed to federal court. See Notice of Removal of Civil Action at 1, filed February 22, 2016 (Doc. 1). Since removal, the Court has dismissed most of the Defendants from this case, including: (i) the New Mexico Corrections Department, see Memorandum Opinion and Order at 113, 2017 WL 3575883, at *49, filed August 17, 2017 (Doc. 82); (ii) MDC, see Memorandum Opinion and Order at 24, 272 F. Supp. 3d 1256, 1270, filed September 22, 2017 (Doc. 84); (iii) and the Bernalillo County Board of County Commissioners, see Memorandum Opinion and Order at 47, 278 F. Supp. 3d 1245, filed September 30, 2017 (Doc. 87). The Court also issued an Order allowing Gallegos to amend his Complaint, and to add Kline and King as Defendants, and the

---

Section" of this opinion. S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95 (D.N.M. 2015)(Browning, J.).

[30]The Defendants assert that this fact is irrelevant, but they do not dispute it. See MSJ Reply at 3. The Court will therefore consider this fact undisputed. See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion. S.E.C. v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n. 95 (D.N.M. 2015)(Browning, J.).

rationale for this decision is discussed below.  See Order at 7.

1.    **The Motion.**

Gallegos argues that he has good cause to amend his Complaint.  See Motion at 1. Specifically, he contends that he received answers to interrogatories stating that Kline and King assisted in answering them.  See Motion at 2.  Essentially, Gallegos explains that he had previously been "unable to identify who were the persons that were directly involved in this matter for violation of the 8th Amendment Deliberate Indifference," and so he should be able to amend his Complaint to add Kline and King.  See Motion at 4.

2.    **The Response.**

The Defendants responds to the Motion.  See Defendants Bernalillo County Board of County Commissioners' and Bernalillo County Detention Center's Response in Opposition to Plaintiff's Motion to File a Second Amended Complaint, filed March 2, 2017 (Doc. 59)("Response").[31]  The Defendants contend that Gallegos' proposed amendment does not sufficiently plead a deliberate indifference claim, because it does not address whether Kline and King knew of and disregarded an excessive risk to Gallegos' health and safety.  See Response at 6.

The Defendants next aver that the Court should deny the Motion because of undue delay and lack of diligence.  See Response at 6.  The Defendants assert that Gallegos moved to amend a year after the case was removed and after the deadline to amend had passed.  See Response at 6.  According to the Defendants, the "Plaintiff filed this lawsuit in 2015 and was apparently aware of the identity of MDC personnel allegedly involved in the underlying events.  This is

---

[31]The Defendants that filed the Response are Bernalillo County and MDC.  As explained above, the Court has dismissed them from this case.  For the sake of convenience, however, the Court will refer to them as "Defendants."

borne out by Plaintiff's deposition testimony where he identified the alleged MDC persons by their last names." Response at 7. Accordingly, the Defendants conclude that "it can be assumed Plaintiff knew these names before his deposition and there is no excuse for not timely seeking to amend." Response at 7.

**3.    The Reply.**

Gallegos replies to the Response. See Plaintiff's Reply to Defendant Bernalillo County Board of Commissioners and Bernalillo County Detention Center Response to Plaintiff's Motion to File a Second Amended Complaint, filed March 16, 2017 (Doc. 62)("Reply"). Gallegos contends that he could not remember the names of the corrections officers involved in transferring him out of MDC, but when he was released from prison and reviewed the depositions of Kline and King, he recalled that they were the officers involved. See Reply at 3. Gallegos continues that Kline and King's depositions "were not transcribed and/or were unable to be delivered to the Plaintiff for his reading until he was released" from prison. Reply at 4. Gallegos concludes that the "motion to amend . . . should be granted since no additional depositions will be necessary." Reply at 5.

**4.    The First Hearing.**

The Court held a hearing regarding the Motion on June 2, 2017. See Draft Transcript of Motion Hearing at 1:9-13 (taken June 2, 2017)("Tr.")(Court).[32] The Court opened by observing "it seems to me that the Plaintiff has sufficiently explained why he could not have timely identified those guards. . . . So it seems to me that we ought to bring that guard in, and that's probably about it." Tr. at 2:21-3:1 (Court). The Defendants argued that, if the Motion were granted, "King and Kline would probably both come into this courtroom and say we don't know

---

[32]The Court's citations to the hearings' transcripts refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

anything, we don't remember him." Tr. at 10:16-18 (Quinones). The Court responded: "I think it may come down to whether Mr. Gallegos can actually identify the person that apparently he showed the order to." Tr. at 10:24-11:1 (Court). The Court continued that it needed "to figure out if Mr. Gallegos is prepared to point the finger at one of these people." Tr. at 11:8-9 (Court). The Court asked Gallegos about his version of events relating to Kline and King, and the following colloquy occurred:

> Mr. Lawless: His story is those two people and again the Court has to consider that when you're dealing with [] somebody [who is] in jail that you can't send them photographs.

> The Court: I understand.

> Mr. Lawless: And his story, I don't think is going to change at all. His story is I showed [the Methadone Order] to everybody, including both of those guards Kline and King.

> The Court: And he can say under oath, "I showed it to King and I showed it to Kline."

> Mr. Lawless: He can say that.

> . . . .

> The Court: He's going to say under oath, I showed it to Kline and King?

> Mr. Lawless: Correct.

> The Court: And is he going to testify that both Kline and King said I don't care what that is you're heading to the big house?

> Mr. Lawless: Both Kline and King said some form of that.

> The Court: Some form of that and he'll testify under oath as to both of those people saying that?

> Mr. Lawless: I believe that's correct.

Tr. at 19:24-20:24 (Lawless, Court)(alterations added). The Court later asked why it took so

- 23 -

long to determine that Kline and King were the two people that Gallegos wants to add to his Complaint. See Tr. at 32:2-4 (Court). Gallegos replied that "[h]e was in jail, so you can't just send depositions in and all these things you can't go over and visit him because they're on lockdown a lot. So we had to wait until he was able to do this. And he says now he knows their names." Tr. at 32:7-11 (Lawless).

The Defendants responded that the Motion should be denied because of undue delay. See Tr. at 32:16-18 (Quinones). Specifically, the Defendants asserted that "King and Kline were deposed on December 7, 2016. And so Plaintiff had time to do a timely amendment even at that point." Tr. at 32:21-23 (Quinones). Eventually, the Court stated that it was inclined to grant the Motion in part to add Kline and King. See Tr. at 44:17-18 (Court).

5. **The MSJ.**

After the Court issued an Order allowing Gallegos to amend his Complaint to add Kline and King as Defendants, see Order at 7, the Defendants moved for summary judgment on the basis of qualified immunity, see MSJ at 1. The Defendants first argue that Gallegos cannot show that they acted with deliberate indifference. See MSJ at 11. The Defendants contend that Gallegos did not complain to them regarding the Methadone Order, that they did not have access to the computer files containing Gallegos' court orders, and that they did not see the Methadone Order. See MSJ at 13. Accordingly, the Defendants conclude that they "were unaware of any facts from which the inference could be drawn that a substantial risk of serious harm existed." MSJ at 13.

The Defendants next aver that, in any event, they are entitled to qualified immunity, because the "Plaintiff cannot demonstrate Defendants were deliberately indifferent to Plaintiff's safety." MSJ at 15. According to the Defendants, "[b]oth Kline and King testified Plaintiff did

not complain to them regarding the methadone order.  Both also testified having no access to Plaintiff's computer file to review court orders."  MSJ at 15.  Essentially, according to the Defendants, "Kline and King were nothing more than government officials performing their respective discretionary functions."  MSJ at 15.  For these reasons, the Defendants assert that they are entitled to qualified immunity.  See MSJ at 15.

    6.    **The MSJ Response.**

    Gallegos responds to the MSJ.  See MSJ Response at 1.  Gallegos first asserts that there "are factual disputes as to whether the [Methadone Order] was shown to the Defendants."  MSJ Response at 8 (alteration added).  Gallegos argues: "As a result of those factual disputes the court cannot conclude that the order was not shown to both of those present Defendants and conclude without hearing testimony as to whether the facts presented by Gallegos or the facts presented by Defendants are correct in what had happened."  MSJ Response at 8.  Gallegos continues that "[t]o use the expression 'I don't give a shit' is the height of deliberate indifference."  MSJ Response at 10.  According to Gallegos, "[t]o refuse to read and/or ignore the order when Mr. Gallegos complained not only to the Defendants but to nurses in the methadone program also indicated serious deliberate indifference."  MSJ Response at 10.  Gallegos asserts that Kline and King "knew or would have known from the face of the order and from the nurse that a serious medical condition existed with regard to the Plaintiff."  MSJ Response at 10.

    Regarding qualified immunity, Gallegos avers that a "constitutional right to be free from deliberate indifference under *Estelle v. Gamble*, [429 U.S. 97 (1976)] . . . has been clearly established law under the constitutional requirements of the 8th Amendment since 1976, more than 40 years ago."  MSJ Response at 11.  Gallegos continues that Kline and King "cannot

possibly claim they were unaware of Plaintiff's constitutional right under the 8th Amendment and dozens of cases clarifying that right over the past four decades when they deliberately disregarded Plaintiff Gallegos' complaint." MSJ Response at 11. Gallegos concludes that the Court should deny the MSJ. See MSJ Response at 11.

7.    **The MSJ Reply.**

The Defendants reply to the MSJ Response. See MSJ Reply at 1. The Defendants first assert that Gallegos cannot show that Kline and King acted with deliberate indifference. See MSJ Reply at 4. Specifically, the Defendants contend that they never saw the Methadone Order, that Gallegos did not complain to them about it, and that they had no access to the computer files containing the Methadone Order. See MSJ Reply at 5.

The Defendants next assert that it is immaterial whether they should have known of any risk of harm to Gallegos and that, without being subjectively aware of any such risk, they could not have been deliberately indifferent. See MSJ Reply at 6. According to the Defendants, "[w]ithout meeting his burden of showing the subjective element of a viable Eighth Amendment claim, Plaintiff's lawsuit fails." MSJ Reply at 6.

Additionally, the Defendants argue that any conduct of non-Defendants such as Iverson is irrelevant, because "'a plaintiff must plead each government-official defendant, through the official's own individual actions, has violated the Constitution.'" MSJ Reply at 7 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). It follows, according to the Defendants, that it is irrelevant whether Gallegos showed the Methadone Order to individuals other than Kline and King.

Finally, the Defendants re-assert their qualified immunity argument that, because Gallegos cannot meet the subjective element of a deliberate indifference claim, no constitutional

violation occurred.  See MSJ Reply at 8.  According to the Defendants, Kline and King "meet the very definition of government officials performing discretionary job functions, the type of public actors that are protected under qualified immunity."  MSJ Reply at 8.  The Defendants conclude that the Court should grant the MSJ.  See MSJ Reply at 9.

**8.** **The Second Hearing.**

The Court held a hearing regarding the MSJ on June 12, 2018.  See Draft Transcript of Motion Hearing at 1:16-17 (taken June 12, 2018)("Second Tr.")(Court).  The Defendants began by asserting that Gallegos had not met a deliberate indifference claim's subjective component, because, "if a prison official is unaware of the risk of harm, no matter how obvious the risk or how gross his negligence in failing to perceive it, his failure to alleviate it is not an infliction of punishment and therefore not a constitutional violation."  Second Tr. at 6:7-11 (Quinones).  The Defendants continued that, regardless, "no one would have seen . . . that plaintiff was in any kind of distress."  Second Tr. at 7:23-24 (Quinones).  According to the Defendants, it is unclear what happened to the Methadone Order in MDC's records department, but that failure to act on the Methadone Order "would at most constitute negligence and not deliberate indifference.  In fact, negligence by persons other than Mr. Kline and Ms. King."  Second Tr. at 10:25-11:3 (Quinones).  The Defendants added that "what matters is whether the MDC defendants were personally involved and whether they personally participated. That's it."  Second Tr. at 13:15-17 (Quinones).

Gallegos then began his argument.  See Second Tr. at 15:3 (Lawless).  The Court first asked Gallegos if he asserted any claims other than deliberate indifference against Kline and King in their individual capacities.  See Second Tr. at 15:16-21 (Court).  Gallegos replied that those were his only claims.  See Second Tr. at 15:22-16:12 (Lawless, Court).

Gallegos then addressed deliberate indifference's objective prong, asserting that the Methadone Order stated that Gallegos should remain in MDC's custody so that he would not incur life-threatening withdrawal symptoms. See Second Tr. at 17:17-21 (Lawless). When asked what record evidence indicates that Gallegos' methadone withdrawal symptoms were life-threatening, he responded that such statements were in the Methadone Order and in Gallegos' testimony, but nothing else specifically addresses that point. See Second Tr. at 17:22-18:21 (Court, Lawless). The Court replied that,

> if a layperson can look at the situation and realize the severity of the [medical] condition and there's a lot of times that can be done, then that can be deliberate indifference. Otherwise, it has to be ordered by a doctor and I'm not seeing in the record here that this [titration] order is being ordered by a doctor.

Second Tr. at 22:1-6 (Court). The Court continued that "I don't know the origin of it. I don't know who is ordering this other than the court, a lawyer." Second Tr. at 22:7-8 (Court).

Gallegos then addressed qualified immunity's clearly established prong, arguing that Farmer v. Brennan, 511 U.S. 825 (1994), and Self v. Crum, 439 F.3d 1227 (10th Cir. 2006), show that the law regarding his claim is clearly established. See Second Tr. at 25:8-26:12 (Lawless, Court). Gallegos asserted that "there isn't anybody that works in the corrections department" who does not know about the holding in Estelle v. Gamble, 429 U.S. at 104, regarding deliberate indifference. Second Tr. at 28:6-7 (Lawless). Based on this information, Gallegos averred that the law is clearly established. See Second Tr. at 28:14-19 (Lawless).

The Defendants responded that they work in the area of security, and that they do not have access to inmates' computer files. See Second Tr. at 28:24-29:6 (Quinones). The Defendants continued that, "without being subjectively aware of the risk of harm to plaintiff, King and Kline cannot be deemed to have been deliberately indifferent to plaintiff's safety." Second Tr. at 30:23-25 (Quinones). The Defendants then summarized their main point: "The

fact of the matter is King and Kline did not consciously disregard an excessive risk to Mr. Gallegos's health or safety. And, therefore, plaintiff cannot meet the subjective component of a viable 8th Amendment claim." Second Tr. at 30:25-31:4 (Quinones). At the hearing's conclusion, the Court offered its inclination that it was unsure whether Gallegos met deliberate indifference's objective component, but that he had not met the subjective component or qualified immunity's clearly established prong. See Second Tr. at 31:10-24 (Court). The Court also invited Gallegos to submit any cases that he wanted the Court to consider regarding the clearly established prong. See Second Tr. at 32:15-20 (Lawless, Court).

## LAW REGARDING MOTIONS TO AMEND

"While Rule 15 governs amendments to pleadings generally, rule 16 of the Federal Rules of Civil Procedure governs amendments to scheduling orders." Bylin v. Billings, 568 F.3d 1224, 1231 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)). When a court has not entered a scheduling order in a particular case, rule 15 governs amendments to a plaintiff's complaint. See Fed. R. Civ. P. 15. When a scheduling order governs the case's pace, however, amending the complaint after the deadline for such amendments implicitly requires an amendment to the scheduling order, and rule 16(b)(4) governs changes to the scheduling order. See Bylin v. Billings, 568 F.3d at 1231. Rule 15(a) of the Federal Rules of Civil Procedure provides:

(1) **Amending as a Matter of Course.** A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under rule 12(b), (e), or (f), whichever is earlier.

(2) **Other Amendments.** In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should

freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(bold and italics in original). Further, the local rules provide that, with respect to motions to amend a pleading, "[a] proposed amendment to a pleading must accompany the motion to amend." D.N.M.LR-Civ. 15.1.

Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires. See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, 2007 WL 709041, at *1-2 (D.N.M. 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., 2005 WL 3664299, at *1-2 (D.N.M. 2005)(Browning, J.). The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given. Fomen v. Davis, 371 U.S. 178, 182 (1962). See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001). In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile." Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999). See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80. An amendment is "futile" if the pleading "as amended, would be subject to dismissal." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)). A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66

(10th Cir. 1993)).  See Youell v. Russell, 2007 WL 709041, at *2-3 (D.N.M. 2007)(Browning, J.); Lymon v. Aramark Corp., 2009 WL 1299842 (D.N.M. 2009)(Browning, J.).  The United States Court of Appeals for the Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no adequate explanation for the delay, Woolsey, 934 F.2d at 1462. Furthermore, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." Las Vegas Ice, 893 F.2d at 1185.

Frank v. U.S. W., Inc., 3 F.3d at 1365-66.[33]  The longer the delay, "the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend."  Minter v. Prime Equip. Co., 451 F.3d at 1205 (citing Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)).  Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'"  Minter v. Prime Equip. Co., 451 F.3d at 1206 (quoting Viernow v. Euripides Dev. Corp., 157 F.3d 785, 799-800 (10th Cir. 1998)).  "[P]rejudice to the opposing party need not also be shown."  Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185. "Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."  Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at

---

[33]The Court notes that there is older authority in the Tenth Circuit that seems to be to the contrary.  See R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir. 1975)("Lateness does not of itself justify the denial of the amendment.").  Minter v. Prime Equipment Co. seems to clarify that the distinction is between "delay" and "undue delay."  Minter v. Prime Equipment Co., 451 F.3d at 1205-06.  Delay is undue "when the party filing the motion has no adequate explanation for the delay."  Minter v. Prime Equipment Co., 451 F.3d at 1206.

1185 (quoting State Distribs., Inc. v. Glenmore Distilleries Co., 738 F.2d 405 (10th Cir. 1984)). Along the same vein, the court will deny amendment if the party learned of the facts upon which its proposed amendment is based and nevertheless unreasonably delayed in moving to amend its complaint.  See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

Refusing leave to amend is generally justified only upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.  See Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993).  Again, the matter is left to the Court's discretion.  See Frank v. U.S. W., Inc., 3 F.3d at 1365-66; Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc., 3 F.3d at 1365-66, and stating that resolving the issue whether to allow a plaintiff to file a supplement to his complaint is "well within the discretion of the district court").  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Schs., 2007 WL 1306814, at *2 (D.N.M. 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).  "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim."  Burleson v. ENMR-Plateau Tel. Co-op., 2005 WL 3664299 at *2 (D.N.M. 2005)(Browning, J.)(citing Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)).

## LAW REGARDING MODIFICATION OF SCHEDULING ORDERS

"The District Court has wide discretion in its regulation of pretrial matters." Si-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990).  Scheduling orders, however, "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).  Accord Street v. Curry Bd. of Cty. Comm'rs, No. CIV 06-0776 JB/KBM, 2008 WL 2397671, at *6 (D.N.M. Jan. 30, 2008)(Browning, J.).  The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension.  Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a "manifest injustice" or "substantial hardship" test.  Otherwise, a fear that extensions will not be granted may encourage counsel to request the longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and diligence are related.  "The Tenth Circuit . . . has recognized the interrelation between 'excusable neglect' and 'good cause.'" Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(Rushfelt, J.)(citing In re Kirkland, 86 F.3d 172, 175 (10th Cir. 1996)).  "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6.  See Advanced Optics Electronics, Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order.").  In In re Kirkland, the Tenth Circuit dealt with the definition of "good cause" in the context of a predecessor to modern rule 4(m) of the Federal Rules of Civil Procedure,[34] and noted:

---

[34] Rule 4(m) provides that

> [W]ithout attempting a rigid or all-encompassing definition of 'good cause,' it would appear to require <u>at least as much</u> as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of 'good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified' is normally required.

86 F.3d at 175 (emphasis in original)(quoting <u>Putnam v. Morris</u>, 833 F.2d 903, 905 (10th Cir. 1987))(internal quotation marks omitted). The Tenth Circuit explained that <u>Putnam v. Morris</u> "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'" <u>In re Kirkland</u>, 86 F.3d at 175.

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request. In <u>Advanced Optics Electronics, Inc. v. Robins</u>, the Court found that, where the defendant did not conduct discovery or make any good-faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling order. 769 F. Supp. 2d at 1313 n.8. In <u>Street v. Curry Bd. Of Cty. Comm'rs</u>, however, the Court found that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her

---

> If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P. 4(m). The Tenth Circuit in <u>In re Kirkland</u> interpreted rule 4(j), which was substantially identical. <u>See</u> 86 F.3d at 174 ("Rule 4(j) requires the court to dismiss a proceeding if service has not been made upon the defendant within 120 days after filing and the party responsible for service cannot show good cause why it was not made.").

identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery." 2008 WL 2397671, at *11. In <u>Montoya v. Sheldon</u>, No. CIV 10-0360 JB/WDS, 2012 WL 5353493 (D.N.M. Oct. 7, 2012)(Browning, J.), the Court did not find good cause to modify the scheduling order and reopen discovery, and refused to grant the plaintiffs' request do so, where the plaintiffs' excuse for not disclosing their expert before the close of discovery was that they thought that the case would settle and they would thus not require expert testimony. <u>See</u> 2012 WL 5353493, at *14. The Court noted:

> The [plaintiffs] filed this case on April 15, 2010. Because [Plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

2012 WL 5353493, at *14.

In <u>Scull v. Management & Training Corp.</u>, 2012 WL 1596962 (D.N.M. May 2, 2012)(Browning, J.), the Court denied a plaintiff's request for an extension of time to name an expert witness against a defendant. The plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, but a scheduling order was in effect before the second defendant entered the case. The Court concluded that the plaintiff should have known that he would need to name an expert witness against the defendant already in the case. <u>See</u> 2012 WL 1596962, at *8. The Court determined that the plaintiff was seeking "relief from his own disregard" for the deadline. 2012 WL 1596962, at *8. "Despite his knowledge that [defendant] PNA had yet to enter the case, [plaintiff] Scull chose to allow the deadline to pass without naming expert witnesses against [defendant] MTC." 2012 WL 1596962, at *8. Regarding the defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, because it "was not unreasonable for

Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he had not yet had the opportunity to engage in discovery against PNA as he had against MTC." 2012 WL 1596962, at *9. The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," as Scull could not have determined the need for an expert witness until after PNA entered the case. 2012 WL 1596962, at *9.

In Stark-Romero v. National Railroad Passenger Co (AMTRAK), 275 F.R.D. 544 (D.N.M. 2011)(Browning, J.), the Court concluded that a lawyer had shown excusable neglect when he missed a scheduling deadline because, soon after his son's wedding, his father-in-law developed a tumor in his chest, and the lawyer arranged his father-in-law's medical care, and only after the lawyer returned to his work did he realize that a deadline passed. See 275 F.R.D. 549-550. The Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but concluded that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not because of his inadvertence. 275 F.R.D. 549-550. In West v. New Mexico Taxation and Revenue Department, No. CIV 09-0631 JB/CEG, 2010 WL 3834341 (D.N.M. July 29, 2010)(Browning, J.), the Court allowed a plaintiff extended time to file a response to a defendant's motion for summary judgment, in part because of the difficulty that the plaintiff's counsel experienced attempting to obtain depositions with certain defense witnesses, and thus it was not her fault, and in part because cross-motions on summary judgment are particularly helpful for the Court:

> [C]ross-motions tend to narrow the factual issues that would proceed to trial and promote reasonable settlements. In some cases, it allows the Court to determine that there are no genuine issues for trial and thereby avoid the expenses associated with trial. The Court prefers to reach the merits of motions for summary judgment when possible.

2010 WL 3834341, at \*\*4-5.  On the other hand, in <u>Liles v. Washington Tru Solutions, LLC</u>, No. CIV 06-854 JB/CEG, 2007 WL 2298440 (D.N.M. June 13, 2007)(Browning, J.), the Court denied a plaintiff's request for additional time to respond to a defendant's motion for summary judgment, when the only rationale that the plaintiff provided was that its counsel's "family and medical emergencies" precluded the plaintiff from timely responding.  2007 WL 2298440, at \*2.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)("<u>Celotex</u>").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u>  <u>Celotex</u>, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  <u>Cardoso v. Calbone</u>, 490 F.3d 1194, 1197 (10th Cir. 2007).

<u>Plustwik v. Voss of Nor. ASA</u>, No. 2:11-cv-757, 2013 WL 1945082, at \*1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  <u>Celotex</u>,

477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[35]  Once the movant meets this

burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a

genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 256 (1986)("Liberty Lobby").

      The party opposing a motion for summary judgment must "set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,

1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)

("However, the nonmoving party may not rest on its pleadings but must set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It

is not enough for the party opposing a properly supported motion for summary judgment to "rest

on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 256.  See

Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States,

622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is

made, the opposing party may not rest on the allegations contained in his complaint, but must

_____

      [35]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme
Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the
law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727,
at 470 (3d ed. 1998)("Wright & Miller")("Although the Court issued a five-to-four decision, the
majority and dissent both agreed as to how the summary-judgment burden of proof operates;
they disagreed as to how the standard was applied to the facts of the case.").

respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The United States Court of Appeals for the Tenth Circuit applied this doctrine in

Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[36]] explained that the

blatant contradictions of the record must be supported by more than other witnesses'

---

[36]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), Belcher v. United States, 216 F. App'x 821 (10th Cir. 2007), and Toler v. Troutt, 631 F. App'x 545 (10th Cir. 2015), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

**LAW REGARDING QUALIFIED IMMUNITY**

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 392 (1971)("Bivens").  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and Bivens, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights.  To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability,

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); see also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

    **1.**       **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly

established -- will often be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[37] the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law";

---

[37]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts."  Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011).  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

(iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[38] "Courts should think carefully before expending

---

[38]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions

to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that:
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory

clearly established prong became a part of the qualified immunity test. <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. <u>See</u> Christopher Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, <u>Constitutional Alternatives to the Exclusionary Rule</u>, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. <u>See</u> 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

<u>Kerns v. Bd. of Comm'rs</u>, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), <u>abrogated on other grounds as recognized by</u> <u>Ysasi v. Brown</u>, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). <u>See</u> Richard E. Myers, <u>Fourth Amendment Small Claims Court</u>, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[39] See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong. See Kerns v. Bader, 663 F.3d at 1182; see also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

## 2. **Clearly Established Rights.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905,

---

[39]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely or superficially -- at whether there is a constitutional right and whether there is a violation. It is difficult to stop and review the facts, rights, and alleged violations to the clearly established prong without looking at the facts, rights, and alleged violations on the merits in the case before the Court. Pearson v. Callahan sounds acceptable in theory, but it does not work well in practice. The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing. Saucier v. Katz worked better in practice.

923 (10th Cir. 2001). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188. In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II"). In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam). In concluding that they had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one. Although we cited *Graham v. Connor*, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it. Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity. We also relied on several cases resolving excessive-force claims. But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876. The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S.

at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case.  See Aldaba II, 844 F.3d at 874 n.1.  The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with
> "fundamentally similar" facts, noting that "officials can still be on notice that their
> conduct violates established law even in novel factual circumstances." *Id.* at
> 741[].  This calls to mind our sliding-scale approach measuring the egregiousness
> of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the
> Supreme Court has vacated our opinion here and remanded for us to reconsider
> our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that
> the cases it relied on were "simply too factually distinct to speak clearly to the
> specific circumstances here." 136 S. Ct. at 312.  We also note that the majority
> opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730, [] (2002).  As can
> happen over time, the Supreme Court might be emphasizing different portions of
> its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam,

another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. 548, 551

(2017)(per curiam).  In concluding that police officers were entitled to qualified immunity, the

Supreme Court emphasized: "As this Court explained decades ago, the clearly established law

must be 'particularized' to the facts of the case."  White v. Pauly, 137 S. Ct. at 552 (quoting

Anderson v. Creighton, 483 U.S. at 640).  With that principle in mind, the Supreme Court

explained that the Tenth Circuit "panel majority misunderstood the 'clearly established' analysis:

It failed to identify a case where an officer acting under similar circumstances as Officer White

was held to have violated the Fourth Amendment."  White v. Pauly, 137 S. Ct. at 552.  See

District of Columbia v. Wesby, 138 S. Ct. at 591 ("Tellingly, neither the panel majority nor the

partygoers have identified a single precedent -- much less a controlling case or robust consensus

of cases -- finding a Fourth Amendment violation under similar circumstances.").  Although the

Supreme Court noted that "we have held that [Tennessee v.] *Garner*[, 471 U.S. 1 (1985)] and

*Graham* do not by themselves create clearly established law outside 'an obvious case,'" it

concluded "[t]his is not a case where it is obvious that there was a violation of clearly established

law under *Garner* and *Graham*." 137 S. Ct. at 552.[40]

---

[40]If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be clearly established. As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. <u>See</u> Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014). Although still stating that there might be an obvious case under <u>Graham</u> that would make the law clearly established without a Supreme Court or Circuit Court case on point, <u>see</u> <u>White v. Pauly</u>, 137 S. Ct. at 552, the Supreme Court has sent unwritten signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts, <u>see</u> <u>Malone v. Board of County Comm'rs for County of Dona Ana</u>, 2017 WL 3951706, at *3 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police when shot and was not raising his gun, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies").

Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. <u>See</u> <u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). Nevertheless, the Supreme Court has crafted its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. <u>See</u> <u>Saenz v. Lovington Mun. Sch. Dist.</u>, 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with that approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, Pauly v. White (U.S. Supreme Court, filed Mar. 2, 2018)(No. 17-1078)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. <u>See</u> <u>generally</u> William Baude, <u>Is Qualified Immunity Unlawful?</u>, 106 CAL. L. REV. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice

## LAW REGARDING EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIMS

When a prisoner is incarcerated, the Eighth Amendment protects him from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as from the intentional use of excessive force. Farmer v. Brennan, 511 U.S. at 828 (quoting Helling v. McKinney, 509 U.S. 25, 28 (1993)). "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates." Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999). An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation

---

Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret [ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted). "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted). The judiciary should be true to § 1983 as Congress wrote it.

     Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that the Defendants were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Board of County Comm'rs for County of Dona Ana, 2017 WL 3951706, at *3; Brown v. The City of Colorado Springs, 2017 WL 4511355, at *8, and willing to reverse district court decisions.

marks omitted).   The second condition represents the functional application of the deliberate-indifference standard.   See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.")(quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. 25, 36 (1993).  Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36.  "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36.  The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.").  The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'" United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006).  Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole

purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." United States v. LaVallee, 439 F.3d at 688. See Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks."). Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury." United States v. LaVallee, 439 F.3d at 688.

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. at 298. Courts apply this subjective inquiry to determine whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For Eighth Amendment purposes, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments." 83 F.3d at 1202. In determining whether to apply Eighth Amendment standards or substantive due process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." 83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990)). Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory. See Riddle v. Monragon, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment."). See also Salazar v. San Juan Cty. Det. Ctr., No. CIV 15-0417, 2016 WL 335447, at *30-32 (D.N.M. Jan. 15, 2016)(Browning, J.); Hinzo v. N.M. Dept. of Corrections, No. CIV 10-0506, 2012 WL 13081442, at *6 (D.N.M. 2012)(Browning, J.).

## ANALYSIS

The Court concludes that Gallegos may amend his Complaint, because he has shown good cause by demonstrating that he was in jail, and could not adequately work with his attorney to timely identify Kline and King. Kline and King did not, however, act with deliberate indifference, because they were not subjectively aware of a substantial risk of serious harm to Gallegos. Finally, Kline and King are entitled to qualified immunity, because Gallegos has not met his burden of demonstrating that his asserted right is clearly established. Accordingly, the

Court will grant both the Motion and the MSJ.

## I.     GALLEGOS MAY AMEND HIS COMPLAINT.

The Court concludes that Gallegos may amend his Complaint.  Generally, "[t]he court should freely give leave [to amend a complaint] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Foman v. Davis, 371 U.S. 178, 182 (1962).  If a party seeks to amend his or her pleading after the time for seeking leave for pleading amendments has passed under a scheduling order, then, in addition to meeting rule 15(a)(2)'s requirements, he or she must satisfy rule 16(b)(4)'s good-cause requirement.  See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1240 (10th Cir. 2014)(Matheson, J.)("After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard.").

Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'"  Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d at 1240; Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)("Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts.").  See Gerald v. Locksley, 849 F. Supp. 2d 1190, 1209-11 (D.N.M. 2011)(Browning, J.)(same).  The Court has previously stated that its rule 16(b)(4) good-cause inquiry focuses on the diligence of

the party seeking to amend the scheduling order. See Walker v. THI of N.M. at Hobbs Ctr., 262 F.R.D. 599, 602-03 (D.N.M. 2009)(Browning, J.).

Here, although there is a rule 16 order, and the deadline to amend has passed, Gallegos may still amend his Complaint. First, Gallegos has met the rule 15(a) standard. At the hearing, the Court asked Gallegos "why it took so long to figure out [that] King and Kline were the two people you want to add?" Tr. at 32:2-4 (Court). Gallegos responded that

> [h]e was in jail . . . so you can't just send depositions in and all these things you can't go over and visit him because they're on lockdown a lot. So we had to wait until he was able to do this. And he says now he knows their names and everybody had denied all of this for the months before this.

Tr. at 32:5-12 (Lawless). Gallegos says that he can state under oath that he showed the Methadone Order to Kline and King. See Tr. at 20:8-10 (Court, Lawless). Gallegos further says that he could testify that Kline and King did not care about the order. See Tr. at 20:18-24 (Court, Lawless). The Court concludes that, because of the difficulties associated with Gallegos' incarceration and his planned testimony, "justice so requires" the Court to give leave to amend the Complaint. Fed. R. Civ. P. 15(a)(2).

Gallegos has also demonstrated good cause under rule 16(b)(4). Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Tenth Circuit has held that "parties seeking leave to amend their complaints after a scheduling order deadline must establish good cause for doing so." Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d at 1241. "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d at 1240.

Here, Gallegos has good cause for amending his complaint and has not demonstrated a lack of diligence. Gallegos "was in jail . . . so you can't just send depositions in and all these

things you can't go over and visit him because they're on lockdown a lot. So we had to wait until he was able to do this." Tr. at 32:5-10 (Lawless). In other words, because Gallegos was in jail, he could not adequately work with his attorney to identify Kline and King. This reason is good cause for allowing Gallegos to amend his Complaint, and it does not demonstrate a lack of diligence.

The Defendants argue that the Court should deny the Motion, because amending the Complaint would be futile and frivolous, or, alternatively, because of undue delay and lack of diligence. See Response at 4, 6. The Court disagrees. First, amending the Complaint is neither futile nor frivolous. After being released from prison, Gallegos said that he could state under oath that he showed the Methadone Order to Kline and King. See Tr. at 20:8-10 (Court, Lawless). Gallegos further said that he would testify that Kline and King did not care about the order. See Tr. at 20:18-24 (Court, Lawless). If Gallegos showed Kline and King the Methadone Order, but they did not care about it, as Gallegos alleges, those facts at least present a non-frivolous and non-futile argument that Kline and King acted with "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. at 104. Based on these representations, amending the Complaint is not futile or frivolous.

Second, the Court will not deny Gallegos' Motion on undue delay and lack of diligence grounds. "After Plaintiff Gallegos was released from prison . . . and had a chance to review the depositions of Officers Kline and King he was able to recall these were the people who transported him." Reply at 3. "On reviewing those depositions, Plaintiff realized . . . [Kline and King] were the proper John Doe Defendants." Reply at 3 (alteration added). Because Gallegos was in prison, it is understandable why there may have been delay in identifying Kline and King by name. Gallegos' incarceration is a sufficient reason for the Court to "freely give leave." Fed.

R. Civ. P. 15(a)(2).  For these reasons, Gallegos has met the requirements for amending his Complaint to add Kline and King.

## II.     <u>**KLINE AND KING DID NOT ACT WITH DELIBERATE INDIFFERENCE**</u>.

The Court concludes that Kline and King did not act with deliberate indifference.  As a threshold matter, "review of summary judgment in the qualified immunity context differs from that applicable to review of other summary judgment decisions."  <u>Thomson v. Salt Lake Cty</u>, 584 F.3d at 1312.  "In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party."  <u>Thomson v. Salt Lake Cty</u>, 584 F.3d at 1312. "The plaintiff must demonstrate *on the facts alleged* both that the defendant violated his constitutional or statutory rights, and that the right was clearly established."  <u>Thomson v. Salt Lake Cty</u>, 584 F.3d at 1312 (emphasis in original)(internal quotation marks omitted).

"At the summary-judgment phase, a federal court's factual analysis relative to the qualified-immunity question is distinct."  <u>Cox v. Glanz</u>, 800 F.3d 1231, 1243 (10th Cir. 2015).

> [T]he objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury.  Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court.

<u>Cox v. Glanz</u>, 800 F.3d at 1243.  <u>See</u> <u>Tolan v. Cotton</u>, 134 S. Ct. at 1865 ("In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first asks whether the facts, [t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]")(alterations in original)(internal quotation marks omitted).  "Thus, at summary judgment, we must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional

right, which (2) was clearly established at the time of the defendant's conduct." Estate of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014). As explained above, Gallegos and the Defendants dispute some of this case's facts, so, for this opinion's purposes, the Court will accept Gallegos' version of events to the extent that "a reasonable jury could find facts supporting a violation of a constitutional right," specifically deliberate indifference. Estate of Booker v. Gomez, 745 F.3d at 411.

The Supreme Court has held "that deliberate indifference to serious medical needs of prisoners" constitutes a violation of the Eighth Amendment's prohibition on cruel and unusual punishment. Estelle v. Gamble, 429 U.S at 104.[41] "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. at 104 (footnotes omitted). "Deliberate indifference has both an objective and subjective component." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999).

> The medical need must be sufficiently serious to satisfy the objective component. We have held that a medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that

---

[41]The Court notes that "[t]he constitutional protection against deliberate indifference to a prisoner's serious medical needs as announced in *Estelle v. Gamble* . . . applies to pretrial detainees through the due process clause of the Fourteenth Amendment." Barrie v. Grand Cty, Utah, 119 F.3d 862, 867 (10th Cir. 1997). Although this case's events occurred at MDC, before Gallegos was sent to the Corrections Department, he had already been convicted. See Judgment, Sentence, and Order Suspending Sentence at 1, State of New Mexico v. Martin Gallegos, No. CR 2014-4787, filed November 7, 2014 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court October 18, 2017 (Doc. 90-6)(showing that Gallegos was convicted on November 6, 2014). As such, he was not a pretrial detainee. Even if he were though, the same Estelle v. Gamble standard would apply. See Barrie v. Grand Cty, Utah, 119 F.3d at 868-69 ("[A] prisoner, whether he be an inmate in a penal institution after conviction or a pre-trial detainee in a county jail, does not have a claim against his custodian for failure to provide adequate medical attention unless the custodian knows of the risk involved, and is 'deliberately indifferent' thereto.").

even a lay person would easily recognize the necessity for a doctor's attention.

Hunt v. Uphoff, 199 F.3d at 1224 (internal quotations and citation omitted). One issue is whether the objective component test applies to the alleged harm that may happen to the prisoner or to the prisoner's symptoms at the time that the prison employee sees the prisoner. The Tenth Circuit has explained that,

> when delay by prison employees results in damage to a prisoner's heart, the question raised by the objective prong of the deliberate indifference test is whether the alleged harm (such as heart damage) is sufficiently serious (which it undoubtedly is), rather than whether the symptoms displayed to the prison employee are sufficiently serious.

Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005). In other words, the objective prong refers to the alleged harm and not to the symptoms that a prison employee might see.

"The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." Martinez v. Garden, 430 F.3d 1302, 1304 (10th Cir. 2005)(internal quotations and citation omitted). "In measuring a prison official's state of mind, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Martinez v. Garden, 430 F.3d at 1304 (internal quotations omitted).

First, Gallegos does not meet the objective prong. The evidence presented does not show that Gallegos' methadone titration program "is one that has been diagnosed by a physician as mandating treatment." Hunt v. Uphoff, 199 F.3d at 1224. Gallegos uses methadone, because he "was on a high dosage of pain medication" and "the doctor -- one of my doctors told me my opiate receptors were so burned out from the medication that I had [taken] for several years, so we tried the methadone and that helped." Gallegos Depo. at 90:18-22.[42] Gallegos was on pain

---

[42]The Defendants assert that this fact is irrelevant, but they do not dispute it. See MSJ

medication, because of a childhood accident that caused severe burns and resulted in his hand being amputated.  See Gallegos Depo. at 22:16-18.   These facts may show that a doctor originally prescribed methadone for Gallegos, but they do not show that a doctor mandated that Gallegos be titrated off of methadone.

Additionally, the Methadone Order states that Gallegos "is currently taking methadone, under the supervision of a medical doctor, for dependency issues"; that Gallegos "cannot immediately end his methadone treatment, as will be required when he is transported into the custody of the Department of Corrections, without jeopardizing his health"; and that Gallegos shall remain at MDC "until his level of methadone treatment has reached a point where Defendant will not incur life-endangering withdrawal symptoms upon transfer to the Department of Corrections."   Methadone Order at 1-2.   While these facts suggest that failing to titrate Gallegos might endanger his health, they do not show that a physician mandated titration treatment.  See Hunt v. Uphoff, 199 F.3d at 1224.  Instead, the Methadone Order shows that a judge, not a doctor, mandated the titration.  See Methadone Order at 1-2.

The Court takes the phrase "life-endangering withdrawal symptoms" seriously. Methadone Order at 1-2.  No evidence shows, however, that this phrase came from a doctor.  At the Second Hearing, Gallegos stated, "we don't have any evidence of what took place at that hearing in front of [the judge who signed the Methadone Order], but that's the whole idea.  That

Reply at 3.   The Court will therefore consider this fact undisputed.   See D.N.M.L.R.-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").   Additionally, this fact is not irrelevant.   One way to meet the objective prong of a deliberate indifference claim is to show that "a medical need is sufficiently serious."   One way to show that a need is sufficiently serious is to demonstrate that it "is one that has been diagnosed by a physician as mandating treatment."   Hunt v. Uphoff, 199 F.3d at 1224 (internal quotations and citation omitted).   Because Gallegos' testimony addresses this point, it is not irrelevant.

order went into effect because he had obviously [written] that order based on what he heard. Otherwise, he didn't just make it up, I don't think." Second Tr. at 18:7-11 (Lawless)(alterations added). Although the Court does not believe that the state court made the Methadone Order out of whole cloth, the Court does not know whether the state court obtained the Methadone Order's language from a doctor's testimony, a lawyer's form order, or elsewhere. The record does not tell. A defense lawyer could have written it and the state court could have signed it with little evidence regarding the order's findings. At any rate, Gallegos has not shown that a doctor mandated titration treatment, so he has not met the objective prong using this route.[43]

---

[43]To be clear, even if a doctor prescribes methadone titration for an inmate, that prescription does not mean that the facility housing the inmate must establish a methadone program like MDC's. The Supreme Court has held that it is "the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. at 103. The Supreme Court did not hold, however, that every correctional facility must provide a specific treatment. As long as inmates receive the medical care they need, no Eighth Amendment violation occurs. Therefore, a policy that sends inmates to MDC to receive methadone titration before transferring them to a prison without a methadone program is constitutional.

Further, the Eighth Amendment does require prisons to treat every medical issue prisoners face. "Certainly, not every twinge of pain suffered as the result of delay in medical care is actionable." Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000). Failing to meet a medical need is not actionable if that need does not satisfy the deliberate indifference test's objective prong, i.e. showing that a doctor mandated treatment or showing that the medical need is so obvious that even a lay person would easily recognize the need for a doctor's attention. See Mata v. Saiz, 427 F.3d at 751. Therefore, a prison violates the Eighth Amendment by ignoring a prisoner's need for methadone titration only if -- along with satisfying the subjective prong -- that need is severe enough to satisfy the objective prong.

More generally, the Court believes that Estelle v. Gamble was wrongly decided. Estelle v. Gamble holds that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." 429 U.S. at 104 (internal quotation marks omitted). The Eighth Amendment, however, proscribes "cruel and unusual punishment" and not the "unnecessary and wanton infliction of pain." U.S. CONST. amend. VIII. Estelle v. Gamble's flaw is that it interprets the word "punishment" too broadly. The founders and those who influenced them, such as Montesquieu and Blackstone, understood the word "punishment" to refer to sanctions that governments intentionally impose and not isolated incidents of misconduct by prison staff. See generally THE FOUNDER'S CONSTITUTION (Philip B. Kurland & Ralph Lerner eds., 1986), available at http://press-

A second way to meet the objective prong is to show that the harm is sufficiently serious, because it "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d at 1224. The Tenth Circuit has explained that,

> when delay by prison employees results in damage to a prisoner's heart, the question raised by the objective prong of the deliberate indifference test is whether the alleged harm (such as heart damage) is sufficiently serious (which it undoubtedly is), rather than whether the symptoms displayed to the prison employee are sufficiently serious.

Mata v. Saiz, 427 F.3d at 753. In other words, the objective prong measures the alleged harm and not the symptoms that a prison employee might see.[44] Gallegos' evidence does not meet this standard. When evaluating whether Gallegos' alleged harm is objectively serious, it is important to be clear about what, exactly, Gallegos' alleged harm is. According to Gallegos, Kline and King -- as a result of their deliberate indifference -- allowed Gallegos to be transported from MDC, where he would have received methadone titration to ease his withdrawal symptoms, to

---

pubs.uchicago.edu/founders/tocs/amendVIII.html. Although those harms may be crimes or torts, they were historically never understood to be constitutional violations. The Court, however, is a district court, and will apply Estelle v. Gamble.

[44]If the Court were writing on a clean slate -- which, as a district court, it is not -- the Court would not adopt this standard. As the Honorable Bobby Baldock, United States Circuit Judge, discussed in dissent,

> [i]ndifference does not relate to how a situation might have been handled differently in hindsight. At the outset, indifference relates to a prisoner's situation at a particular point in time and what measures, if any, are warranted to address that situation. Under the panel's view of the law, a prisoner who complains of a headache, receives aspirin, and later has a brain aneurism has satisfied the objective prong of the deliberate indifference test. That cannot be the law.

Mata v. Saiz, 427 F.3d at 764 (Baldock, J., dissenting). Indeed, if a plaintiff can meet the objective prong by showing that a harm is so obvious that a layperson would know to call a doctor, the test should be about the symptoms that the layperson actually sees, and not about what could happen after the fact if those symptoms remain untreated. People who are not doctors do not usually know what symptoms lead to what harms. When the symptoms disregarded are themselves serious, and the prison employee does nothing, that inaction should be what satisfies both the objective and subjective prongs.

the Corrections Department, where he received non-methadone palliative treatment[45] for those

same withdrawal symptoms. Thus, the proper inquiry is whether the harm Gallegos suffered on

account of receiving non-methadone palliative treatment instead of methadone titration satisfies

deliberate indifference's objective prong. That inquiry is not the same as whether methadone

withdrawal is itself objectively serious; even if Gallegos remained at MDC and received

methadone titration, he would have still experienced withdrawal symptoms.

> A common treatment with methadone detox is to gradually reduce the dose of
> methadone in a process called **weaning or tapering**. Some individuals will be
> switched from methadone to clonidine at this point, while others will continue to
> simply receive reduced doses of methadone. The final weeks of tapering are
> problematic for many. During this time, the individual may experience more

---

[45]In an earlier Memorandum Opinion and Order at 11-13, filed August 17, 2017 (Doc. 82)("August MOO"), the Court described this non-methadone palliative treatment in some detail:

> On November 12, 2014, the same day that the New Mexico Corrections
> Department received Gallegos into its custody, Corizon Health medical personnel
> evaluated Gallegos' withdrawal symptoms and gave him a "Kick Kit to address
> his withdrawal symptoms." Corizon Health Nursing Encounter Tool --
> Withdrawal at 1 (dated November 12, 2014), filed May 8, 2017 (Doc. 69-
> 2)("Nursing Encounter Tool -- Withdrawal"). See New Mexico Corrections
> Department Physician's Orders at 1 (dated November 12, 2014), filed May 8,
> 2017 (Doc. 69-3)("Physician's Orders"). Further, on November 21, 2014,
> Gallegos requested another Kick Kit, indicating it "helped some" and was also
> prescribed Elavil for pain. See New Mexico Corrections Department
> Interdisciplinary Progress Notes at 1 (taken November 21, 2014), filed May 8,
> 2017 (Doc. 69-4)("November 21, 2014 Interdisciplinary Progress Notes"). Next,
> on November 26, 2014, Corizon Health medical personnel denied Gallegos
> narcotics, but offered him "Ibuprofen, Tylenol, Mobic, Aleve, or Naproxen" to
> address his pain, but Gallegos refused. Mexico Corrections Department
> Interdisciplinary Progress Notes at 1 (taken November 26, 2014), filed May 8,
> 2017 (Doc. 69-4)("November 26, 2014 Interdisciplinary Progress Notes"). Then,
> on December 3, 2014, a Corizon Health provider conducted another assessment of
> Gallegos' withdrawal symptoms and ordered one dose of Clonidine. See Corizon
> Clinical Institute Withdrawal Assessment -- Alcohol (dated December 3, 2014),
> filed May 8, 2017 (Doc. 69-6)("Clinical Institute Withdrawal Assessment –
> Alcohol"); Corizon Nursing Encounter Tool -- Headache, filed May 8, 2017 (Doc.
> 67-7)("Nursing Encounter Tool -- Headache")).

August MOO at 11-13 (footnotes omitted).

intense withdrawal symptoms, which encourages relapse.

Eric Patterson, <u>Methadone Withdrawal</u>, DRUGABUSE.COM, https://drugabuse.com/library/ methadone-withdrawal/ (emphasis in the original)(footnote omitted).  Because Gallegos would have experienced some withdrawal symptoms even if he had been titrated, he must show that the extra harm he suffered because of receiving non-methadone palliative treatment instead of methadone titration meets the objective prong.  The harm he would have suffered anyway had he been titrated as per the Methadone Order is not part of his alleged injury.  The proper question therefore concerns a difference in harms -- that is, whether the extra harm that he suffered is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Hunt v. Uphoff</u>, 199 F.3d at 1224.

This harm is not obvious to a layperson.  Doctors and scientists may know how much extra harm Gallegos suffered by receiving one treatment versus another, but someone with no medical training would not.  Iverson testified as follows:

> Q: [W]ithdrawal from methadone, do you know what kind of symptoms that can cause?
>
> A: No, sir.
>
> . . . .
>
> Q: You wouldn't know whether that was life threatening, could be life threatening or anything like that?
>
> . . . .
>
> A: I'm not aware.
>
> Q: That's something for the methadone people, right?
>
> A: Yes, sir.

Iverson Depo. at 17:4-16.  Given that MDC's records supervisor, Iverson, is not familiar with methadone withdrawal symptoms generally, regardless how they are treated, the Court is not

prepared to conclude that a layperson, such as Iverson, would know about the seriousness of the extra harm suffered as a result of receiving one treatment over another. That harm is not "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d at 1224. Cf. Mata v. Saiz, 427 F.3d at 754 (holding that "severe chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong"); Oxendine v. Kaplan, 241 F.3d 1272, 1278 (10th Cir. 2001)(holding that the ineffectiveness of a doctor's "reattachment and subsequent care of the severed finger, as evidenced by the blackening and necrifying tissue," was so obvious that a lay person would easily recognize the need for a doctor's attention).

To be clear, the Court is not suggesting that methadone withdrawal symptoms are categorically not serious. The Court is rather only ruling on the difference in harms between the two treatments Gallegos received, i.e., on the difference between two alternative treatments for those symptoms. Methadone withdrawal symptoms might be serious in some circumstances. One source notes that, "though ending or lowering the dose of it seldom leads to life-threatening consequences, it can result in certain medical and psychological complications that can put the detoxing user in harm's way if they aren't managed." "Methadone Withdrawal," Drugabuse.com, https://drugabuse.com/library/methadone-withdrawal/. In any event, the seriousness of methadone withdrawal symptoms generally is not before the Court, and Gallegos has not met deliberate indifference's objective prong.

Even if Gallegos met the objective prong, Gallegos does not meet the subjective prong of deliberate indifference vis-a-vis Kline or King. Regarding King, Gallegos testified as follows:

Q: At that time did you have a copy of the methadone order?

A: Yes, I did.

Q: Did you show it to the officer?

A: Yes, I did.

Q: Did she read it?

A: No, she didn't.

Q: Did she take it in her hand?

A: No, she didn't. I tried to give it to her and she said, "I don't give a shit. You're leaving."

Gallegos Depo. at 69:7-70:17.[46]  Gallegos further testified:

> I did, in fact, tell her that I had this court order and that she needed to call somebody in the front and let them know that I had a court order to stay in the detention center until I lower my dosage. And when she told me, "I don't give a shit," I said, "I'm going to contact my attorney and file a lawsuit against you guys because you guys are transporting me on a court order that was given to me and my understanding was I would be there for a period of six weeks so I wouldn't have to go through the withdrawal symptoms."

Gallegos Depo. at 69:21-70:6.[47]  Essentially, Gallegos testified that he showed King the

---

[46]The Court understands that this fact is disputed. See MSJ ¶ 41, at 7; MSJ Response ¶ 7, at 3. "At the summary-judgment phase, a federal court's factual analysis relative to the qualified-immunity question is distinct." Cox v. Glanz, 800 F.3d at 1243. "[T]he objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury." Cox v. Glanz, 800 F.3d at 1243 (emphasis in original). Instead, the proper inquiry is whether "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." Estate of Booker v. Gomez, 745 F.3d at 411. Because a reasonable jury could accept Gallegos' testimony, the Court will accept it for this analysis' purposes.

[47]The Court understands that this fact is disputed. See MSJ ¶ 41, at 7; MSJ Response ¶ 7, at 3. "At the summary-judgment phase, [however,] a federal court's factual analysis relative to the qualified-immunity question is distinct." Cox v. Glanz, 800 F.3d at 1243. "[T]he objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury." Cox v. Glanz, 800 F.3d at 1243 (emphasis in original). Instead, the proper inquiry is whether "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." Estate of Booker v. Gomez, 745 F.3d at 411. Because a reasonable jury could accept Gallegos' testimony, the Court will accept it for this analysis' purposes.

Methadone Order, that King did not care about it, see Gallegos Depo. at 69:7-70:17, and that he told King that he was supposed to remain at MDC so that he would not have to go through withdrawal symptoms, see Gallegos Depo. at 69:21-70:6. These facts are insufficient, however, to meet the subjective prong. "In measuring a prison official's state of mind, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Martinez v. Garden, 430 F.3d at 1304 (internal quotations omitted). Gallegos' testimony shows that King knew of facts from which the inference could be drawn that a substantial risk of serious harm relating to methadone withdrawal symptoms might exist, but his testimony does not show that King drew such an inference. Although circumstantial evidence may be used to show that King drew the inference, "an official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, it is not an infliction of punishment and therefore not a constitutional violation." Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008). Additionally, King's only subjective knowledge of the methadone program is that it exists and administers methadone doses to inmates. See MSJ ¶ 31, at 6 (asserting this fact)(citing King Depo. at 7:6-18).[48] Because the subjective component requires King to draw the inference of a substantial risk of serious harm, Martinez v. Garden, 430 F.3d at 1304, Gallegos has not met the subjective component of deliberate indifference regarding King.[49]

_____

[48]Gallegos purports to dispute this fact, citing pages 68-73 of the Gallegos Depo. Those pages do not, however, address King's knowledge of the methadone program. The Court will therefore consider this fact -- that King's only subjective knowledge of the methadone program is that it exists and administers methadone doses to inmates -- undisputed. See Fed. R. Civ. P. 56(c)(1)(A)("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . .").

[49]A key distinction between a deliberate indifference claim under the Eighth Amendment, and an ordinary negligence or medical malpractice claim, is that the Defendant must be

Similarly, Gallegos does not meet the subjective component regarding Kline. Gallegos testified about his interaction with Kline as follows:

Q: Did you have any communications with that officer?

A: Yes, I told him about -- I showed them the order, too, but they said, "you have to go. Transport is here for you. You're going."

Q: You showed it to the officer you called Kline?

A: Yes.

Q: Anything else that he said besides what you mentioned?

A: No, he just said, "I can't do nothing. The court order is here, the transport order is here. You're leaving right now and that's all there is to it. I don't know what to tell you."

Q: Okay. So you brought up the methadone order first to the female officer who came to your cell who told you you were being transported?

A: Yes.

Q: And then you also told this corrections officer in the releasing area about the methadone order?

A: Yes.

Gallegos Depo. at 74:7-75:3.[50] In short, Gallegos testified that he showed the Methadone Order

_____

subjectively aware of the harm. See Martinez v. Garden, 430 F.3d at 1304 Assertions that a Defendant should have known of the harm are irrelevant, or else a deliberate indifference claim under the Eighth Amendment would, in effect, be constitutionalized tort law.

When instructing juries in deliberate indifference cases with such issues of proof, courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known, and juries should be instructed accordingly.

Farmer v. Brennan, 511 U.S. 825, 843 n.8 (1994).

[50]The Court understands that this fact is disputed. See MSJ ¶ 25, at 6; MSJ Response ¶ 3, at 2. "At the summary-judgment phase, a federal court's factual analysis relative to the

to Kline, but Kline said that there was nothing he could do about it. See Gallegos Depo. at 74:7-75:3. Although Gallegos' testimony may show that Kline was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," Martinez v. Garden, 430 F.3d at 1304, i.e. methadone withdrawal symptoms, it does not show that Kline drew the inference,[51] see Martinez v. Garden, 430 F.3d at 1304. Further, Kline's only subjective knowledge of MDC's methadone treatment program is that a subcontractor runs it and keeps track of who takes methadone. See MSJ ¶ 23, at 6 (asserting this fact)(citing Kline Depo. at 21:14-19); MSJ Response ¶ 2, at 2 (admitting this fact). Additionally, security personnel like Kline have nothing to do with the methadone program. See MSJ ¶ 23, at 6 (asserting this fact)(citing Kline Depo. at 21:14-19); MSJ Response ¶ 2, at 2 (admitting this fact). On these facts, Gallegos does not meet the subjective component of deliberate indifference regarding Kline. Accordingly, Gallegos has not shown that Kline and King acted with deliberate indifference. Cf. Sealock v. Colorado, 218 F.3d at 1210-11 ("There is evidence that [a prison

---

qualified-immunity question is distinct." Cox v. Glanz, 800 F.3d at 1243. "[T]he objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury." Cox v. Glanz, 800 F.3d at 1243 (emphasis in original). Instead, the proper inquiry is whether "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." Estate of Booker v. Gomez, 745 F.3d at 411. Because a reasonable jury could accept Gallegos' testimony, the Court will accept it for this analysis' purposes.

[51]Although the Methadone Order says that Gallegos shall remain at MDC "until his level of methadone treatment has reached a point where [he] will not incur life-endangering withdrawal symptoms," Methadone Order at 2, Gallegos' testimony regarding his interaction with Kline does not show that Kline read the Methadone Order, see Gallegos Depo. at 74:7-75:3. Consequently, the Court will not rule that Kline drew an inference regarding Gallegos' medical needs from reading it. Further, even if Kline read the Methadone Order, the order says that it "shall remain in effect for six weeks maximum." Methadone Order at 2. Because Kline does not verify court orders and does not have "'computer access to all that information,'" MSJ ¶¶ 15-16, at 5 (asserting this fact)(quoting Kline Depo. at 13:22), see MSJ Response ¶ 2, at 2 (admitting this fact), the phrase "six-weeks maximum" would not have told him whether the order was still operative.

employee] was informed that appellant might be having a heart attack, and that he was present when appellant displayed symptoms consistent with a heart attack. . . . Appellant has met the subjective element of the deliberate indifference test.").

## III.     KLINE AND KING ARE ENTITLED TO QUALIFIED IMMUNITY.

The Court concludes that, even if Kline and King acted with deliberate indifference, they are entitled to qualified immunity, because Gallegos has not met his burden of demonstrating that his asserted right is clearly established.  Qualified immunity requires a plaintiff to demonstrate that the right allegedly violated was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d at 1107.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  The plaintiff bears the burden of showing that the law is clearly established.  See Kerns v. Bader, 663 F.3d at 1180.  "[T]he law is not clearly established where 'a distinction might make a constitutional difference.'"  McGarry v. Board of County Commissioners for County of Lincoln, 294 F. Supp. 3d 1170, 1187 (D.N.M. 2018)(Browning, J.)(quoting Kerns v. Bader, 663 F.3d at 1188).  As explained above, and in prior cases, the Court has observed that "the Supreme Court has sent out unwritten signals to the lower courts that [a] factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts."  Nelson v. City of Albuquerque, 283 F. Supp. 3d 1048, 1107 n.44 (D.N.M. 2017)(Browning, J.).  See White v. Pauly, 137 S. Ct. at 552 ("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case.").

Here, the only case that Gallegos appears to cite in the MSJ Response for the "clearly

established" proposition is Estelle v. Gamble, 429 U.S. at 104. MSJ Response at 11 ("A constitutional right to be free from deliberate indifference under *Estelle v. Gamble* . . . has been clearly established law."). That case's facts, however, bear no resemblance to Gallegos' case. Estelle v. Gamble is about an inmate who was injured "while performing a prison work assignment" and complained "of the treatment he received after the injury." 429 U.S. at 98. Estelle v. Gamble's facts are unrelated to this case's. See 429 U.S at 98-101. At the hearing, the Court asked Gallegos what he thought was the most closely analogous case to his from the Supreme Court, the Tenth Circuit, and from anywhere else. See Tr. at 25:2-7 (Court). Gallegos offered Farmer v. Brennan, 511 U.S. at 828, and Self v. Crum, 439 F.3d at 1227. Neither of those cases are factually analogous to this one. Farmer v. Brennan is about a transsexual inmate who alleged that prison officials acted with deliberate indifference when they put the inmate in a prison "despite knowledge that the penitentiary had a violent environment and a history of inmate assaults," and despite knowledge that a transsexual inmate who "projects feminine characteristics would be particularly vulnerable to sexual attack." Farmer v. Brennan, 511 U.S. at 831 (internal quotation marks omitted). Farmer v. Brennan's facts are unrelated to Gallegos' case. Similarly, Self v. Crum is off point. That case is about an inmate who sued a prison doctor alleging deliberate indifference, because the doctor had not timely diagnosed the inmate's heart condition, thereby causing heart damage and requiring surgery. See Self v. Crum, 439 F.3d at 1229-30.

Finally, after the hearing and in an email to the Court, see Email at 2, filed June 18, 2018 (Doc. 103)("Email"), Gallegos offered City of Canton, Ohio v. Harris, 489 U.S. 378 (1989). In that case, the plaintiff was arrested and taken to the police station in the back of a police car, and when she arrived at the station, she was "found sitting on the floor" of the police car. City of

<u>Canton, Ohio v. Harris</u>, 489 U.S. at 381. "She was asked if she needed medical attention, and responded with an incoherent remark. After she was brought inside the station for processing, Mrs. Harris slumped to the floor on two occasions." 489 U.S. at 381.

> No medical attention was ever summoned for Mrs. Harris. After about an hour, Mrs. Harris was released from custody, and taken by an ambulance (provided by her family) to a nearby hospital. There, Mrs. Harris was diagnosed as suffering from several emotional ailments; she was hospitalized for one week and received subsequent outpatient treatment for an additional year.

489 U.S. at 381. Factually, <u>City of Canton, Ohio v. Harris</u> is different from this case, because, unlike Kline and King, the police officers saw Harris exhibiting symptoms of a medical condition. <u>See</u> 489 U.S. at 381. Legally, <u>City of Canton, Ohio v. Harris</u> is distinguishable, because it is about whether municipalities can be liable under 42 U.S.C. § 1983 "for constitutional violations resulting from its failure to train municipal employees," 489 U.S. at 380, and not about prison officials' individual liability. Because Gallegos has not met his burden of showing a factually analogous case, <u>see</u> <u>Kerns v. Bader</u>, 663 F.3d at 1180, the Court could grant the MSJ on that basis alone.[52]

---

[52]At the hearing, the Court invited Gallegos to submit any cases that he wanted the Court to consider regarding the clearly established prong. <u>See</u> Second Tr. at 32:15-20 (Lawless, Court). The Court has reviewed each of the submitted cases, <u>see</u> Email at 2, and concludes that they are off point. First, <u>Ramos v. Lamm</u>, 639 F.2d 559 (10th Cir. 1980), is about shelter and sanitation conditions in a prison, <u>see</u> 639 F.2d at 567, as well as the prison's food services, <u>see</u> 639 F.2d at 570, its "atmosphere of tension, anxiety and fear," 639 F.2d at 572, and inadequate healthcare staff and resources, <u>see</u> 639 F.2d at 574-78. In contrast, Gallegos asserts no claims regarding MDC's facilities. Second, <u>Sealock v. Colorado</u>, 218 F.3d at 1210, held that the plaintiff met deliberate indifference's subjective prong, because a defendant "was informed that appellant might be having a heart attack, and that he was present when appellant displayed symptoms consistent with a heart attack." 218 F.3d at 1210. <u>Sealock v. Colorado</u> also holds that if another defendant "knew that appellant had unexplained chest pain" and failed to act, such conduct might be deliberate indifference. 218 F.3d at 1211-12. No evidence suggests, however, that Gallegos displayed any symptoms to Kline and King, or that Kline and King knew that Gallegos was experiencing symptoms. In fact, Gallegos' testimony suggests that he was in "stable" condition on the date he left MDC. Gallegos Depo. at 68:10-13.

Third, <u>Barry v. Ratelle</u>, 985 F. Supp. 1235 (S.D. Cal. 1997)(Brewster, J.), discusses

prison officials diagnosing the plaintiff with a hernia and telling him that he needed surgery. See 985 F. Supp. at 1237. Officials approved the surgery, but the plaintiff never received it. See 985 F. Supp. at 1237. Prison officials also promised the plaintiff a truss (a supportive device) to alleviate the hernia's pain, which he also never received. See 985 F. Supp. at 1237. The plaintiff asserted that he was experiencing severe pain and that the defendants knew it, but that they allowed him "to remain in pain for nearly two years without even giving him a truss." 985 F. Supp. at 1240. The court, in ruling on a motion to dismiss, held that the plaintiff had alleged a deliberate indifference claim. See 985 F. Supp. at 1240. Gallegos does not allege, however, that Kline and King allowed him to remain in pain for any lengthy period of time, and, more importantly, Gallegos' evidence does not show that he was in pain on the day he left MDC, or that Kline and King knew that he was experiencing symptoms.

Fourth, Gobert v. Caldwell, 463 F.3d 339 (5th Cir. 2006)(Higginbotham, J.), is about an inmate who alleged deliberate indifference, because his doctors did not adequately treat his leg injury, see 463 F.3d at 343-44. The United States Court of Appeals for the Fifth Circuit held that the defendant doctor was not deliberately indifferent. See 463 F.3d at 349. The Fifth Circuit explained that a trier of fact might find negligence in the plaintiff's treatment but not deliberate indifference. See 463 F.3d at 352. In short, Gobert v. Caldwell is off point, because it is about a doctor's incorrect diagnosis and/or treatment of an inmate, see 463 F.3d at 349-52, which is unrelated to Gallegos' case.

Fifth, Toler v. Troutt, 631 F. App'x 545 (10th Cir. 2015)(unpublished), is about "whether it was clearly established that [the doctor's] conduct -- prescribing a medication in treating [the plaintiff's] medical condition that was different than the medication recommended by consulting physicians -- was deliberately indifferent to [the plaintiff's] medical needs," 631 F. App'x at 547 (alterations added). The court held that "not only was this not clearly established, but the law was clearly established to the contrary." 631 F. App'x at 547. Because Gallegos' case is unrelated to which treatment a doctor prescribed him, Toler v. Troutt is inapposite.

Sixth, in Grant v. Bernalillo Cty. Detention Center, 173 F.3d 863 (Table), 1999 WL 157415 (10th Cir. 1999)(unpublished), the Tenth Circuit emphasized that a "delay in medical treatment for a serious medical need does not violate a prisoner's constitutional rights unless the prisoner can show that the delay resulted in substantial harm." 1999 WL 157415, at *3. The Tenth Circuit consequently held that the plaintiff failed to state a deliberate indifference claim, because he "failed to make any specific allegations as to the length of the delay in providing medical care, and he has failed to allege that this unspecified delay resulted in substantial harm." 1999 WL 15741, at *3. Because Gallegos' allegations are unrelated to the length of delay before treatment, Grant v. Bernalillo Cty. Detention Center is inapposite.

Seventh, Saunders v. Horn, 960 F. Supp. 893 (E.D. Pa. 1997)(Pollak, J.), involved an inmate who wore orthopedic shoes that a doctor prescribed. See 960 F. Supp. at 895. He was transferred to a new prison, and, upon arrival, a prison official took away his orthopedic shoes, telling the inmate that, if he needed them, a doctor at the new prison would order them. See 960 F. Supp. at 895. He was forced to wear regular shoes, which caused him constant pain. See 960 F. Supp. at 895. He wrote letters to two high-ranking prison officials complaining of his predicament, but he received no response. See 960 F. Supp. at 896. The Eighth Amendment issue before the Court was whether the high-ranking officials' failure to respond constituted personal involvement in any alleged wrongdoing. See 960 F. Supp. at 896. The court held that the high-ranking officials' acquiescence could show personal involvement. See 960 F. Supp. at

The Court has, however, independently reviewed Supreme Court and Tenth Circuit cases regarding deliberate indifference claims.  The Court could not locate a Supreme Court case with facts somewhat analogous to this case, other than <u>City of Canton, Ohio v. Harris</u>, 489 U.S. at 381, which, as explained above, is off point.  The most analogous Tenth Circuit case that the Court could locate was <u>Al-Turki v. Robinson</u>, 762 F.3d 1188 (10th Cir. 2014).  In that case, an inmate complained of severe pain, but the prison nurse ignored the inmate, saying "she would

---

896-97.  The court further held that the plaintiff's complaint could be read to allege that a prison official took away his orthopedic shoes, the plaintiff did not receive treatment, the regular shoes caused him pain, and the high-ranking prison officials acquiesced in the failure to address the plaintiff's feet problems.  <u>See</u> 960 F. Supp. at 896-97.  <u>Saunders v. Horn</u> is not, however, analogous to Gallegos' case.  Most notably, Gallegos' case is not about whether Kline and King acquiesced in another prison official taking away medical treatment.  Further, Gallegos' case does not involve a defendant taking a medical device away from an inmate upon arrival at a prison; it instead involves corrections officers ignoring a court order requiring treatment.

Eighth, <u>Reed v. Dunham</u>, 893 F.2d 285 (10th Cir. 1990), is about a plaintiff who received four knife wounds from his fellow inmate.  <u>See</u> 893 F.2d at 286.  The correctional staff waited an hour to take the plaintiff to a medical facility, and the plaintiff was not treated until forty-five minutes after his arrival.  <u>See</u> 893 F.2d at 287.  The Tenth Circuit held that the plaintiff's "credible allegation of an as yet inadequately explained delay of nearly two hours in the provision of full medical treatment for apparently serious stab wounds is clearly not frivolous." 893 F.2d at 287.  This case is not factually analogous to Gallegos,' because Gallegos does not complain of a delay in receiving medical treatment.  Further, stab wounds are "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Hunt v. Uphoff</u>, 199 F.3d at 1224.  For the reasons explained above, the same is not true regarding methadone withdrawal symptoms.  <u>Reed v. Dunham</u> is therefore not analogous to Gallegos' case.

Ninth, <u>Garrett v. Stratman</u>, 254 F.3d 946 (10th Cir. 2001), is about a plaintiff prisoner with a shoulder injury.  <u>See</u> 254 F.3d at 948.  A doctor recommended surgery, but a consultation with a specialist, an orthopedic surgeon, did not occur until eleven months later.  <u>See</u> 254 F.3d at 948.  The prisoner alleged that the delay in treatment meant that surgery would no longer help him and that the delay also caused him great pain.  <u>See</u> 254 F.3d at 948.  The plaintiff further alleged that a doctor repeatedly told him that treatment was coming, but it never occurred.  <u>See</u> 254 F.3d at 948.  On these facts, the plaintiff asserted deliberate indifference.  <u>See</u> 254 F.3d at 948.  The court ultimately concluded that it lacked jurisdiction over the appeal.  <u>See</u> 254 F.3d at 948.  Regardless, <u>Garrett v. Stratman</u> is inapposite, because Gallegos does not allege a delay in medical treatment, nor does he allege that failing to treat an injury exacerbated his condition. For these reasons, none of the cases that Gallegos cites meet qualified immunity's clearly established prong.  <u>See White v. Pauly</u>, 137 S. Ct. at 552 ("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case.")(quoting <u>Anderson v. Creighton</u>, 483 U.S. at 640).

not see Plaintiff because it was too late and because Plaintiff's complaint was not an emergency." 762 F.3d at 1191. The next day, the prison's medical staff saw the Plaintiff, at which time the Plaintiff passed two kidney stones. See 762 F.3d at 1191. The Tenth Circuit held that the prison nurse "violated clearly established law by choosing to ignore Plaintiff's repeated complaints of severe abdominal pain and requests for medical assistance." Al-Turki v. Robinson, 762 F.3d at 1195.

Gallegos' case, however, is not analogous to Al-Turki v. Robinson. Although both cases involve, in a general sense, a prison official ignoring an inmate's medical requests, there are distinctions between them. First, Gallegos' case involves prison officials who ignore a court order, an issue unrelated to Al Turki v. Robinson's facts. See 762 F.3d at 1191-92. More importantly, however, Al Turki v. Robinson involved an inmate telling prison officials that "he was experiencing severe pain and nausea, and he asked to go to the medical center," and the defendant was told about the inmate's symptoms. 762 F.3d at 1191. Nothing in the record indicates, however, that Gallegos was experiencing pain when he spoke with Kline and King, or that he told them that he was experiencing a medical problem.

The closest factually analogous case that the Court could locate from any federal court involves an inmate who had entered into a settlement agreement with "Division of Correction personnel." Romero v. Clem, No. DKC-15-3152, 2016 WL 4269101, at *8 (D.M.D. 2016)(Chasanow, J.). The settlement agreement required that he be assigned a bottom bunk in prison because of a prior knee injury. See 2016 WL 4269101, at *1. A prison employee, however, "refused to look at the order and refused to read any documents Romero attempted to present to her for review." 2016 WL 4269101, at *1. Ultimately, Romero was assigned a top bunk, and when he attempted to climb into the bunk, he fell and injured himself. See 2016 WL

4269101, at *1.  The inmate asserted that the prison officials violated his Eighth Amendment rights.  See 2016 WL 4269101, at *3.  The court noted that "Defendants maintain that Romero's fall was caused by the bunk moving when he was attempting to get into it, and not because of the condition of his knee."  2016 WL 4269101, at *8.  The court held, however, that "[t]his assertion does not address Romero's claim that an existing medical order requiring his permanent assignment to a bottom bunk was ignored by medical staff despite the well-documented issues with his knee," thereby creating a "genuine dispute of material fact precluding summary judgment in favor of Defendants."  Romero v. Clem, 2016 WL 4269101, at *8.

This case appears factually analogous to Gallegos' story, in that prison officials ignored an order that led to an injury.  Importantly, however, the court did not hold that the defendants acted with deliberate indifference in ignoring the settlement agreement; the court held only that a genuine dispute of material fact existed which precluded summary judgment.  See 2016 WL 4269101, at *8.  Further, "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  One unpublished out-of-state district court decision does not meet this standard.

The Court understands that, to some, the cases described above may sound at least somewhat analogous to this case.  Importantly, however, as this Court has observed, then-Judge, now-Justice, Gorsuch held that "the law is not clearly established where 'a distinction might make a constitutional difference.'"  McGarry v. Board of County Commissioners for County of Lincoln, 294 F. Supp. 3d at 1187 (quoting Kerns v. Bader, 663 F.3d at 1188).  See White v. Pauly, 137 S. Ct. at 552 ("As this Court explained decades ago, the clearly established law must

be 'particularized' to the facts of the case."). Because the above distinctions <u>might</u> make a constitutional difference, the Court cannot properly conclude that the law is clearly established. The Court therefore concludes that Gallegos has not met his burden of demonstrating that Kline and King violated clearly established law. Accordingly, the Court will grant the Motion in part[53] and grant the MSJ.[54] Because deliberate indifference is the only claim that Gallegos asserts in the Second Amended Complaint, <u>see</u> Second Amended Complaint ¶¶ 7-9, at 2, the Court will enter Final Judgment.[55]

**IT IS ORDERED** that: (i) the Plaintiff's Motion to File a Second Amended Complaint, filed February 17, 2017 (Doc. 58), is granted in part to the extent that it requests to add Clyde Kline and Jovonne King as substitute parties for John Does No. 1-2; (ii) the requests in the Defendants Kline's and King's Motion for Summary Judgment on the Basis of Qualified Immunity and Other Grounds, and Supporting Memorandum, filed October 18, 2017 (Doc. 90), are granted; and (iii) Final Judgment will be entered. Plaintiff Martin Gallegos' claims against Defendants Clyde Kline and Jovonne King are dismissed with prejudice.

---

[53]The Court previously issued an opinion in which it denied the Motion in part to the extent that Gallegos proposed to add New Mexico Corrections Department General Counsel James Brewster. <u>See</u> Memorandum Opinion and Order at 113, filed August 17, 2017 (Doc. 82).

[54]The Court understands that, at the Motion hearing, it said that, if the Defendants are "going to turn around and file a motion for qualified immunity, and I'd probably be inclined on what I know, I'm not ruling on it without a motion in front of me, but inclined to deny it." Tr. at 59:8-12 (Court). As the Court said when it made that statement, it was not ruling on an MSJ that had not been filed. The MSJ, the MSJ Response, and the MSJ Reply were not filed until after the Motion hearing, so the Court had not yet studied the Gallegos, Kline, and King depositions, or the other evidence, through the lens of a motion for summary judgment. After studying those depositions in a summary judgment posture, and for the reasons discussed in this opinion, the Court concludes that it should grant the MSJ.

[55]Although the Second Amended Complaint's wording is somewhat ambiguous, <u>see</u> Second Amended Complaint ¶¶ 7-9, at 2, Gallegos represented at the Second Hearing that deliberate indifference was his only claim. <u>See</u> Second Tr. at 15:22-16:12 (Lawless, Court).

UNITED STATES DISTRICT JUDGE

Counsel:

Stephen F. Lawless
Grisham & Lawless, P.A.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Carlos M. Quiñones
Quiñones Law Firm
Santa Fe, New Mexico

     *Attorneys for Defendants Bernalillo County Board of County Commissioners, Bernalillo County Metropolitan Detention Center, Clyde Kline, and Jovonne King*

Debra J. Moulton
Deborah D. Wells
Kennedy, Moulton & Wells P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant New Mexico Corrections Department*